

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**JONATHAN R. STREETER**

jonathan.streeter@dechert.com
+1 212 698 3826 Direct
+1 212 314 0049 Fax

November 12, 2019

**VIA ECF AND HAND DELIVERY**

Hon. Denise Cote
United States District Court
Southern District of New York
500 Pearl Street, Room 1910
New York, NY 10007

Re: *United States v. Nikas, et al.*, 19-cr-716

Dear Judge Cote:

We respectfully submit this letter making a renewed bail application for Telemaque Lavidas. The facts concerning bail have changed, most importantly: 1) the bail package proposed below is much more substantial than that previously offered; 2) the discovery recently produced by the government makes clear that its evidence in this case is weak and therefore Mr. Lavidas does not have incentive to flee; and 3) we have compiled extensive evidence, which is described and documented below, demonstrating Mr. Lavidas's deep and long-standing personal, family and business ties to New York. In short, there is no possibility that Mr. Lavidas would forever give up his ability to live in the United States – where he is a citizen and has lived the vast majority of his adult life – as well as most of the western world, and subject his family and close friends to enormous financial hardship, in order to become a fugitive from justice. Rather, he has every reason to stay and fight this case. In this application we present a set of conditions that will reasonably assure his appearance, and therefore, under the Bail Reform Act, he should be released.

## I.    Proposed Bail Conditions

We propose the following bail conditions to assure Mr. Lavidas's appearance:

1) A $25 million personal recognizance bond secured by his family's $11,150,000 apartment located in Manhattan. This bond would be further co-signed by the following people:



November 12, 2019
Page 2

    a.  his twin sisters Danae Alexandra and Phaidra Helene Lavidas, both of whom are US citizens, live in New York, recently graduated from UCLA, and are in graduate school in New York (Danae is in a pre-med program at Columbia University and Phaidra is in graduate school at NYU studying marketing);

    b.  his mother Loukia Lavidas, who spends considerable time in the United States and is a Trustee for the American College of Greece, located in Boston;

    c.  his wife Caterina Radaelli Lavidas, who is a legal permanent resident of the US (a green card holder), is currently caring for their 16-month old daughter (who is a US citizen) at the family apartment in Manhattan described above, and will give birth to their second child in May (who will also be a US citizen); and

    d.  his sister Elli Maria Lavidas, who graduated from Princeton in 2002, is a private practice psychotherapist in Greece but spends considerable time in New York and plans to be in New York for most of November, December and January in the lead up to and during the trial of this case;

2) A separate $1 million personal recognizance bond co-signed by the following people:

    a.  James Christopoulos, Mr. Lavidas's long-time and close friend, whom he met when they were roommates in college at Columbia University in 1999, who lives in Manhattan with his family and works at a private equity firm in New York, and who is prepared to post his family home as security;

    b.  Romanos Fessas, also Mr. Lavidas's long-time and close friend whom he met when they were in college together at Columbia University in 1999, who has an MBA from Harvard Business School, who lives with his family and works in New York, and who is prepared to post his family home as security;



November 12, 2019
Page 3

    c.  Charis Dimaras, who lives in Ithaca, NY, is a Professor of Music with tenure at Ithaca College, is a US citizen and has a wife and two children in Ithaca who are also US citizens (Mr. Dimaras is Mr. Lavidas's sister's brother in law), and is prepared to post his family home in Ithaca as security; and

    d.  David Steinhardt, who lives in New York, is a co-founder of Clarity Capital and a trustee of the Natan Fund and is a longtime friend and investor in Mr. Lavidas's company Mediterra, which is discussed below;

3)  The co-signers listed in paragraph 2 above (who are not immediate family members of Mr. Lavidas) will also sign an undertaking and agree to make it part of this Court's Release Order that if they are reimbursed by any source for any loss associated with the PRB, they will immediately forfeit that reimbursement to the United States;

4)  Home detention at the family apartment located at 40 East 72nd Street, NY, NY, with electronic monitoring (an ankle bracelet), strict pre-trial supervision, and no travel outside the SDNY;

5)  Surrender of all of Mr. Lavidas's travel documents (and no new applications);

6)  Surrender of all of his wife Caterina's travel documents, as well as those of their 16 month-old daughter (and no new applications); and

7)  No contact with any co-defendants or witnesses other than with counsel present.

This package is considerably more substantial than the one recommended by Pretrial Services and the one previously considered at prior bail hearings. It will reasonably assure Mr. Lavidas's appearance in this case.

      First, at the prior bail hearings, the government has repeatedly focused on the family's wealth to argue that Mr. Lavidas is likely to flee.[1] While the family runs a

---

[1] In *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019), the Second Circuit recently held that the use of private armed guards to assure home confinement is discouraged



successful pharmaceutical business that has significant presence in the US (more on that below), the family does not have the level of wealth that would allow it to dismiss or replace the losses it would suffer if Mr. Lavidas were to flee. As shown in the attached exhibit listing family assets, the family net worth, which is controlled by Mr. Lavidas's mother and father, is approximately ██████ *See* Ex.1 [filed under seal]. The package above would require the family to forfeit the apartment in New York, which is a substantial portion of its net worth. Moreover, it would result in a judgment in the United States for the remainder of the $25 million against Mr. Lavidas, his three sisters (two of whom are US citizens and live full time in the US), his mother (who spends considerable time in the US), and his wife who is a legal permanent resident. In short, the family would lose a significant portion of its net worth so that Mr. Lavidas could live the rest of his life as a fugitive, or, at a minimum, almost every member of Mr. Lavidas's immediate family would have a crippling judgment hanging over their heads that would destroy their lives in the US and would limit their ability to do business in many parts of the world. Mr. Lavidas is extremely close to his family. These people have enormous moral suasion over him. He would never do that to them.

---

because of disparities between the ability of rich and poor to afford such a condition. But the Second Circuit held that when the government specifically and heavily relies on a person's wealth to justify detention, thereby subjecting a person to detention because they are wealthy, the use of private guards may be appropriate. *Id.* at 82 ("the private security condition . . . may be appropriate where the defendant is deemed to be a flight risk primarily *because of* his wealth. In other words, a defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained") (emphasis in original). At both prior bail hearings in this case the government relied heavily on Mr. Lavidas's family wealth to justify his detention. *See, e.g.*, October 18 Tr. 10:11-17 ("defendant has access to considerable wealth outside the United States"); October 23 Tr. 6:15 ("Mr. Lavidas has access to significant assets overseas"); October 23 Tr. 6:21-23 ("the family apartment . . . is just an indication of the type of wealth that would be available to Mr. Lavidas."). While Mr. Lavidas does not propose the use of private guards herein, and submits that the conditions he proposes are more than adequate to assure his appearance, if the Court is not satisfied with those conditions he would like to be heard on the possibility of using private security guards at his family home to assure his appearance.



Second, the proposal above includes an additional independent $1 million PRB to be co-signed by four additional people with whom Mr. Lavidas is very close, three of whom will post their personal homes as security. Each of these cosigners will also sign an undertaking to forfeit to the United States any reimbursement they receive to compensate them for the losses suffered if the bond were to be executed against them. If he were to flee, Mr. Lavidas would be financially damaging his close friends of many years and Mr. Dimaras, who is his sister's brother-in-law. These people all have moral suasion over Mr. Lavidas.

Third, the fact that all of these people are willing to sign a bond and take this financial risk is strong testimony that they know and trust Mr. Lavidas, and that they know and trust he will not flee.

Fourth, in order to flee, Mr. Lavidas would need to cut the pretrial services ankle bracelet, evade the other pretrial services electronic monitoring methods, and escape the country through some means that requires no passport.

Fifth, while the issue of extradition was debated at length at the prior bail hearings, there is at least a substantial possibility that Greece would extradite him back to the United States, since he is not currently a registered Greek citizen, and even if he were, Greek law does not prohibit the government from extraditing its citizens.[2]

Sixth, even assuming Greece would not extradite him, Mr. Lavidas would be abandoning his entire business and personal life in the US (more on that below), would be tearing his two US citizen children and green-card-holding wife out of the US (where she wants to stay, which is why she applied for and obtained a green card), and would, importantly, also be permanently surrendering his ability to travel to any of the many countries around the world that have extradition treaties with the US, including those where his family also has business interests, such as France, Italy and Germany. These countries readily extradite non-citizens to the US. In other words, he would be a fugitive

---

[2] Both the government and the defense agreed at the last bail hearing that Greece is obligated to extradite non-Greek citizens to the US, and it is obligated to extradite its citizens who become Greek citizens after perpetration of the crime for which extradition is sought. Even if Mr. Lavidas could retroactively perfect his Greek citizenship to before 2012, Greek law does not prohibit extradition of Greek citizens. *See* Ex. 2.



November 12, 2019
Page 6

from justice in most first-world countries for the remainder of his life (probably at least forty years), and he could not even hope to visit those countries without risk of arrest and extradition to the US.

Finally, he would be destroying the remainder of his life and badly hurting his entire family and several close friends, all to avoid facing charges that, as discussed below, are supported by weak evidence, and that, even if he is convicted after trial, do not result in the level of sentencing guidelines range (51-63 months without acceptance points; 37-46 months with acceptance) that courts ordinarily view as creating strong incentive to flee.

## II.      The Government's Case is Weak

Contrary to the government's assertions at prior bail hearings, its evidence in this case is not strong.  It consists almost entirely of circumstantial evidence surrounding the timing of phone calls and trades (trades by Mr. Nikas, not Mr. Lavidas) prior to four announcements by a company called Ariad, for which Mr. Lavidas's father served on the board of directors.  The circumstantial evidence includes little more than cell phone records, Nikas's trading records, and corporate documents from Ariad.  We know from the discovery that the government produced last week that:

1) There are no emails, text messages, or written communications of any kind suggesting Mr. Lavidas provided MNPI to anyone, including Mr. Nikas.  Nor are there any emails, text messages, or written communications from Mr. Nikas suggesting that he ever received MNPI from Mr. Lavidas.  Thus, despite executing search warrants for years of electronic communications of Mr. Lavidas and Mr. Nikas (as well as numerous other unnamed participants in the broader schemes), the government will not present a single incriminating written communication.

2) There are no recorded phone calls or consensual recordings, either by a cooperating witness, an undercover agent or from a wiretap, that implicate Mr. Lavidas in any way.

3) The government cannot offer any cooperating witness who met or had any interaction whatsoever with Mr. Lavidas.  And no cooperating witness will testify



November 12, 2019
Page 7

that he or she witnessed Mr. Lavidas engage in any insider trading conduct or witnessed him say or do anything supporting the charges in this case.



In paragraph 30 of the indictment, the government also alleges as follows, in an attempt to show that Mr. Lavidas was paid for providing tips:

As compensation for receiving the MNPI described above, GEORGIOS NIKAS, a/k/a "George Nikas," the defendant, paid TELEMAQUE LAVIDAS, the defendant, at various times during the scheme.



The government explained at a prior bail hearing that this paragraph refers to a $500,000 wire transfer to a business run by Mr. Lavidas. *See* October 23 Tr. 12:12-15.

But the discovery produced by the government clearly demonstrates that this wire had absolutely nothing to do with the alleged scheme. Rather, at the time in question, Mr. Lavidas was running a completely legitimate business called Mediterra. Mediterra sold health food bars in many national and well known chains such as Whole Foods, CVS, Target, Kroger, Publix, Meijer, Home Shopping Network and QVC. *See, e.g.*, Exs. 3 and 4. Mediterra products were featured on Oprah's web site, *see* Ex. 5, in a national digital magazine popular with young adults called Refinery 29, *see* Ex. 6, in a March 2015 issue of Shape Magazine, and in other media outlets. The company had substantial revenues, earning over $1 million USD in annual revenues by 2015. *See* Ex. 3. The success of the company resulted in interest from ▇▇▇▇▇ and ▇▇▇ which is a major food distributor, each of which attempted to acquire Mediterra in 2017 and 2018, respectively. *See* Exs. 7 and 8 [filed under seal]. In connection with those potential acquisitions, Mediterra underwent substantial due diligence reviews demonstrating the company had multiple employees, consultants, and advisors, a strong brand that received excellent customer feedback, and extensive distribution channels. It maintained contractual relationships with numerous third-parties, including marketing consultants and manufacturers. The company also received investments from more than twenty outside investors who provided capital to the business through three investment rounds (Series A, B, and C). *See* Exs. 9, 10 and 11. The company maintained an office in New York City at 20 West 22nd Street, Suite 1601. (Ex. 12). It was represented by multiple reputable law firms in the US and abroad in its formation, in the series A, B, and C investment rounds, and the negotiations with ▇▇▇▇ and ▇▇▇. In short, Mediterra was a completely legitimate business.

The discovery produced by the government shows that the wire transfer the government claims was payment from Nikas to Mr. Lavidas for alleged tips was in fact a bona fide and arm's length investment in Mediterra by Nikas's wife, Miranda Patera. Ms. Patera is independently wealthy (her family has a well-known shipping company in Greece), she has known Mr. Lavidas for many years, and she has a particular interest in health food and wellness issues. *See* Exs. 13 and 14. She made an investment of $500,000 and signed a subscription agreement evidencing that investment. *See* Exs. 9 and 11. This investment was made alongside many other outside investors over the life of the company, whose investments totaled more than $6 million. *See* Ex. 9. The government



does not and cannot allege that any of those investors had any involvement with the alleged scheme.  Ms. Patera purchased shares of a company in which she genuinely wished to invest and she still has those shares to this day.  This was not compensation for tips and there is no evidence that it was.[3]

   In sum, for all the reasons explained above, the government's evidence in this case is weak, and Mr. Lavidas looks forward to challenging it at trial.  At a minimum he is entitled to the presumption of innocence and does not have strong incentive to flee. This case is entirely unlike those in which courts have held that strong evidence creates such an incentive.  *See United States v. Briggs*, 697 F.3d 98, 102 (2d Cir. 2012) (finding that the strength of evidence, which included intercepted communications between defendant and other co-defendants, weighed in favor of detention); *United States v. Bellomo*, 944 F. Supp. 1160, 1164 (S.D.N.Y. 1996) (strength of government's evidence, which included cooperating eyewitnesses and interceptions of oral communications created a "strong incentive to flee" prosecution).

---

   [3] Separately, while Mediterra had a successful launch in 2014, by 2016 Mediterra began to need further capital.  Accordingly, Mediterra borrowed $250,000 from David Steinhardt, who was one of the earliest investors in Mediterra, $200,000 from Nikas, and $400,000 from his family.  These loans were documented with executed contracts.  *See e.g.*, Exs. 15, 16.  Pursuant to Nikas' documented loan agreement that the government produced in discovery, he wired $200,000 to Mediterra on September 28, 2016, which is 1 to 3 years *after* Nikas allegedly traded Ariad stock based on inside information.  *See* Ex. 15.  At some point there was discussion that the loans from Steinhardt and Nikas might be converted to equity and, around August 10, 2017, Mr. Lavidas informed all Mediterra shareholders of this possibility.  *See* Ex. 17.

   Nikas ultimately chose not to convert the debt to equity and, accordingly, Mediterra began repaying the loan.  On June 2, 2018, Mediterra made its first repayment of the loan to Nikas in the amount of $100,000. (Ex. 18).  All of these events were years after the alleged scheme was over, and Mediterra would not have paid Nikas back $100,000 if the original $200,000 was not a legitimate loan.



November 12, 2019
Page 10

      Finally, even assuming a conviction, Mr. Lavidas is not facing a sentencing guidelines range that courts typically find sufficient to create a strong incentive to flee. According to the indictment, which was returned approximately one month ago on October 7, 2019, after a four-year investigation, Nikas earned profits of $1.95 million from alleged tips about Ariad. USSG Section 2B1.4, entitled "Insider Trading" applies to this offense. The base offense level is 8. Section 2B1.4 provides that the offense level is increased by the levels listed in Section 2B1.1 according to the gain resulting from the offense. Section 2B1.1 in turn provides for an increase of 16 levels for a gain between $1.5 million and $3.5 million, resulting in a total offense level of 24. Mr. Lavidas, who has an unblemished record and zero criminal history points, is in criminal history category I. The resulting guidelines range, assuming a conviction after trial with no reduction for acceptance of responsibility, is 51-63 months. With a reduction of three levels for acceptance of responsibility, the guidelines range is 37-46 months. These guidelines ranges are simply not comparable to those that courts typically find create a strong incentive to flee. *See, e.g.*, *United States v. English*, 629 F.3d at 317, 322 (2d. Cir. 2011) (reasoning that 20-year mandatory minimum sentence provided defendant incentive to flee); *United States v. Hollender*, 162 F. Supp. 2d 261, 264 (S.D.N.Y. 2001) (finding that defendant facing 121 - 151 months of incarceration presented a risk of flight, as the defendant was "looking at the possibility of spending the most productive years of his life in a Federal prison.").

### III.    Mr. Lavidas has Deep and Long–Standing Connections to New York

      At the prior bail hearings, the government argued that Mr. Lavidas does not have strong connections to New York and to the United States. This is not accurate. Mr. Lavidas was born in 1981 in New York City. He is a US citizen. During his childhood he went to an American/Greek school in Athens, but both he and his family spent considerable time in New York and the United States, and his family operated a substantial pharmaceutical business in Princeton, New Jersey called Lavipharm Labs. In 1987, when he was 6 years old, his family bought an apartment at 5th Avenue and East 56th Street in Manhattan. In 1994, when he was 13 years old, his parents bought a four-bedroom apartment at the corner of Fifth Avenue and East 67th Street in Manhattan. In 1999, when he was 18, Mr. Lavidas moved to New York to attend Columbia University. He has lived in New York for the vast majority of his life since 1999.



November 12, 2019
Page 11

Upon graduating from Columbia University, Mr. Lavidas went to work for Lavipharm Labs in Princeton, where he worked full time from 2003 to 2009. From 2009 to 2012, he split time between New York and Athens while working for the family business. From 2013 to August 2018, Mr. Lavidas moved back to New York full time to focus on developing Mediterra, the business described above, which was based in New York. He lived first in the family apartment on East 67th Street. His family sold that apartment in 2017, briefly rented another apartment on the Upper East Side of Manhattan, and then bought a three-bedroom apartment at 40 East 72nd Street, which they own today. Mr. Lavidas lived in that apartment until August of 2018. In the meantime he met his now-wife Caterina, and they married in New York in January 2017. Caterina obtained her legal permanent residence status in the US in February 2018 because they planned to live most of their life in the US. They had their first child in New York in June 2018.

Between August 2018 and October 2019, Mr. Lavidas, his wife and their daughter did spend considerable time traveling between New York, Greece, and Italy for two reasons. First, having just had a new child, they were visiting with family in those locations. Second, his wife's sister became ill and therefore they spent time in Italy attending to her. During this time period, Mediterra was reducing its activities. At the end of 2018, Mr. Lavidas turned his attention back to working for the family business, including for a newly-formed US-based company called Technomed.

During late 2018 and 2019, Mr. Lavidas has been largely responsible for running Technomed. While he is technically employed by one of the family businesses incorporated in France, most of his responsibility has been to launch and grow this US-based business. Technomed was incorporated in Delaware in 2018. *See* Ex. 19. Technomed entered into an agreement with



Technomed began earning income in March of 2019, and has approximately $2.9 million in net income (Earnings Before Interest Taxes Depreciation and Amortization or "EBITDA") in its first seven months. *See* Ex. 21 [filed under seal].



November 12, 2019
Page 12

Mr. Lavidas's father is 71 years old, and therefore the plan has been for Telemaque Lavidas, who is a US citizen and has lived most of his adult life in the US, to run this US business that earns considerable revenue.  ██████  has other indications that have not yet been approved by the FDA but that could potentially be lucrative.  Mr. Lavidas is managing the process to get FDA approval for these uses, which requires him to be able to work in the US.  In sum, Technomed provides another strong connection to the US and is yet another highly valuable opportunity that both Mr. Lavidas and his family would give up if he were to flee and become a fugitive from the United States (and every other country that has an extradition treaty with the US).

Mr. Lavidas has paid federal income taxes in the United States and New York state and city income taxes for most years of his adult life, including each of the last three years.  (Ex. 22) [filed under seal].

Accordingly the government's assertion at prior bail hearings that Mr. Lavidas has weak ties to the US is not accurate.  He has lived here almost all of his adult life; he is a US citizen; his child is a US citizen; both of his sisters are US citizens who live in New York; his family has owned valuable property in New York since 1987 and spends considerable time in New York; and his family has owned multiple businesses in the US, including most recently Technomed, which is currently one of the family's largest sources of income, and which he is responsible for running.

At prior bail hearings, the government made much of the fact that when he was arrested, Mr. Lavidas was staying not at the family home on 72nd Street but rather at Nikas's apartment on West 56th Street in Manhattan.  There is a simple explanation for this:  In the summer of 2019, during the time period when he and his wife were traveling in Europe to see family with their newborn baby and to be with his wife's ill sister, Mr. Lavidas's twin sisters graduated from UCLA and moved to New York.  Because the family apartment that Mr. Lavidas has occupied for many years was available at the time, his sisters moved in temporarily until they found their own apartment (which they have now done).  Due to this temporary family arrangement, when Mr. Lavidas and his wife and daughter were planning to come back to New York in October 2019, they looked into corporate housing since it would be a challenge to have his family, including his 16-month old and his wife who is pregnant with morning sickness, move into a three bedroom apartment with two recent college graduates.



Ultimately Mr. Lavidas realized that Mr. Nikas had a large empty apartment in New York and inquired about renting it.  Mr. Lavidas and Nikas agreed that he would rent the apartment for 30 days for approximately $6,000 until Mr. Lavidas and his family could move back into the 72nd Street apartment then occupied by his sisters.  Mr. Lavidas and his family flew into the US on October 12, 2019, approximately a week before his arrest, were let into Nikas's apartment by the superintendent, and later got their own set of keys from Nikas's cousin, who manages Nikas's affairs in the US.  Unbeknownst to Mr. Lavidas, Nikas (who is a Greek citizen) has stayed away from the United States for the last year, no doubt because he got word that the FBI was investigating him.  In contrast, as explained at the prior bail hearing, after Mr. Lavidas got notice from Google on April 6, 2018, that the FBI in the Southern District of New York had obtained a court order for his emails, he nonetheless continued to come and go from the United States multiple times, and even made arrangements to stay at Nikas's apartment.  This is hardly the conduct of someone who is conscious of his guilt or who is willing or likely to become a fugitive from the United States.

The government also made much at the bail hearing of the fact that four SIM cards were found at Nikas's apartment at the time of Mr. Lavidas's arrest. October 23 Tr. 8:1-16.  The government claimed that these SIM cards showed Mr. Lavidas would engage in deceptive conduct to hide his location or identity, thereby suggesting he was a flight risk.  This is absurd.  First, at the time of the bail hearing, the government knew that it had located Mr. Lavidas by obtaining warrants for cell site location data on Mr. Lavidas's cell phone[4], which is currently subscribed to in his name and which appears in the signature block of his email account that the government seized.  In other words, while the FBI used elaborate means to find him, Mr. Lavidas was not hiding.  He entered the country at Newark airport using his US passport, booked his plane tickets in his own name, and was using his own US-based cell phone openly and notoriously in New York. Second, despite to the government's illogical assertion that SIM cards found in Nikas's apartment, along with a great deal of other property owned by Nikas, must belong to Mr. Lavidas (*see* October 23 Tr. 8:16-25), there is absolutely no evidence that those SIM cards are Mr. Lavidas's, because they are not.  In any event, the government cannot dispute that Mr. Lavidas was using his own US-based cell phone while he was in New York in the week before his arrest.  The reason is simple: even though he received notice

---

[4] These cell site location search warrants have been produced in discovery.



November 12, 2019
Page 14

more than a year earlier that the FBI had searched his emails, he was not hiding, which further shows he is not a risk of flight.[5]

## Conclusion

Mr. Lavidas has deep and long-standing personal and professional ties to New York and to the United States. In order to keep him detained, the government must bear the burden of showing by a preponderance of the evidence that he is a risk of flight and that no conditions or combination of conditions can reasonably assure his appearance. *See United States v. Sabhani*, 493 F.3d 63, 75 (2d Cir. 2007).

In this application we have offered a set of conditions that will assure his appearance, including two large personal recognizance bonds, secured by more than $13 million worth of property, and cosigned by 9 people who are close to Mr. Lavidas and who have significant moral suasion over him. Mr. Lavidas's sisters have already moved out of the family apartment on East 72nd Street, which is now available so that he and his wife and daughter can live there should he be released. He would be subject to home confinement with electronic monitoring by pre-trial services, including an ankle bracelet, and he and his wife would surrender all travel documents.

Mr. Lavidas is entitled to the presumption of innocence and should not be incarcerated prior to trial. The government's case against him is weak, and he has every incentive to stay and fight it at trial. Indeed, even if he were convicted, he is not facing the kind of sentence that would motivate him to flee. It simply does not make sense that Mr. Lavidas would become a fugitive from justice, abandoning the US and most other modern counties in the world. In so doing he would destroy a substantial part of his family's net worth, would give up promising business opportunities in the US, and would

---

[5] The government also highlighted during the bail hearing that Mr. Lavidas had tickets to travel to Mexico. October 23 Tr. 5:1-2. It is true that he bought airline tickets and made hotel reservations in his own name to travel to a resort near Cancun, Mexico for a family vacation during October. He also bought return tickets to New York for several days later. The fact that he booked a short family vacation using his own name and passport, with return tickets to New York, is hardly evidence he was hiding or had plans to flee.



November 12, 2019
Page 15

impose crippling financial judgements on his close family and friends who are prepared to sign a bond.

He is entitled to bail and should be released as soon as possible.

Respectfully submitted,

Jonathan R. Streeter
Brian Raphel
Siobhan M. Namazi