K1D7LAV1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                 v.                         19 CR 716 (DLC)

TELEMAQUE LAVIDAS,

                 Defendant.

------------------------------x

                                            New York, N.Y.
                                            January 13, 2020
                                            9:00 a.m.

Before:
                    HON. DENISE COTE,

                                            District Judge

                         APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
RICHARD A. COOPER
DANIEL TRACER
     Assistant United States Attorneys

DECHERT LLP
     Attorneys for Defendant
BY:  JONATHAN R. STREETER
     SIOBHAN MARIA NAMAZI
     BRIAN C. RAPHAEL

     -and-

REED SMITH LLP
BY:  ERIC H. SUSSMAN
     NATALIE R. SALAZAR
     ANTHONY TODD
     JENNIFER L. ACHILLES

ALSO PRESENT:

ROBERT HUPCHER, F.B.I.
NATHANIEL COONEY, USAO Paralegal
JACOB PECHET, USAO Paralegal

K1D7LAV1

(Trial resumed; jury not present)

THE COURT:  Good morning, counsel.  I will mark the draft jury charge as a court exhibit.

DEPUTY COURT CLERK:  Court Exhibit 3.

THE COURT:  Does the government have any requests, objections or suggestions?

MR. TRACER:  We do, your Honor.  We have three, and I will just go through them quickly.

So, our first objection would be to the multiple conspiracy charge that's been included on page 28.  Does your Honor want me to address it briefly?  I can give you the substance of our objection.

THE COURT:  Did you want to change the language?  Or are you objecting to its inclusion?

MR. TRACER:  We object to its inclusion.

THE COURT:  Oh, yes, I thought that might be the issue, so let's just let that remain for further argument.  Next.

MR. TRACER:  Sure.  The next one we have is in the statute of limitations charge, and that's on page 54.

Under 18 U.S.C. 3301, the statute of limitations for securities fraud -- which in this case is all the counts other than wire fraud -- is six years rather than five years, and so we would ask that the dates in the first two paragraphs be changed from October 7, 2014 to October 7, 2013, which would be

six years before the return of the indictment, not five.

THE COURT:  So that applies to counts --

MR. TRACER:  So, it applies to all the counts except Count Six.  Title 18 securities fraud has a six year statute of limitations, and Title 15 securities fraud has a six year statute of limitations; and so Count Six would not though -- count Six would have a five year.

And, actually, to put a finer point on it, I think Count Two -- which is the conspiracy to commit wire fraud and securities fraud -- each object would have a different statute, because 18 U.S.C. 3301 includes conspiracy.

So, if the jury were to find the object of conspiracy to commit securities fraud -- I recognize this is a little confusing -- but I think the way it would work out is if they were to find the conspiracy to commit securities fraud, that would have a six year statute, but the conspiracy with respect to the wire fraud object would have a five year statute of limitations.

THE COURT:  Let me just get my copy of the indictment.

MR. TRACER:  Sure.

THE COURT:  So, essentially if the jury convicts on Count Two only as to wire fraud, then the statute of limitations would run from 2014.

MR. TRACER:  That's my understanding, your Honor, yes.

THE COURT:  If it convicts with both objects or with

only the securities fraud object, then the 2013 date is the applicable date.

MR. TRACER:  Correct.

THE COURT:  Thank you.  I will try to craft something.

MR. TRACER:  OK.  And then again for all the substantive charges I think your Honor has our view on that.

Then the third --

THE COURT:  You mean with respect to the statute of limitations?

MR. TRACER:  Correct.

THE COURT:  Yes.

MR. TRACER:  And then the third point we have is in the expert testimony instruction, which appears on page 60 of your Honor's draft, the parties had agreed that neither Jan Jindra nor Vinita Juneja were experts.  They were both in there to summarize voluminous records, and neither party for each of those actually tendered them as experts.  So, Reggie Donaldson was an expert; the other two we do not believe testified as experts.

THE COURT:  OK, thank you.  I know they weren't offered explicitly, but the inquiry -- particularly of the defense witness -- the set-up for direct and some of the door opening on cross treated the witness as an expert.  The set-up for the direct by defense counsel was:  You made your own choices; you decided; you personally decided what materials to

look at; you personally analyzed the indictment; you decided personally what charts to make; you personally used your background and knowledge to approach these issues.

And, of course, the jury will or won't find that credible, that there was no guidance given by counsel, that's whatever, but the defense presented the person as an expert. Then, of course, when the government tried to cross-examine about the believability of that, we got into a whole mess about another spot and how that ended up there, and again the witness was adamant that it was the witness's choices, and the witness's understanding and the witness's analysis.

This is not summary witness testimony that I have been handed a bunch of documents and I have correctly tabulated what they show.

So, you know, I'm thrilled the parties have agreed on anything; you have agreed on a lot.  I don't want to undercut your willingness to agree on things, but a lot of that testimony should have been stricken if this wasn't an expert.

Anyway, we will note that for now, and then we will come back to that when we see how many other issues we might have.

So Jindra and Juneja -- and I agree that the government's expert simply summarized voluminous records and presented them graphically, and there was no suggestion that that person had been asked to use their own discretion in terms

K1D7LAV1

of what assumptions to make or what analysis to undertake.  So anyway, anything else?

MR. TRACER:  Those are our three.  Thank you.

THE COURT:  OK.  Defense counsel?

MR. STREETER:  Thank you, your Honor.  I mean other than of course the objections contained in our brief -- which I know that the Second Circuit made its decision -- I just want to preserve those, your Honor.

THE COURT:  Well, I'm sorry, we can't proceed that way.

MR. STREETER:  OK, I will point out to you where it's relevant in the charge, but I wanted to -- you know, we put in a lengthy brief on that.  I understand that the Second Circuit made a decision right after we put in the brief, but I will point out to you right now the two places that are most important for that issue.  OK?

THE COURT:  Great.

MR. STREETER:  And I think, by the way, they are important for that issue even in light of the Second Circuit's decision last Monday, so I will explain to you what I mean.

It is on page 14, in the securities fraud -- by that I mean Title 18 securities fraud -- first element, scheme to defraud.  In the first paragraph the charge says, "It includes embezzling or converting for one's own use property belonging to another."

The law is very clear, your Honor, that theft and fraud are two different things.  Fraud is the use of deception or misrepresentations in order to convert something to your own use.  Theft is just simply walking in and stealing it.  And this charge right here is describing theft, not the use of deception or the use of misrepresentation to obtain property.

So, we object to that language.  We think that the language at least needs to be written to account for that the defendant is responsible for having participated in some dishonest, deceptive or misrepresentative conduct to obtain something, and we submit he didn't.  So, that's our objection to that language.

THE COURT:  So, give me the language with respect to the sentence you've identified that you are requesting.

MR. STREETER:  I am requesting that that sentence be stricken.  Converting for one's own use property belonging to another is stealing something; it's not lying to someone or convincing them to give you their money.

THE COURT:  So, you would just exclude that sentence.

MR. STREETER:  I would delete that sentence.

THE COURT:  Excuse me one second.

OK, I will look again.  I think this formulation came right out of Blaszczak, but I will confirm that.

MR. STREETER:  Your Honor --

THE COURT:  Next.

MR. STREETER:  I want to be heard about Blaszczak, your Honor.

THE COURT:  Yes.

MR. STREETER:  The real issue in Blaszczak was whether or not the personal benefit element would apply to Title 18 securities fraud and wire fraud.  And that was a very live issue in that case, because there really was no evidence of personal benefit at all.  That's not this case.

I mean I have to be candid here, the fact that the two people were friends and that they had overlapping business relationships, we're not arguing that as a technical matter the personal benefit -- I mean we are going to argue about motive and whether he had a reason to commit the crime -- which is a totally different thing -- but in terms of the personal benefit, whether or not he was friends with the person, we're not disputing that.  We have embraced and admit that they were friends, and under the law that would be enough to confer a benefit.

That was the issue in Blaszczak so that is really what Blaszczak decided.  Blaszczak did not address this question that I am raising, which is, that it still needs to be fraud, that garden variety theft -- if I walk into a store and steal a diamond out of a case at a jewelry store and walk out, I have not committed fraud.  I have committed larceny; I have stolen something; but I didn't lie to anybody, I didn't deceive

anybody.  And there is a Second Circuit case that very clearly lays all this out in the securities fraud context, Dorozhko -- which we cited in our brief -- which very clearly lays out that there is a difference between theft and fraud.  And in that case it was about computer hacking.  And what the Second Circuit said was -- it sent it back down to the district court and it said, district court, we want you to figure out whether or not the computer hacking in this case involved making misrepresentations in order to hack a computer, or did it just involve brute force, you know, tearing down a fire wall and stealing information out of a computer not through deception and misrepresentations.  And there is a difference.  One is fraud, one is larceny.  And this language here is referring to essentially larceny, and that's not fraud.

THE COURT:  What about the word embezzlement?

MR. STREETER:  I mean embezzlement, the jury doesn't know what that word means; it hasn't been defined for them.

THE COURT:  But you wouldn't deny that Blaszczak uses that formulation repeatedly.

MR. STREETER:  I wouldn't deny it, but the issue wasn't addressed in that case, because the real issue in that case was:  Are we going to require a personal benefit?  And that's what the Second Circuit was addressing --

THE COURT:  Well --

MR. STREETER:  And so this question --

THE COURT:  -- it's broader than that.  It had a lot to do with what is confidential information and what are the specific requirements of securities fraud under Title 18.  But I get your point.  Let's move to your next one.

MR. STREETER:  OK.  So the same point essentially on page 16 comes out, at the end of the charge on page 16 where the charge says, "The defendant knew that his conduct of the scheme was calculated to deprive Ariad to its right to the exclusive use of its confidential information."

And depriving someone of their information is not fraud, it's theft.  Again --

THE COURT:  What is the formulation you would like there?  What's your request?

MR. STREETER:  I would like the sentence deleted.

THE COURT:  OK.  Or how about "calculated to fraudulently deprive Ariad"?

MR. STREETER:  But we need at some point in the charge to define what fraud means.  And fraud means --

THE COURT:  I have done that at the very beginning, on page 14, which is a classic definition of fraud, and you had no objection to it there.

MR. STREETER:  Understood, your Honor.

THE COURT:  Next.

MR. STREETER:  That's all we have.

THE COURT:  OK.

K1D7LAV1

MR. STREETER:  And, I mean, look, your Honor --

THE COURT:  Let's go back.

MR. STREETER:  I want to say one other thing.  I just want to make clear --

THE COURT:  Sure.

MR. STREETER:  -- it is our view that in this context, in order to prove a scheme to defraud, one needs to prove the things that are laid out in the insider trading law about a scheme to defraud.  And we explain this in detail in our brief, and I'm not going to go through all of that right now, but my view is that the same elements that you describe -- not necessarily focused on the personal benefit, but all the other elements you describe in the insider trading section, that is what the government needs to prove to prove a scheme to defraud under all three of these statutes here.  That is a summary of our position from that brief; we stand by it.  We do not waive that for these purposes.  We want to preserve that for appeal. I understand the Second Circuit's decision, but I'm telling you that we preserve that for appeal, and we object to anything other than that formulation to prove fraud in the context of insider trading.

THE COURT:  So, Mr. Streeter, I appreciate that you're taking issue with basically the holding of the Blaszczak opinion, and that's fine.  But with respect to this charge I need specific language.  You say the personal benefit

K1D7LAV1

discussion is in the context of a lot of other things that are happening in insider trading law in order to tease out a lot of other elements.  It doesn't stand alone; it's part of the fabric of the law.

MR. STREETER:  I will tell you what my proposal is, your Honor.  My proposal is what we put in our requests to charge, which is --

THE COURT:  That's not --

MR. STREETER:  Wait.

THE COURT:  Mr. Streeter --

MR. STREETER:  Your Honor.

THE COURT:  -- that's not helpful.  You had a whole document.  You had more than one document.  I need specific language.

MR. STREETER:  I will tell you exactly what it is.

In your Honor's charge, when your Honor is charging insider trading, your Honor defines a scheme to defraud.  Our application is that the exact same language be used to define a scheme to defraud for both wire fraud and Title 18 securities fraud.  That is our application.  I understand the Blaszczak decision, but I'm telling you that that is our application.

MR. STREETER:  So that's the specific language.  I would import all of that language into these two other charges.

THE COURT:  OK.  I actually don't define the scheme to defraud in that context; I just define an intent to defraud.

K1D7LAV1

But let's move on to the multiple conspiracy point.  Which I take it, does the defense seek the multiple conspiracy charge or not?

MR. STREETER:  Yes we do, your Honor.

THE COURT:  OK, so we have a dispute with respect to that.  And I will hear from the government.

MR. TRACER:  Sure, your Honor.  In cases where a single defendant proceeds to trial, that instruction is not appropriate.  I would rely on your Honor's comments and rulings in a case called U.S. v. Barnes, 11 Crim. 184, where the defendant in that case proceeded to trial alone on drug conspiracy charges, requested a multiple conspiracy charge, and the Court -- and I am citing the transcript here at 1543 of that case -- declined, noting that Barnes failed to cite any Second Circuit case in which a multiple conspiracy charge has been approved, recommended or given when it's a single-defendant case.

As the Court knows, and as the jury instructions make clear, it is the province of the jury to decide what the scope of the conspiracy is.  Here it's a single defendant, he is charged with a pretty clear single conspiracy in the indictment, and so there is simply no need for a charge like this, and in the context of one defendant a charge like this we submit to your Honor would be confusing, and the jury would not be sure what it's calling upon them to do.  So for that reason

in this case we think the charge would be better left out.

THE COURT:  So sorry that I wasn't as smart as I once was, but thank you for pointing that out.

So, Mr. Streeter --

MR. STREETER:  Your Honor, there clearly are multiple conspiracies that evidence has been presented about in this trial.  Mr. Nikas and Mr. Demane and a whole host of other people were participating in another conspiracy, and there has been a lot of evidence at this trial about that other conspiracy.  If there was ever a case where you need a multiple conspiracy charge to make it clear to the jury that they need to unanimously find Mr. Lavidas guilty of the conspiracy charged in the indictment as opposed to the other one about which they have heard a whole lot of evidence, this is such a case.

THE COURT:  So, to just take the conspiracy law, on the charge as written the jury could not convict the defendant of the crime of conspiracy -- and I know there are two conspiracy counts -- unless they find that he agreed with another person to conspire with the object being as charged, and that he knowingly and willfully became a participant of that conspiracy.  So, knowing that that is clearly stated and would be the sine qua non of a conviction on a conspiracy count, I think that the government was right and I was previously right that a multiple conspiracy charge does not

stand here.

Now, if defense counsel can cite any Second Circuit case to me where a multiple conspiracy count was given in a single defendant case, I will look at that again.

OK. Now let's return to the expert issue. I think that's the only other one that we left sort of open and that I wanted time to talk to counsel about.

It really isn't so much the expert witness charge. If the parties don't want an expert charge given, that's fine with me with respect to these other two witnesses. The issue is the quality of the evidence that was presented and the sort of misleading representation of this as a summary witness of voluminous documents. And if I don't have any request to do anything about that, so be it too, then the parties have reached agreement, and we live with that record.

MR. TRACER: May we have a moment to confer?

THE COURT: Sure.

MR. TRACER: Your Honor, we are OK leaving it in as long as it's for both parties, so it will be Dr. Jindra and Dr. Juneja, and we will leave the charge as is.

THE COURT: And, Mr. Streeter, what's the defendant's view?

MR. STREETER: That is acceptable to us.

THE COURT: OK. OK, good. Thank you, counsel.

Oh, sorry.

K1D7LAV1

MR. TRACER: Just a scheduling issue. We understand from speaking with the defense -- we're not holding them to anything -- but we expect they may rest sometime this morning. In the event they do that before the midmorning break, we just wanted to flag for the Court that we would need a few minutes to set up some of the audiovisual equipment for closing, so we would ask to take a break at that point even if it is a little bit earlier or later than usual.

THE COURT: Absolutely, we will let counsel have a break before summations begin.

So, is the defendant taking the stand?

MR. STREETER: He is not, your Honor.

THE COURT: OK. So can I just complete then the allocution that we began last week.

MR. SUSSMAN: Your Honor, I'm sorry, can we literally have three minutes to confer with our client just briefly?

MR. STREETER: Your Honor, we have been talking to him about this issue the entire time we have represented him for the last two months and change, but we would like to have just one more conversation. We had -- frankly, the subway lines were down this morning.

THE COURT: No kidding.

MR. STREETER: So give us two minutes with him, and then we will be ready.

THE COURT: OK.

K1D7LAV1

(Recess)

THE COURT:  Please be seated.  So, Mr. Streeter, Mr. Sussman, are we ready for the completion of the allocution?

MR. STREETER:  We are, your Honor.

THE COURT:  Thank you so much.

So, I'm going to ask the defendant, please, to stand.

Do you remember that last week we had a discussion with each other about your right to testify at this trial in your own defense?

THE DEFENDANT:  I do remember.

THE COURT:  Good.  And have you discussed that issue with -- that is, have you discussed with your lawyers whether or not -- and I don't want to know the content of the discussion -- but have you discussed with your lawyers the topic of whether or not you should take the stand at this trial and testify in your own defense?

THE DEFENDANT:  I have, your Honor.

THE COURT:  And do you understand that the final decision as to whether to take the stand at this trial and testify in your own defense is the decision for you and you alone to make ultimately?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Do you wish to testify in your own defense at this trial?

THE DEFENDANT:  I do not, your Honor.

K1D7LAV1

THE COURT:  OK.

Does the government have any additional question for me to place to the defendant?

MR. TRACER:  No, your Honor.

THE COURT:  Does defense counsel have any additional question for me to place to the defendant?

MR. STREETER:  No, your Honor.

THE COURT:  Thank you.  You may all be seated.

So, this is the situation:  We're missing a couple of jurors.  And, for the record, the subway system on the West Side at least was a real problem today, so it's not a surprise that we're having some delay.  Ms. Rojas will keep us all advised.  Thank you.

(Recess)

THE COURT:  Bring in the jury.

(Continued on next page)

(Jury present)

THE COURT:  Morning, ladies and gentlemen.  We know some of you had a very difficult commute this morning, so thank you for your presence.

Counsel.

MR. STREETER:  Thank you, your Honor.  I'm going to read a stipulation.

This stipulation is Defendant's Exhibit 1056, and I will skip the preamble and just read the portion of the stipulated part.

"If called to testify under oath at trial, F.B.I. Agent Matthew Mahaffey would state that:

"1.  In an interview by the government of Marc Demane Debih on October 31, 2019, Demane stated that Georgio Nikas told him that Nikas was calling both Telemaque Lavidas and Telemaque Lavidas' father to get information about Ariad Pharmaceuticals, and this was at some point in the evening after the dinner at which he met Telemaque Lavidas.

"2.  In an interview by the government of Demane on December 12, 2019, in response to being told that a visa for his wife was likely not happening, Demane said and/or indicated he would debate no longer cooperating."

It is further stipulated and agreed that this stipulation is admissible in evidence as a defendant's exhibit at trial.  The defense offers it.

K1D7LAV1

THE COURT:  Received.

(Defendant's Exhibit 1056 received in evidence)

MR. STREETER:  Thank you.  I have another one to read, your Honor, and it states after the preamble:

"1.  On or about October 18, 2019, the government lawfully obtained the following electronic devices from Telemaque Lavidas:  Black iPhone with cracked back; dark gray iPhone 11; a USB drive; silver iPad, serial DLXV41N3HP34; Apple laptop, serial C1MP412QG086.

"2.  On or about October 18, 2019, the government lawfully obtained additional electronic devices from George Nikas' apartment in New York, New York.

"3.  On May 11, 2017, the government lawfully obtained e-mails contained on that date in Telemaque Lavidas' g-mail account ("tlavidas@mediterraneannutrition.com").

"4.  On October 23, 2015, January 25, 2017 and June 11, 2018, the government lawfully obtained e-mails contained on those dates in Georgios Nikas' g-mail account ("george.nikas@ g-mail.com.").

It is further stipulated and agreed that this stipulation is admissible in evidence as a defendant exhibit at trial.  And, your Honor, this is Defense Exhibit 1055.

THE COURT:  Received.

(Defendant's Exhibit 1055 received in evidence)

MR. STREETER:  I then have a list of exhibits that the

K1D7LAV1

parties have agreed can be admitted by stipulation, and I'm going to read those exhibits.  They are all defense exhibits, and I will just read the numbers.  The numbers are Defendant's Exhibits 701, 701A, 701B, 701C, 702, 702A, 703, 703A, 566, 568, 1035, 1036, 828, 1051, 1007, 1035, 1036, 1043, 1048 and 1045.

The defense offers all those exhibits.

THE COURT:  Received.

(Defendant's Exhibits 701, 701A, 701B, 701C, 702 received in evidence)

(Defendant's Exhibits 702A, 703, 703A, 566, 568 received in evidence)

(Defendant's Exhibits 1035, 1036, 828, 1051, 1007 received in evidence)

(Defendant's Exhibits 1035, 1036, 1043, 1048 and 1045 received in evidence)

MR. STREETER:  I have another stipulation to read, your Honor.  After the preamble it states:

"1.  The landline assigned to telephone number 212-452-2661 was located in the five bedroom Lavidas family home at 2 East 67th Street, Unit 3, New York, New York 10065 (the "Lavidas New York landline").

"2.  The Lavidas New York landline was used by Telemaque Lavidas, his parents, his three sisters and various household employees when they were in New York during the time period January 2010 through August 2014."

It is further stipulated and agreed that this stipulation is admissible in evidence as a defense exhibit at trial, and this is Defense Exhibit 1059.

THE COURT:  Received.

(Defendant's Exhibit 1059 received in evidence)

MR. STREETER:  One more stipulation to read, your Honor.

After the preamble it says:

"Beginning in or about 2015, Centerview Partners ("Centerview") hired an expert firm in forensic analysis of computers (the "forensic firm") to conduct an analysis of a laptop that was used by Darina Windsor with the user name "D Windsor" (the "Windsor laptop") in connection with her work at Centerview.  As part of that analysis, the forensic firm compiled lists of over 70,000 artifacts from the Windsor laptop (the "lists").  Each artifact in the lists refers to a file, folder, document, or data on the Windsor laptop that the user name D Windsor attempted to access.  Attempted access includes any form of affecting the underlying file, including, for example, previewing, opening or saving the file, whether or not the user was successful in doing so.

"3.  For each artifact, the lists contain a row with information about the artifact and the underlying file, including in many cases the file path for the underlying file on the computer systems of Centerview to which the Windsor

K1D7LAV1

laptop attempted access.

"4.  From the lists it is not possible to determine whether Windsor was able to successfully access or modify any particular file on the computer systems of Centerview.

"5.  Defense Exhibit 767 is a true and accurate summary of mentions of the word "Ariad" in the lists from June 2013 and from February 2015 through August 2015.

"6.  Defense Exhibit 768 is a true and accurate summary of mentions of the word Baxalta in the lists from May 2015 through August of 2015.

"7.  In or about 2019 the forensic firm retrieved certain files from the computer systems of Centerview (the "files"), the file paths from which the files were retrieved in or about 2019 were the same as or similar to the file paths that are indicated for certain of the artifacts in the lists. Each of these artifacts referred to a file path that contained the term Baxalta and that is listed on the Baxalta summary exhibit Defense Exhibit 768.  From the lists or the files it is not possible to determine whether any of the files were modified by anyone between the date of attempted access by the Windsor laptop in 2015 as reflected in the lists and the date on which that file was retrieved by the forensic firm in 2019.

"Defense Exhibit 759 is a true and accurate copy of one of the files retrieved from the computer systems of Centerview in 2019 from a file path with the same name as the

file path listed for item 4 in the jump list report portion of defense Exhibit 768.

"Defense Exhibit 765 is a true and accurate copy of the one of the files retrieved from the computer system of Centerview in 2019 from a file path with the same name as the file path listed for item 7 in the jump list report portion of Defense Exhibit 768.

"Defense Exhibit 762 is a true and accurate copy of one of the files retrieved from the computer system of Centerview in 2019 from a file path with a similar name as the file path listed for item 6 in the jump list report portion of Defense Exhibit 768.

"12.   Defense Exhibit 763 is a true and accurate copy of one of the files retrieved from the computer systems of Centerview in 2019 from a file path with a similar name as the file path listed for item 11 in the jump list report portion of Defense Exhibit 768.

"13.   Defense Exhibit 764 is a true and accurate copy of one of the files retrieved from the computer systems of Centerview in 2019 from a file path with a similar name as the file path listed for item 9 in the jump list report portion of Defense Exhibit 768."

It is further stipulated and agreed that this stipulation and the exhibits referred to in this stipulation, are admissable in evidence as defense exhibits at trial.

I would offer the stipulation, which is Defendant's Exhibit 769 --

THE COURT:  Received.

MR. STREETER:  I also offer the two summary reports which are Defense Exhibit 767 and Defense Exhibit 768.

THE COURT:  Received.

(Defendant's Exhibits 767, 768 and 769 received in evidence)

MR. STREETER:  I now want to use Ms. Namazi again to publish certain of those exhibits.

Could you highlight the title at the top, please.

Ms. Namazi, could you read that aloud, please.

THE WITNESS:  "Excerpts from Internet history and jump list reports - Ariad."

MR. STREETER:  And then, Mike, can you highlight the first entry, the entirety of the first entry on the chart.

Ms. Namazi, could you go ahead and read each of those -- each of those columns.

(Continued on next page)

K1ddlav2

MS. NAMAZI:  Number 1, Internet history report.  Date/time, 06/13/13, 4:59:40 p.m.  URL --

MR. STREETER:  If you could just read the last -- from the word AstraZeneca on in the URL name?

MS. NAMAZI:  AstraZeneca, discussion, 20, percentage 20, materials underscore, 2013, 05 - 17 underscore VF.PPS.

MR. STREETER:  Then can you read the "User" column?

MS. NAMAZI:  Dwindsor.

MR. STREETER:  And, Mike, if you could highlight each of the dates in each of these.

And if you could highlight the words "dwindsor" in each of these.

And if you could highlight the words "Ariad" on each of the URL names and the path.

Can I get this screen to work here?

Thank you.

I now, your Honor, want to publish Defense Exhibit 768.

Mike, could you put that up on the screen.

And, first, could you highlight the title at the top.

Ms. Namazi, could you read that, please?

MS. NAMAZI:  Excerpts from Internet history and jump list reports - Baxalta.

MR. STREETER:  OK.  I am going to show Mike what I want.  Could you please highlight the entire "Date" column, the

K1ddlav2

second column over.

And then if you could highlight "dwindsor" in each of these columns.

(Pause)

MR. STREETER:  Ms. Namazi, if you could just read the dates in the "Date/Time" column for each of these entries, starting at the top.

MS. NAMAZI:  July 21, 2015; July 27, 2015; July 27, 2015; May 28, 2015; May 28, 2015; May 28, 2015; May 28, 2015; May 28, 2015; July 21, 2015; July 27, 2015; July 27, 2015; July 27, 2015; July 27, 2015; July 27, 2015; July 27, 2015.

MR. STREETER:  Thank you.  I am now going to publish just two of those documents.

Mike, if you could pull up on the screen Defense Exhibit 764 and highlight everything on that page.

And Ms. Namazi, could you read that please?

MS. NAMAZI:  The top right-hand corner says "Centerview Partners."  The title is "Project Miles – Analysis at various prices," dated July 24, 2015.

MR. STREETER:  And then, Mike, could you turn to the second page, and just highlight the term "Premium" in the middle.

And at the lower left-hand corner, could you highlight the word "Miles Metrics."

Thank you.  If you could pull up Defense Exhibit 765,

K1ddlav2

in evidence.  Highlight everything on that page.

Ms. Namazi, could you read that, please?

MS. NAMAZI:  The top right-hand corner says "Centerview Partners."  The title is "Project Miles Background Information," dated July 25, 2015.

MR. STREETER:  And, Mike, could you turn to the third page of the document and highlight the bullet point at the bottom that says, "Depending on the view."  Highlight that entire bullet point.

And, Ms. Namazi, could you please read that?

MS. NAMAZI:  "Depending on view of Iclusig growth potential, relative to precedent transactions, it is possible to back into how much value is ascribed to Bribatnib in an acquisition of Miles at various prices."

MR. STREETER:  Mike, could you turn to I believe it is the sixth page of the document, and can you highlight the title at the top of the page.

Could you read that, Ms. Namazi?

MS. NAMAZI:  "Harvey Berger's payout at various offer prices."

MR. STREETER:  Mike, can you make the redaction show just that it is redacted.

Can you do that?

(Pause)

MR. STREETER:  That's fine.

K1ddlav2

Your Honor, this is one of the exhibits that was redacted

THE COURT:  Normally, ladies and gentlemen, the word "redaction" or some indication appears on a document when it is redacted.  As I told you before, it just means that material that is not important for your decision making has, by agreement of the parties, been removed from the document or hidden.

MR. STREETER:  Mike, can you turn to the thirteenth page of the document, and can you highlight the name in the upper left-hand corner.

And under "Key Management," can you highlight "Harvey Berger."

And then the last one to look at is the second-to-last page of the opportunity, page 16.  Can you highlight the top of that.

And, Ms. Namazi, can you read that?

MS. NAMAZI:  "Miles Product/Pipeline Portfolio Opportunity."

MR. STREETER:  And can you read what's contained in the yellow box on the left-hand side in the middle of the page and the green box on the left-hand side on the page.

MS. NAMAZI:  "Iclusig label expansion, Bribatnib (AP26113)."

MR. STREETER:  Thank you.

K1ddlav2                        Stathi - direct

That's all we are going to publish right now, your Honor.

Our next witness is Katerina Stathi.

AIKATERINI STATHI,

called as a witness by the defendant,

having been duly sworn, testified as follows:

THE CLERK:  Please be seated.

Please state your full name for the record and spell out your first and last names.

THE WITNESS:  My name is Aikaterini Stathi, A-i-k-a-t-e-r-i-n-i S-t-a-t-h-i.

DIRECT EXAMINATION

BY MR. STREETER:

Q.  Good morning, Ms. Stathi.

A.  Good morning.

Q.  Focusing on the time period from 2013 through 2016, can you please tell the jury where you worked?

A.  I was working on the Mediterra Project as a legal advisor.

Q.  What is the Mediterra Project?

A.  Mediterra is a startup company founded by Telemaque Lavidas which commercializes, develops and manufactures snacks, and in particular it is bars, containing ingredients based on Mediterranean diet.

Q.  And what is Mediterra Holdings?

A.  Mediterra Holdings is the parent company.  It is a Swiss

company, incorporated in Lausanne, which holds the trademarks and the formulations for products.

Q.  And what was your role, if any, in the formation of these two companies?

A.  I had an active role, always in collaboration with local counsel, as Mediterra Holdings was a Swiss company, as I mentioned earlier.

Q.  I want to step back for a minute and ask you a little bit about your background.

Where are you from originally?

A.  I'm Greek.

Q.  And how far did you go in school?

A.  Up to post-graduate level.

Q.  What type of post-graduate training do you have?

A.  I have a master's in law, so an LLM, which is a post-graduate degree in law, with a major in international business law.

Q.  And where did you get that degree?

A.  In London, United Kingdom.

Q.  What is the name of the university?

A.  Kings College.

Q.  And when did you receive your LLM?

A.  In 2002.

Q.  And where did you go to work after you got your LLM?

A.  I worked for a law firm for ten months in Athens, started

training, then I continued by joining the legal department of Lavipharm SA.

Q.   What is Lavipharm SA?

A.   Lavipharm SA is the parent company of a group of companies in the pharmaceutical sector.  So Lavipharm SA develops manufactures and commercializes pharmaceutical products in Greece and world.

Q.   And what was your role there?

A.   I joined the Legal Department, as I said before, in 2003, and ended up being head the legal department.

Q.   And who was the CEO of Lavipharm?

A.   Dr. Athanasios Lavidas.

Q.   And for how many years were you the head legal counsel of Lavipharm?

A.   Approximately three, so from 2010 until 2013.

Q.   And after 2013, what job did you go do next?

A.   So towards the end of 2013, I left Greece because my husband had a job offer abroad.  So at the time I resigned from my position at Lavipharm SA.  Telemaque Lavidas had asked me at the time if I was interested in continuing working with him on the Mediterra Project, which he had already started working for from approximately the end of 2012.

Q.   And did you agree to do that?

A.   I did.

Q.   And what role did you take on with Mediterra?

K1ddlav2                          Stathi - direct

A.   So I was a consultant to the company providing legal advice.

Q.   And for what years did you work for Mediterra in that role?

A.   From 2013 up to 2018.

Q.   And what -- you mentioned the products that Mediterra made or sold.  Did Mediterra actually make those products, or how did it come to have those products?

A.   So Mediterra actually -- products would be developed by Mediterra, so the formulation of the bars, but the manufacturing process was outsourced to a third-party manufacturer based in Canada.

Q.   What role did you have in negotiating with that third party?

A.   I was actively involved in drafting the contract with the manufacturer.

Q.   And how about the process of distributing the product, how did that work?

A.   So for companies of Mediterra's size, small companies, there are no direct contracts with the points of sale.  The company enters into an agreement with brokers, and they have their contacts with the points of sale and they assure the distribution of the product through the distribution channels, which in Mediterra's case was groceries and natural foods.

Q.   Do you remember the names of some of the groceries and natural food stores that sold Mediterra products?

K1ddlav2                    Stathi - direct

A.   Whole Foods, 7-Eleven, Walgreen's, CVS.

Q.   And what role, if any, did you have in negotiating with those distributors?

A.   I reviewed the contracts.

Q.   And how about trademarks?  Did Mediterra have any trademarks?

A.   Yes.  Mediterra had quite a few.  So there is a Mediterra word trademark.  Then there is the Mediterra logo trademark, which is a tree inside a circle.  Then there were a couple of slogan trademarks, like "Good health is in our nature," and "Go Taste Life."  So they were registered in various countries, U.S., Canada.  There were international registrations with various countries, and China, South Korea, various -- worldwide, let's say.

Q.   What role did Telemaque Lavidas have in connection with Mediterra?

A.   He was the founder and managing director.

Q.   And at some point were there discussions about selling Mediterra or, a portion of it, to another company?

A.   That is correct, yes.

Q.   When was the first time that those discussions were had?

A.   In 2016.

Q.   And what was the company?

A.   Pepsi.

          MR. STREETER:  I am going to be up on the screen for

the witness and the Court and counsel Defense Exhibit 821.

Q.  Do you recognize that document?

A.  I do.

Q.  What is that?

A.  This is a presentation prepared by Mediterra's team for Pepsi.

MR. STREETER:  The defense offers 821.

MR. COOPER:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 821 received in evidence)

MR. STREETER:  Can we publish it for the jury?

And can I ask you, Mike, to turn to --

Q.  What was the purpose of this presentation?

A.  So Mediterra had got the attention of Pepsi, and they were commencing discussions about a possible transaction.  So the aim of this presentation was to very quickly give an overview of the company, of the products, of the trademarks, of the people of Mediterra.

MR. STREETER:  Mike, can you turn to page 2893, Bates number 2893.  I believe it is the fourth page of the document, and highlight the top half -- not highlight but blow up the top half of the page.

Q.  What is that on the screen there?

A.  So this is the product -- these are the products with Mediterra, the bars in their packaging.  Some of them are in

the sweet and others in the savory category. So there were two categories of products.

MR. STREETER: Mike, can you turn to the page that ends in Bates number 2898.

Q. Ms. Stathi, what's this page?

A. So this is a page of the presentation showing certain quotes from media coverage received for grants for the products.

Q. Can you give us some examples of the some of the media locations that covered Mediterra?

A. The Oprah Magazine, Marie Claire, U.S. Weekly, Martha Stewart, Women's Health, Weight Watchers.

MR. STREETER: And can you turn to the next page, Mike, and highlight the right-hand side of the page.

Q. First of all, before you do that, can you tell us what's shown on this page?

A. The point of sales for the products. What this means, where the distributor can effectively -- sorry, the consumer can find the products, where they were on sale.

Q. Can you read the names of some of the locations where one could buy Mediterra bars?

A. Whole Foods, GNC, CVS, Wegmans, 7-Eleven, Fresh & Easy.

MR. STREETER: And can you turn now, Mike, to the next page of the document.

Q. What is shown on this page?

K1ddlav2                          Stathi - direct

A.   So it's the core team of Mediterra.  Some of these people were employees and some of them were advisors, so consultants.

Q.   Telemaque Lavidas, how is he listed?

A.   Founder and chairman.

Q.   And Powell Pruitt, how is he listed?

A.   Chief Executive Officer.

Q.   And Marty Hagge?

A.   Marty Hagge was VP of sales and marketing.

         MR. STREETER:  And if you could turn to the second-to-last page of the document, Mike.

Q.   What is depicted on this page, Ms. Stathi?

A.   So this is the trademarks -- these are the trademarks.  So we have, as I was saying before, the Mediterra word trademark with a list of the -- some of the countries where the trademark was registered at the time.

         Below to the left we have the logo trademark, the tree inside the circle.  We also have the slogan trademarks, "Go Taste Life" and "Good Health.  It's in our nature."  And we also have the packaging that was copyrighted.

         MR. STREETER:  You can take that down, Mike.

Q.   Ms. Stathi, who were the owners of Mediterra, generally, not by name just yet?

A.   OK.  So initially when the company was founded, it was the Lavidas family, so the company owned by the family, and subsequent to that there were various financing rounds, so new

shareholders joining.

Q.  Can you explain what you mean by a financing round in a little more sort of plain terms?

A.  So a financing round is when an investor injects capital into the company, the share capital of the company is increased, and as a consequence new shares are issued.  These shares are distributed to the new investors, who become shareholders in proportion to the money they have contributed.

Q.  And how many such sort of financing rounds were there at Mediterra?

A.  We had three in total.

Q.  And what did you call them?

A.  Financing Round Series A, Series B and Series C.

Q.  And when, approximately, was Series A?

A.  September 2013.

MR. STREETER:  I'm going to ask that Defense Exhibit 801 be brought up just for the witness, counsel, and the Court.

Q.  What is this document?

A.  So this is a shareholders agreement that was entered into straight after the first financing round.  So it is an agreement between all the shareholders that are in relation to all the matters relating to the company, so governance, etc.

MR. STREETER:  The defense offers 801.

MR. COOPER:  No objection.

THE COURT:  Received.

K1ddlav2                              Stathi – direct

(Defendant's Exhibit 801 received in evidence)

MR. STREETER:  Can we publish that for the jury.

BY MR. STREETER:

Q.  So when is this document dated?

A.  September 9, 2013.

MR. STREETER:  And, Mike, can you highlight from Gotham LLC down to Hellas.

Q.  Do you see the portion that is highlighted on the screen?

A.  Yes, I do.

Q.  What are those entities and people that are highlighted on the screen?

A.  So these are the investors that participated in the first financing round, so the Series A investors, who became shareholders of the company.

Q.  And how many are there?

A.  Six.

MR. STREETER:  And can we turn to the -- it is the 39th page of the document, Mike.

Can you flip that on its side and blow up the part that has got text.  And can you highlight the upper left-hand corner, what it says there.

Q.  So what is this portion of Defense Exhibit 801?

A.  So this is a capitalization table, which was an exhibit to the shareholders agreement.  So this shows -- it lists all the investors of Mediterra, then the shareholders actually, the

K1ddlav2                        Stathi - direct

amount each one of them has invested, the number of shares

attributed to each one of them as a consequence of their

investment, and the percentage that they hold in the company.

Q.  Can you tell us what the amount invested by Gotham LLC was?

A.  $500,000 U.S.

Q.  And how about the second name that I don't think I can read

very well.

A.  That is Demergon Funds.

Q.  How much was its investment?

A.  $500,000?

Q.  At the very bottom, it says, "Total Investment Series A."

         Do you see that?

         MR. STREETER:  Can you highlight that, Mike?

Q.  What was the amount of the total investments in the Series

A investment?

A.  $2 million.

Q.  And did there come a time when there was a Series B

investment round?

A.  That is correct, 2015.

         MR. STREETER:  Can we go to Defense Exhibit 809 just

for counsel and the Court and the witness.

Q.  What is Defense Exhibit 809?

A.  So this is the investment and subscription agreement

entered into in March 2015 by the Series A investors and the

Series B investors.  So this was signed at the time of the

second financing round.  The shareholders that were already

shareholders of the company, as was their right, decided to

also participate in the second financing round, and there were

also some extra investors participating.

MR. STREETER:  OK.  The defense offers 809.

MR. COOPER:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 809 received in evidence)

MR. STREETER:  Mike, if you could highlight the

names -- publish it to the jury.  Apologies.

These names right here.  And in a different color

those names right there.

And you can also pull up the top of the second page

and highlight the first two on there.  Go down just so we can

see the whole thing.

Q.  So what's depicted in yellow at the top of the page?

A.  So in yellow are the Series A shareholders.  So they had

already participated, as I said before, in the first financing

round.  They decided to also participate in the second

financing round, as was their right.  So they have a sort of

right of first refusal in any subsequent financing round.  And

in red are the additional.

Q.  The red are the additional Series B investors?

A.  That is correct.  So they are the new shareholders that

came in in this financing round.

Q.   Let me ask you to look at the third name from the last on the first page.  Can you read that to us?

A.   The third?

Q.   The third from the last on the first page.

A.   The third from the last, Hellas --

Q.   Well --

A.   The third from the last, Miranda Patera.

Q.   Is that a name that is known to you?

A.   The name is known to me.

Q.   How is it known to you?

A.   It is known to me because Miranda Patera is a member of a very well known rich holding family, so that's how I initially knew the name.  Of course I knew it from 2015 onwards also as an investor in the company.

Q.   And she was one of the Series B investors here?

A.   That is correct.

Q.   Did there come a time when you learned that she had -- she was married to George Nikas?

A.   Yes.

Q.   When did you learn that?

A.   In 2016, so approximately one year and a half after, when --

Q.   One year and a half after what?

A.   After this financing round.

Q.   OK.  And you were about to say when -- you were about to

describe the circumstances under which you learned that she was married to George Nikas, I believe.

A.   That is correct.

Q.   What were those circumstances?

A.   So it was when George Nikas entered into a loan agreement with the company.

Q.   But prior to that, did you even know that she was connected to him?

A.   No.

Q.   And the documents -- this document that we are looking at, what role, if any, did you have in drafting this document?

A.   I did have a role in drafting it, in reviewing comments, all in collaboration with local Swiss counsel.

          MR. STREETER:  Can you turn to page 39, Mike.  And can you highlight the portion at the bottom with the name and the signature.

Q.   What does that say there?

A.   Miranda Patera.

Q.   And this is what?  What is this page?

A.   So this is a signature page for the investment and subscription agreement.  So there was one such page for each investor, and this is the page for Miranda Patera.

Q.   When you were working for Mediterra, for whom did you work?  Who was your boss?

A.   Telemaque.

K1ddlav2                      Stathi - direct

Q.  Did you work closely with him?

A.  Yes, I did.

Q.  Can we turn now to -- I'm trying to get the page right here -- page 116.

Turn this on its side and blow it up, Mike.

What is this, Ms. Stathi?

A.  So this is the capitalization table, which was, again, an exhibit to the investment and subscription agreement for the Series B financing round.

MR. STREETER:  And, Mike, can you highlight the name Miranda Patera and highlight the amount, dollar amount, next to her name.

Q.  Can you -- so what does this indicate about how much she invested in this round?

A.  So she invested $500,000 U.S.

Q.  And what was the total amount of this Series B round?

A.  $2,505,000 -- $505,000.

Q.  And when was this Series B investment?

A.  In March 2005 -- March 2015.

Q.  You mentioned before the negotiations with Pepsi.  When were they in relation to this?

A.  Subsequently, in 2016.

Q.  Did that start and what happened?

A.  So that started I would say roughly around the time of the presentation you showed before was made to Pepsi, and I would

K1ddlav2                    Stathi - direct

say the whole process lasted for about six months, at which

point the negotiations fell through.

Q.  And do you remember the date, or would it help you to put

the document up, just roughly when the Pepsi negotiations

started?

          MR. STREETER:  Would you put up Defense Exhibit 821 on

the screen, the first page, already in evidence.

          Let's blow up the date at the bottom.

A.  September 28, 2016.

Q.  Is that roughly when the negotiations with Pepsi started?

A.  Yes, it is, yes.

Q.  And can you take a look at Defense Exhibit 822.  Only show

it to counsel, the Court, and the witness.

          (Pause)

          What is this, Ms. Stathi?

A.  So this is the term sheet which was entered into between

Mediterra Holdings and Pepsi.

Q.  Let me stop you right there.

          MR. STREETER:  The defense offers 822.

          MR. COOPER:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 822 received in evidence)

          MR. STREETER:  Can we go ahead and publish it for the

jury.

BY MR. STREETER:

K1ddlav2                        Stathi - direct

Q.  So what is a term sheet?

A.  OK.  So a term sheet is an agreement between two parties outlining the basic terms of a future agreement or future transaction to be entered into between them.  It is, however, not binding, which means that either party may step back without prejudice.

MR. STREETER:  I'm going to ask Mike to highlight this portion right here.

Q.  What does -- what were the basic terms --

A.  So Pepsi --

Q.  -- that were being discussed, I guess?

A.  So Pepsi was going to pay $7 million in cash in order to acquire a 25 percent stake of the company, and there was a future option, also for Pepsi, depending on performance of the company, to proceed with purchasing the rest of the stock remaining.

Q.  And what happened after this term sheet was signed?

A.  The due diligence process started.

Q.  And what was your role in that due diligence process?

A.  I was very much involved with that in working on that with Telemaque, anything having to do with documents, contracts, trademarks, so the let's say legal side of it.

Q.  How long did that due diligence process last?

A.  Well, it started straight after signature of this term sheet, I would say continued for about three months.

Q. Did there come a time when Mediterra considered getting more financing -- what happened with the Pepsi negotiations?

A. So as I mentioned before, they fell through, so the acquisition of the 25 percent equity stake did not materialize.

Q. And so what was the next thing that happened in terms of the financing of the company?

A. So we proceeded later on in that year to a third financing round.

Q. And did there come a time when there were also some loans made to the company?

A. That is correct, yes.

Q. What -- how many loans were made, if you know?

A. Four.

Q. And who were the parties that made the loans, if you know?

A. So it was George Nikas, Mr. Sabater, S-a-b-a-t-e-r, then it's Mr. Steinhart, and then it was The Sorel Trust.

Q. And what is The Sorel Trust?

A. It is a family-owned trust, a Lavidas family owned trust.

Q. So that was a loan coming from the Lavidas family to Mediterra?

A. That is correct.

Q. And Mr. Steinhart, what connection did he have to the company?

A. He was a Series A investor, so he was a shareholder at the time.

Q.   OK.  And you mentioned earlier at some point you learned about the connection between Mr. Patera and Ms. Nikas.  When was that?

A.   That was the time, the time that I actually drafted the loan agreement.

MR. STREETER:  Can we pull up what's in evidence as government Exhibit 501-36.

First publish the first page and then turn to the second page.

Q.   You just mentioned some role that you had in drafting this document?

A.   Yes, that is correct.

Q.   What was that?

A.   I drafted it.

Q.   And what were its basic terms?

A.   So it was a loan for $200,000 U.S. and a duration of 18 months.

Q.   And when was it dated?

A.   September 22, 2016.

Q.   And can you turn to the second page, or the last page of that document, Mike, which is the third page of the document.

Do you see signatures at the bottom?

A.   Yes, I do.

Q.   Who signed?

A.   Telemaque Lavidas for Mediterra Holdings and the lender,

Georgios Nikas.

Q.   And you mentioned other loans that were entered into. When, approximately, in connection with this loan were those loans made?

A.   So the loan of Mr. Sabater was I think maybe four or five days after that.  The loan by Mr. Steinhart was in November. And the loan of the Sorel Trust is approximately the beginning of 2017, I think.

Q.   And these loans, did these occur during the course of the Pepsi negotiations?

A.   That is correct, yes.

Q.   Do you know the reason why loans were used to get financing in this instance as opposed to going to a Series C investment round?

A.   Well, there were actually two reasons for that.  So the first one is that going to a financing round takes a lot of time.  Agreements like the ones you showed before have to be put in place.  The same agreement has to be signed by every investor, so even the slightest comment by one of them then has to go through all of them.  Then the process is also on the Swiss level, because it is a Swiss entity.  It is quite heavily regulated.  So capital increases in Switzerland are consummated before a Notary Public, so it is not something that you can do from one day to another in short.  And the second reason, and maybe more importantly, is that we were in the middle of the

K1ddlav2                          Stathi - direct

negotiation with Pepsi.  So at that time we didn't want to bring any extra shareholders on board.

Q.  Why would you not want to bring extra shareholders on board in the middle of the negotiations with Pepsi?

A.  Because Pepsi was going to become a shareholder itself and with an important stake, and so the number of shareholders was already disclosed to Pepsi so they knew how many there were. They were comfortable with that.  You have to remember, it wouldn't be initially a straightforward acquisition, so Pepsi would become a shareholder itself, and enter into a shareholders agreement with the rest of the shareholders.

Q.  After the Pepsi negotiations broke down, was there a Series C round?

A.  Yes, that is correct.

            MR. STREETER:  Can we turn to Defense Exhibit 826 for the witness, counsel, and the Court.

            The Series C is at the bottom.  I apologize.  Can you take the highlighting off, please, Mike.

            OK.  Can we publish this?  It is already in evidence, I believe.

            I'm sorry.  I offer 826.

            MR. COOPER:  No objection.

Q.  What is Defense Exhibit 826?

A.  It's the capitalization table of the Series C financing round.

MR. STREETER:  I offer it.

MR. COOPER:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 826 received in evidence)

MR. STREETER:  Mike, can you highlight the portion at the bottom that says "Series C Investors."

Q.  And what was the amount of the Series C round?

A.  $2,112,076 U.S.

Q.  And when, approximately, was the Series C round?

A.  In August 2017.

Q.  And did there come a time when the loan from Mr. Nikas was at least partially paid back?

A.  Yes.

MR. STREETER:  I am going to publish what's already in evidence as Defense Exhibit 828 and ask that that be put up on the screen.

Can we highlight the top portion.

Q.  What does the date say there?

A.  February 5, 2018.

MR. STREETER:  And then can we turn to the second page of that document, and can you please highlight these portions.

Q.  So what does it say under the "Reason for Payment" column?

A.  "September 2016, Loan Repayment."

Q.  And can you then look at the beneficiary portion?

A.  Georgios Nikas and Miranda Patera.

Q.   And what is the amount?

A.   $100,000 U.S.

Q.   And who is it being paid by?

A.   Mediterra Holdings SA.

          MR. STREETER:  And if you could take that down.

Q.   Did there come a time when Mediterra negotiated with another party to potentially buy a portion of it?

A.   That is correct.

Q.   When was that and who was the party?

A.   It was in 2018, and the party was Ferrero.

Q.   What is Ferrero?

A.   So Ferrero is an Italian company.  They make sweets and confectionaries.  It's a very, very large company.

Q.   Before we move on, my colleague has reminded me to ask you, the loans that you spoke about earlier, the Nikas one and the other three, how, if at all, were those disclosed to the investors in the company?

A.   So they were in the books of the company so they would form part of the company's financial statements, which are communicated to the investors and they are approved in the yearly shareholders meeting.  And I also remember that they were also mentioned in an investor communication letter that Telemaque would usually address shareholders.  So there was a regular, let's say, update to shareholders.

Q.   And moving back to the Ferrero deal, when were those

negotiations.  What broadly was being contemplated, and what happened?

A.  So that was different to the Pepsi deal in the sense that Ferrero was going to acquire the assets of the company as a whole, so not become a shareholder.  They lasted I think for approximately maybe three months and they fell through.

MR. STREETER:  OK.  I do not have any further questions at this time, your Honor.

CROSS-EXAMINATION

BY MR. COOPER:

Q.  Good morning, Ms. Stathi.

A.  Good morning.

Q.  A couple of questions about Mediterra first.

Mediterra was an international company, right?

A.  Mediterra was a Swiss company.

Q.  It had operations in the United States?

A.  That is correct.

Q.  And it had, I think you said on direct examination, a Swiss holding company, right?

A.  No.  The company is called Mediterra Holdings SA.

Q.  It is a separate company?

A.  It is one company, Mediterra Holdings SA, so this is a Swiss company, and then it had a subsidiary, a wholly-owned subsidiary, Mediterra Inc.

Q.  And the chief of all of that was Mr. Lavidas -- Telemaque

K1ddlav2                    Stathi - cross

Lavidas, right?

A.   That is correct.

Q.   He was the founder and the managing director of all of that?

A.   That is correct.

Q.   All right.  A couple of questions about the funding of Mediterra.

You talked on direct examination about all these different funding rounds.  Do you remember that?

A.   I do.

Q.   The first funding round, it included something called T&A Holdings, right?

A.   No.  T&A Holdings was the founding company, the Lavidas company that I was talking about before, that initially incorporated the company.

Q.   And T&A Holdings, that is a Lavidas family company, right?

A.   That is correct.

Q.   That's Lavidas family money, right?

A.   That is correct, yes.

Q.   OK.  And the second financing round you talked about, you mentioned that Miranda Patera was one of the individuals who provided financing, is that correct?

A.   That is correct.

Q.   An entity called The Sorel Trust also gave money in that round, right?

A.   Yes.

Q.   And The Sorel Trust, that's a Lavidas family trust, right?

A.   Yes.

Q.   That's also Lavidas family money, right?

A.   Right.

Q.   And Miranda Patera, you testified on direct examination, at the time that that second round of financing closed, I believe you said that you didn't know that she was married to George Nikas, right?

A.   Yes.

Q.   But Telemaque Lavidas at the time knew that Miranda Patera was married to George Nikas, right?

         MR. STREETER:  Objection.

         THE COURT:  Sustained.

BY MR. COOPER:

Q.   You now understand that that investment, that $500,000 investment, was an investment on behalf of both George Nikas and Miranda Patera, right?

A.   No.

Q.   You don't have that understanding, ma'am?

A.   No.

Q.   All right.  Well, let's talk about those loans for just one moment.

         You said even after the second round of financing there was a series of loans that the Mediterra company had to

K1ddlav2                          Stathi - cross

raise, right?

A.   Yes.

Q.   And one of those loans was from The Sorel Trust, right?

A.   Yes.

Q.   That's the same Sorel Trust that's the Lavidas Family Trust, right?

A.   Yes.

Q.   Again, Lavidas family money coming into Mediterra, right?

A.   Yes.

Q.   And George Nikas also extended a loan to Mediterra at that time, right?

A.   Yes.

Q.   Now, you understood at the time that Nikas extended that loan -- actually, let me withdraw that question.

       That was a $200,000 loan, right?

A.   Correct.

Q.   And you knew at the time that Nikas extended that loan that Mediterra was having a lot of trouble paying its bills, right?

A.   No.

Q.   Mediterra needed the money, right?

A.   I didn't know that it had trouble paying its bills.  I know that it was exploring --

Q.   Ma'am, that is OK.  The question was just whether you understood that Mediterra was having trouble paying its bills.

A.   No, I did not know that.

K1ddlav2                        Stathi - cross

MR. COOPER:  OK.  Can we please show just the witness, Court and counsel Government Exhibit 1305.

And if we can blow up -- there we go.

Q.  Ma'am, this is an email from Telemaque Lavidas, correct?

A.  That is correct.

Q.  And it's to a gentleman named -- I might get this pronunciation wrong -- Olivier Cherpillod?

A.  Olivier Cherpillod.

Q.  Correct.  Thank you.

And you are copied on this email right?

A.  That is correct.

Q.  And the email is September 21, 2016, right?

A.  That is correct.

Q.  And just take a look quickly at the body of the email, and I'll ask you if this is an email where Mr. Lavidas, Telemaque Lavidas, is discussing that $200,000 -- well --

A.  Yes.

MR. COOPER:  The government offers Government Exhibit 13035.

MR. STREETER:  No objection.

THE COURT:  Received.

(Government's Exhibit 1305 received in evidence)

MR. COOPER:  Mr. Pechet, can you please publish that so the jury can see it.

BY MR. COOPER:

K1ddlav2                    Stathi - cross

Q.   All right.  Now, I want to go through a couple parts of

this email with you, Ms. Stathi.

        MR. COOPER:  First of all, Mr. Pechet, can you blow up

even bigger just that first paragraph that begins, "Sorry for

the long email."

        I'm sorry.  Actually, let's just go to the top first.

Q.   Now that the jury can see this, ma'am, this is an email

from Telemaque Lavidas, right?

A.   Yes, that is correct.

Q.   September 2016, right?

A.   Correct.

Q.   And Olivier --

A.   Cherpillod.

Q.   Thank you.

        He was a lawyer that was working with Mediterra, an

outside lawyer, right?

A.   That is the Swiss counsel I was referring to before.

Q.   So the company had Greek counsel, it had Swiss counsel

also?

A.   It was a company incorporated in Switzerland so it was

necessary.

Q.   Lawyers all over, right?

A.   Exactly.

Q.   And you are copied here, right?

A.   That is correct.

K1ddlav2                    Stathi - cross

Q.  The subject line begins, "Urgent," right?  That's what Mr. Lavidas wrote here?

A.  Yes.

Q.  He wrote, "Urgent."

Now let's look at the first paragraph.

MR. COOPER:  Mr. Pechet, can you blow just that first paragraph really big, please.  All right.

Q.  Now, Ms. Stathi, Mr. Lavidas -- Telemaque Lavidas writes: "Sorry for long email but this is quite urgent," right?

A.  Right.

Q.  And he goes on to right:  "An investor interested in providing liquidity to Mediterra is now ready to wire us $200,000," right?

A.  Right.

Q.  He writes:  "He urgently requests a simple document (even half a page long)," right?

A.  Right.

MR. COOPER:  Mr. Pechet, you can take out that enlargement.

Now, can you blow up the two lines beginning, "Can you please help us."  If you can blow that up nice and big, please.

Q.  Now, Ms. Stathi, Telemaque Lavidas goes to write:  "Can you please help us generating this document?  It does not have to be complicated.  He trusts us, but needs to have a document in place in case his bank asks where the money is going."

K1ddlav2                     Stathi – cross

             Is that what the email says?

A.   That is correct.

             (Continued on next page)

K1D7LAV3

BY MR. COOPER:

Q.  All right.  And then just two more sections.  Mr. Pechet, can you blow up the line just below that that begins "his name".

And, ma'am, Telemaque Lavidas goes on to write, "His name is George Nikas and he will be doing this personally."

Is that right?

A.  That is correct.

Q.  And, Mr. Pechet, last, can you just blow up the three lines underneath that, please.

And Mr. Lavidas writes here, "We are extremely tight at the moment with liquidity and have some very important invoices to pay.  We were hoping to be able to provide the documentation after the wire but that's not possible."

That's what he writes, correct?

A.  That is correct.

MR. COOPER:  You can take that down, please.

No further questions, your Honor.

MR. STREETER:  No questions, your Honor.

THE COURT:  You may step down.

(Witness excused)

THE COURT:  Next witness.

MR. STREETER:  The defense rests, your Honor.

THE COURT:  Ladies and gentlemen, we're going to take our midmorning recess at this point.  Let Ms. Rojas know when

K1D7LAV3

you're ready to resume.

(Continued on next page)

(Jury not present)

THE COURT:  So, counsel, is there anything we need to discuss?

MR. COOPER:  Not from the government.  Thank you, your Honor.

MR. SUSSMAN:  Yes, your Honor, there is from the defense.

As you noted in the record, I too had some subway issues this morning which actually went to the East Side as well as the West Side, and so I missed the majority of the conference.  There is one issue I want to raise with the jury instructions.

On page 9, the --

THE COURT:  So, counsel --

MR. SUSSMAN:  Yes?

THE COURT:  -- I will take this, but this isn't how it works.  Other counsel were here -- indeed more than one defense lawyer -- but, anyway, going ahead, page 9.

MR. SUSSMAN:  Page 9, on the third paragraph, your Honor, the defense objects to the third paragraph.

THE COURT:  This is the reasonable doubt instruction?

MR. SUSSMAN:  It is the reasonable doubt instruction, your Honor.  And I will hand up to the Court and to counsel a case, and then I will explain exactly my concerns.

MR. COOPER:  Your Honor, I'm sorry, may I be excused?

THE COURT:  Yes.

MR. COOPER:  Thank you.

MR. SUSSMAN:  My concern is this, your Honor.  In that third paragraph what it says is that the jury after a fair consideration of the evidence, if they have an abiding belief of the defendant's guilt, then they can find the defendant guilty.  It says actually if they have an abiding belief that a prudent person would be willing to act upon, then they have no reasonable doubt, and under such circumstance it is their duty to convict.

That is in fact not the law, your Honor, and this case which I brought to the Court's attention -- and, for the record, the case is United States v. Glover, it is a Second Circuit case decided in 2008.  The cite is 511 F.3d 340.  And I refer the court to pages 346 through 347 -- what that case makes clear, your Honor, is the standard has to be not whether the jury believes the defendant is guilty; it has to be whether the jury believes that the prosecution has met its burden beyond a reasonable doubt.

This third paragraph actually is contrary to the law in this Circuit, and so the jury cannot -- even if they strongly believe that this defendant is guilty and they're sure, they still can't find it unless the prosecution has provided evidence and proven to them beyond a reasonable doubt.

So, we would ask that that paragraph be stricken from

the instructions.

THE COURT:  OK.  Well, your application is denied. This reasonable doubt instruction comes right out of Second Circuit law, and over and over again I instruct the jury that the government bears the burden of proof with respect to each of the elements with respect to each of the crimes charged, and that it cannot find the defendant guilty unless it finds that the government has born its burden of proof.

Good.  Thanks, counsel.

MR. SUSSMAN:  Thank you, your Honor.

(Recess)

THE COURT:  Please be seated.  Can the government give me a sense of how long the summation will be?

MR. COOPER:  It's under 90 minutes, your Honor.

THE COURT:  Defense counsel?

MR. SUSSMAN:  I think at this point in time, your Honor, we should be right around two hours and 15 minutes.

THE COURT:  Bring in the jury.

(Continued on next page)

(Jury present)

THE COURT: Ladies and gentlemen, all of the evidence is in; the evidentiary record is closed. We now move to the next phase of the case. This phase is the attorneys' final opportunity to speak directly to you. Nothing they say is evidence. Your recollection of the evidence controls. But, nonetheless, I know that you will give them your full attention. This is their opportunity to point out to you pieces of the evidence that they think you should focus on with particular care. It's also their opportunity to suggest to you that there are various connections between pieces of evidence or inferences that can be drawn from pieces of evidence that you should consider during your deliberations. So, again, I know you will give them your full attention.

Now, there will be three summations. As I told you from the beginning, the burden of proof in this case rests exclusively on the government. The government must prove the defendant guilty beyond a reasonable doubt. Therefore, the government will open with the first summation; defense counsel will have an opportunity to give you a summation; and then the government will have an opportunity for a rebuttal summation. So, there will be three in all.

Counsel.

MR. COOPER: Thank you, your Honor good afternoon -- good morning.

Early October 2013 and the news inside Ariad was terrible.  You know that the company had a huge blockbuster drug, but there were some safety issues, and the FDA was very concerned; it was bad news.  The company's stock price was going to tank, and ordinary investors were going to lose their shirts.  But there was somebody who knew that secret information before ordinary investors.  It was that man, the defendant, Telemaque Lavidas.  And you know now exactly what he did.  He picked up the phone and called his best friend George Nikas.  Why?  Because Nikas had millions and millions of dollars riding on Ariad.  Nikas was investing that money in the belief that the stock was going to go up.  But not after the defendant called him.  Because you saw what Nikas did after that.  Instead of betting millions -- and by bet I mean expecting that the company was going to go up -- he totally changed his view and invested millions of dollars believing then that the stock was going to go down.

And wouldn't you know it, a couple of days later, when the news came out, that terrible health news, the stock price plummeted, it went down 66 percent.  Ordinary investors got wiped out.  But because of the defendant's corruption, Nikas didn't get wiped out -- Nikas made millions -- because the defendant gave him an illegal edge.

We're here, ladies and gentlemen, because the defendant obtained secret company information about Ariad and

K1D7LAV3                      Summation - Mr. Cooper

used that information to fuel a major insider trading scheme. He did it over, and over, and over again, helping his friend George Nikas make millions.  We're here because he cheated not just once, but over and over again, in conduct that can only be described as brazen.  He didn't think he was going to get caught.

Ladies and gentlemen, insider trading matters.  No one -- no matter their wealth, no matter their connections to corporate insiders -- is supposed to have an illegal edge.

Now, because of the defendant's insider trading scheme -- he is charged in seven counts here -- the evidence presented in this case, that close personal relationship between the defendant and Nikas, all of those timely telephone calls, the defendant's father getting that secret information, talking to the defendant, the defendant talking to Nikas, the trading records, Nikas selling, Nikas buying based on the defendant's phone calls, all of that ties together to lead to one and only one conclusion:  That the defendant is guilty.

So, this summation is our chance to talk about the different pieces of evidence, all that you've seen at this trial, and explain how it all fits together to show that the defendant is guilty.

First, I want to talk about some things that are not really in dispute here.  What's not really in dispute?  First, the defendant's father received secret Ariad corporate

information.  You know that; there is no real dispute here.  He was on the board of directors.  The board got updated about all the important things -- good and bad -- happening to the company.  In particular, you've seen that the defendant's father got updated about all three insider trading events at issue in this trial.  We will talk about these, but they are October 2013, winter of 2013 and summer of 2015.

Now, you know that those three announcements were all important.  Mr. Streeter in his cross-examination of Harvey Berger spent hours on different news articles and Fly On The Wall.com about rumors and speculation in the market.  But, ladies and gentlemen, the proof is in the pudding here.  You saw the stock price move when those announcements came out.  The information was new, and it was important.  That's why Nikas and the rest of the traders were able to make $15 million based on that secret information.  That doesn't happen unless it's important.  You know that.

What else is there no real serious dispute about?  The defendant and his father were very close, personally and professionally.  The defendant worked, was an executive at the family pharmaceutical business in Greece, Lavipharm.  The defendant and his father -- as we saw this morning through the testimony of Ms. Stathi -- were linked together in the snack bar business Mediterra, and you saw they talked all the time; they were very close.

There is also no dispute that the defendant and his father knew the rules.  Remember Harvey Berger's testimony: "It's simple, confidential information cannot be shared beyond the company."  You saw policy, after policy, after policy, no reasonable dispute that this was crystal clear.

And you saw also Government Exhibit 903.  It's one of those Mediterra documents that the defendant was on, where he acknowledged understanding federal securities laws, material nonpublic information, inside information, can't be shared.  It would be a violation of the law to do it.  On this issue there is no reasonable dispute, both the defendant and his father knew the rules.

So, on one hand no dispute that the defendant's father had this secret information and the defendant and his father knew it couldn't be shared.  On the other hand, there is no real dispute that Nikas and this whole network of traders profited on this inside information.

You remember the testimony of Jan Jindra, all those trading record charts, no dispute those trades were important.  Defense counsel basically conceded this in his opening statement when he agreed that Nikas and Demane were serial inside traders, that this was insider trading.  No real dispute there.

So, what really is in dispute?  How did the information, the inside information, get from Ariad on one hand

K1D7LAV3                        Summation - Mr. Cooper

to George Nikas on the other hand?

At this trial -- we're going to talk about this in a few minutes -- you have seen overwhelming evidence that the defendant was the source of the inside information.  I'm going to talk about eight different ways -- eight independent ways -- that you know that it was the defendant.  Any one of those eight, he's guilty.

The defense contends instead that we got the wrong guy.  Now, that's a serious allegation.  I'm going to say a lot more about it later on, but they said instead in opening statements that some woman named Darina Windsor did it.  Now, they don't have the burden of proof as you've heard, but this was their whole argument.  I am going to come back to it later because it's a ridiculous argument.  You will see that there is zero evidence that Darina Windsor had all of the inside information at issue in this case; zero evidence she even knew George Nikas or any of the traders; zero evidence that she passed any Ariad inside information to anyone.  Zeros across the board.

Ladies and gentlemen, you have sat through the trial, you have heard the witnesses, you've seen the evidence.  Of course, the defendant was the source.  It's obvious.  It's clear as day.

As I said, I'm going to talk about eight different reasons you know it was the defendant.  Any one of them he's

guilty.  Here you have all eight.  So, let's get right to it.

Reason number one, October 2013.  It's seven days in October that show you that the defendant is totally guilty.

So, October 3.  Going into October 3, 2013, Nikas is what is called long on Ariad.  You remember that means he had money invested expecting that the stock was going to go up.  He would profit if the stock went up.  So, that's his belief on October 3.  He has a lot of money riding on that.

What happens next?  Harvey Berger told you Ariad got the single worst news you can have:  Its blockbuster cancer drug was causing serious health issues in patients, unexpected issues.  The FDA was concerned.  Ariad was concerned.  Berger said it was a potential company killer.  So that is what is going on inside of Ariad.  That's what's going on with the board of directors.  They know there is a serious issue.  Who doesn't know?  The investing public.

Now, what happens right around then?  That's October 3.  October 3, the phone records, the defendant and his father are exchanging telephone calls that day, and that night the defendant calls Nikas.  It's the same Nikas who up until that point had millions invested expecting the stock was going to go up.  What does Nikas do the very next day, October 4?  He starts selling.  He starts selling his stock, and he starts investing money that's going to pay off if the stock goes down.  He reverses his position.  He starts laying down millions of

dollars betting the stock is going to go the other way.  Only you know now it wasn't a bet; it was a sure thing.

Ladies and gentlemen, what do you think the defendant and Nikas were talking about the night before?  What made Nikas go from having millions of dollars invested expecting the stock is going to go up and on a dime flip it around and put in millions of dollars expecting that the stock is going to go down?  Do you really think that the defendant and Nikas talked about sports or the weather and then Nikas started selling Ariad?  Of course not.  You know the answer to that.  Your common sense and the evidence tells you it was the defendant passing inside information.  Everything that Nikas did after that call tells you what happened.

I want to pause here, because -- and I have mentioned this before.  I will say it a few more times -- the defense doesn't bear a burden -- but in his opening statement Mr. Streeter said the government is not going to show you any recorded calls, no recordings of what these guys said.

Ladies and gentlemen, recordings?  Actions speak louder than words.  You have Nikas' actions.  You have his money.  He is laying down money after that call, millions and millions of dollars.  That tells you exactly what that conversation was about.  That's October 4, he starts selling and selling and selling.

And a few days pass.  October 7, in the morning the

K1D7LAV3                        Summation - Mr. Cooper

defendant and his father exchange some text messages.  His father, who is getting updated about this terrible, single worst news.

What else happens that day?  Noon, the telephone conference of the Ariad board, where Harvey Berger gives them another update, another update about this terrible news.  What does the defendant do right after that noon conference?  He and Nikas call each other, four calls in a matter of eight minutes.  They're burning up each other's phone lines right after that board call.

Just look at the timing here, ladies and gentlemen.  The last phone call between the defendant and Nikas is at 1:02 p.m. on October 7.  What happens shortly after that?  No surprise, Nikas starts selling even more, almost $2 million that afternoon, after Nikas hangs up the phone with the defendant.  What do you think they were talking about?  Of course the defendant was passing inside Ariad information.  So that's October 7.

And what happens the next day, October 8?  Remember, the announcement comes out on October 9, the really bad announcement that sends the stock price spiraling down.  But what happens on October 8?  Well, in the morning the defendant and his father exchange phone calls.  And where is the defendant?  New York, Midtown, right around Nikas' apartment.  You know that from the cell site.  He's right near his best

friend's apartment, and he's calling his father the day before the single worst news gets announced.

Over the course of that day, no surprise, Nikas dumps millions of dollars of Ariad stock, places millions on the fact that the stock is going to go down.

Now, let me just pause here for a second, because a lot of big numbers have been thrown around at this trial -- millions and millions and tens of millions -- but when you step back, folks, this is $3.1 million just in one day.  This is a lot of money.  You have seen a lot about George Nikas.  He's not going to put down $3.1 million on a lark.  He is not going to put down $3.1 million after he and the defendant talk about sports and snack bars.  No, he's getting the inside information.  That's why he makes all of these trades.

So, let's come to the evening of October 8.  This is another important time period.  This is the night before that announcement.  The market is closed.  Nikas' investment is out there.  He is going to make a mint if the stock spirals down, if the announcement comes out.

So what happens that evening?  Let's look at the cell site again.  First, 8:05 p.m., the defendant is over here, he is over here on the East Side of Manhattan, sort of close to Central Park.  And who is he calling?  He is calling his dad. They talk for 11 minutes.  But he is not staying there.  You know he is not staying there because you see during that call

he is walking over to Nikas' apartment.  He is talking to his dad, and he just happens to find his way over to Nikas' apartment, the same Nikas who has millions betting on the stock going down?

And look at what he does when he gets there.  He calls Nikas.  Outgoing call, ingoing call, 8:19, 8:24.  You know what he is saying there.  He is standing outside the apartment; george, I'm here, we got to talk.  This is the night before the single worst news gets announced.  And you know he is there for a while, because he also is right there at 8:47 p.m., a half an hour later when he is meeting with Nikas again.  What do you think they're talking about?  Nikas is hours away from making millions of dollars when this announcement comes out.  It's no secret what they were talking about.  The defendant was talking about Ariad's secret corporate information.

The proof is in the numbers.  It's no secret.  Look at how it paid off for Nikas.  On that one announcement alone, Nikas, when he sold the stock he avoided losing about $800,000 -- that's there on the right -- and he actually profited, he made cash in his pocket over $3 million on that one trade alone.

Look at the timeline, those calls so well timed, defendant and his father, defendant and Nikas, Nikas dumping stock, the meetings, the calls, Nikas laying down millions like a man who knows exactly what the company is going to announce.

What do you think they were talking about, ladies and gentlemen?  Again, the answer is plain as day.  This timeline is absolutely devastating evidence.

And the other thing about this October 2013 timeline, the defense lawyers' alternate theory, this all Darina Windsor did it defense, it does nothing to explain this evidence.

Harvey Berger told you that Darina Windsor's employers, Centerview Partners, didn't even have this FDA information back in 2013.  It was information that only Ariad had.  How could she be the tipper here?  She didn't even know this news.  Well, we're also going to talk about Demane in a little bit, but you don't even need Demane when you have all of this evidence from the October 2013 timeline.

The evidence here is overwhelming.  You can convict the defendant based just on these seven days in October.  That's the first reason.

Let's talk about the second reason:  Winter 2013.  This is the second insider trading event.  What happens here?  Let's first look at what is going on inside Ariad.  You remember the company is trying to get their big drug back on the market.  They had taken it down, and Berger is updating the board of directors with an update on November 20.  Harvey Berger talked about how difficult it is to do what they were trying to do, to get the drug back on the market.  It's virtually unheard of; it was a big surprise to the market.  You

heard that.  So that's on November 20.

What happens the next day, the day after Berger reports to the board about this big development?  Again, no surprise, George Nikas buys, like a guy who knows exactly what is going on in these discussions with the FDA.  Remember, he thinks now the stock is going to go up.  So, in the beginning, before October, he thought the stock was going to go up, talks to the defendant, thinks the stock is going to go down, and then this news comes out from the board, again flips it around, thinks the stock is going to go back up again.  What do you think they were talking about?  And he continues buying, and buying, and buying, going long, putting down money, betting that the stock price is going to go up.

Now, remember, Nikas was out of the country at that time.  You heard a stipulation he arrived back into New York on December 1, 2013, in the middle of this buying spree for Ariad.  What happened the very next morning right after Nikas steps off the plane?  Who is at Nikas' apartment?  The defendant.

The very next day the defendant goes to Nikas' apartment -- and you saw these connections -- and he is there basically all day.  This is the day after Nikas got back to the country with millions riding on Ariad.  Just like before, what do you think they were talking about?  What is causing the defendant to rush to Nikas' apartment right after his good buddy flies into the country?  Just like before, you know

exactly what they were talking about:  Secret Ariad information.  And Nikas -- Nikas continues buying after that.  You saw that chart.  The green line just keeps on going up and up and up.  And then the big announcement on December 20, and Nikas makes a lot of money.  The stock price goes up just like Nikas knew it would, just like the defendant knew it would, just like the defendant's father knew it would.

Now, having come back, met with the defendant and made a mint, what does Nikas do after this?  Gets out of the country three days later.

Now, let's step back for a minute here, because this is the second time line we've walked through.  And you are starting to see the pattern here.  There are calls, there are tips, there are trades.  Call, tip, trade.  Meeting, tip, trade.  Again and again and again.  Nikas isn't getting lucky.  He is not going to the race track and laying down money on the trifecta.  He knows the answers to the test before the test is even given, because his best friend just a couple of blocks away is feeding him the answers.  This is the second reason, winter 2013, second independent reason you can convict the defendant.

Let's go to the third.  Summer 2015.  Now, before we go through this timeline, I just want to get one thing clear, because there is a lot of testimony about FDA and investment banks.  Those first two announcements -- October 2013 and

winter of 2013 -- those were discussions between the FDA and Ariad, pulling a drug off the market, and now it's safety issues getting the drug back on the market.  Who knew about that?  Ariad and the board of directors.  Who didn't know?  Centerview Partners and someone named Darina Windsor.  You have seen zero evidence that anyone outside of Ariad knew about that.

So let's talk about summer 2015.  This is a bit different.  This one involved the potential acquisition.  You remember a company named Baxalta made an offer to take over Ariad.  So Dr. Berger testified -- and you may remember this -- that when the public learns that one company wants to buy another, the target company's stock price typically jumps up, so you can make a lot of money if you buy that company's stock beforehand.

So what happened?  July 30, 2015, Baxalta the company sends its letter to Dr. Berger to acquire Ariad.  It's really good news -- if you know it -- if you have the inside track.  You could make a mint knowing about this.

So what happens?  This is July 30.  You saw the e-mail.  That night, 11:48 p.m., Harvey Bergen sends an e-mail to the board, including the defendant's father, updates them, he got this letter, it's great news.

What happens the very next day?  The very next day the defendant and his father exchange telephone calls in this time

period, a couple calls between 12:45 and 1:14 in the afternoon.

What happens next?  The defendant calls Nikas.  It's 13 minutes later, ladies and gentlemen.  What do you think he was doing in those 13 minutes?  What can you possibly do in those 13 minutes?  He's got this hot news.  He was sharing it with his best friend.

And what happens right after that?  Right after 1:27 p.m.?  13 minutes later Nikas starts a spending spree.  $3.5 million of Ariad stock that day alone.  Folks, that is a lot of money.  It's a lot of money to put down, and you don't do that unless you know for sure what is happening.

Look at how close in time these calls are and these trades are.  Again, what do you think they're talking about?  Mr. Streeter suggested that you need recordings to know what they're talking about.  Your common sense and the evidence tells you that that's absurd.  Nikas goes long, goes way long, dumps millions into Ariad stock 13 minutes after hanging up the phone.  Think of the things he had to do.  He probably hung up the phone with the defendant; he had to go wherever his brokerage account password was written; maybe he entered it in incorrectly and got one of those text message bounces.  Basically he is going right to his computer and buying Ariad stock based on the hot tip from the defendant.

Now, you know everything that happened before that call, and based on the fact that Nikas bought right after that

call, that the defendant passed that tip to Nikas.  No one lays down that kind of money without knowing what is going to happen.

Now, to cut to the chase with this time period, this summer 2015 time period, you saw Nikas kept buying, and buying, and buying, all the way up through August 28 when there was a news article announcing that Baxalta had made an offer.  No surprise, the stock jumps up -- that's that blue line -- and no surprise Nikas makes a lot of money.

So, let's step back here again, because this is now the third of these three timelines that we're going to walk through.  Don't worry, there are not going to be more time lines here.  But you see that each of the times Athanase Lavidas gets hot inside secret information that the market doesn't know.  Each of these times Nikas trades like a man who has that information.  And each of these times the defendant is right in between the two of them.  Those telephone calls are not innocent calls.  You don't need a recording.  You weren't born yesterday.  Your common sense and the evidence tell you exactly what is going on.  That is insider trading in progress, and that's a third reason -- a third independent reason -- you can convict the defendant.

There is more, a fourth reason.  Now, because of what Nikas and everyone else did in the network in October 2013, because of some of the reasons why they were going short, that

tells you it was the defendant.  Let me explain what I mean.

Now, just before October 2013 Demane told you he was hearing rumors that Ariad was going to be a take-over candidate.  His friend Dov Malnik told him there were rumors in the market that Ariad was going to get taken over.  And you know if a company is going to be a take-over target, you buy that stock, and you make a lot of money when the news comes out and it goes up.

So this is what Demane is hearing.  What does he do?  He checks with Nikas.  Let's just pause there for a minute.  Demane hears a rumor in the market about take-over, and what does he do?  He checks with Nikas.  Why in the world would he do that unless Nikas had a solid source, a guy on the inside who could confirm the rumors that Demane was hearing from Dov Malnik?

Nikas comes back and says it's nothing, it's unfounded.  And you know that after that Nikas calls Demane -- and this is Demane's testimony -- and explained short the company.  You remember that means invest money because the stock is going to go down.  Why?  Because there was a problem with the drug they were selling with the FDA and they had to remove the drug from the market.

Who had that information?  Centerview didn't have that information.  This person Darina Windsor didn't have that information.  The defendant and his father had that

information.

And you also saw -- this was a chart that Dr. Jindra put in talking about all those traders, what their positions were, what their investments were in Ariad. And you see the green bars towards the left. Green means they thought the stock was going up. And those green bars are pretty big. They thought the stock was really going up. And what do they do? Seven day's time -- actually it's really six day's time, from October 3 to October 8, right before the announcement, it goes from very green completely the opposite direction to very red. They flipped their positions. They went from long to short. You know that they did that because they had confidence in the quality of the information. And they made a ton of money. $7.5 million.

Now, why is this important? In a nutshell, this shows you that those traders were trading not based on a rumor -- the rumors were the stock was going to go up because it was a take-over candidate. That's not why they invested. The fact that they went short and bet the stock was going to go down shows you the source wasn't an investment banker, it wasn't some market rumor, it wasn't Fly On The Wall.com or whatever kind of document they put up; it was an Ariad insider. Now, you can convict the defendant for this reason as well, a fourth independent reason.

Fifth reason: The defendant is the only person you

have heard about at this trial who was close to Nikas and knew about all three insider trading events at issue in this case. Remember, Harvey Berger's testimony:  The board learned anything material, anything that could influence the future of the company -- good or bad.  That's what Harvey Berger told you.  And you know that these three events were material, they were important.  He told he updated the board on all three.

Ladies and gentlemen, what other insider have you heard about at this trial who had access to all three pieces of information?  No one.

Take, for example, the FDA information.  FDA information was routinely shared by Berger with the board of directors.  It wasn't shared with outsiders.  Question to Berger:

"Q.  Did Ariad provide information to Centerview Partners about those issues with the medicine Iclusig" -- that was the bad news and at good news -- "in 2013?

"A.  No, sir."

Centerview didn't have it.  Darina didn't have it. The defendant and his family had it.

Now, you have seen a lot of focus by these defense lawyers on other time periods.  I just want to pause here for a minute on other time periods.  You know the three trading events at issue in this case are October 2013, winter 2013 and summer 2015.  Again, they don't have the burden, but they

focused on what happened in 2012 and the beginning of 2013, and they put up charts about the summer of 2013 and trading them. And then they put up that one chart -- I am not even going to show it now -- but it showed Nikas' trading over time, and they highlighted 2017. That's not even an issue in this case. The question for you is insider trading on those three events. Don't be distracted by the attempt to take your eye off the ball of each of those three events.

OK. Let's talk about the next reason you know -- the next independent reason you know the defendant was the tipper here. It's because of that special relationship he had with Nikas. You know the two were very, very close. I'm going to start here with the stipulation between the parties that we read, a couple of days ago last week. You saw these guys weren't just acquaintances, they weren't casual friends. Take a look at how the defendant himself characterized the relationship in the stipulation, Government Exhibit 700: Very close, personal relationship. Overlapping business interests. They conducted business together. You saw evidence of that also. They exchanged e-mails and text messages relating to all sorts of things including news, business news, business interests, they're their overlapping interests, and highly personal details with their romantic relationships with women.

Folks, do you really think that these guys are going to draw the line in their relationship at talking about insider

information about Ariad?  Of course not.  This isn't some passing acquaintance.  It's close and it's meaningful.

You also saw all the different ways that they communicated.  You saw those e-mails where they were exchanging BBMs or BlackBerry messages.  You saw telephone contact, text messaging.  You heard that they met in person.  These guys had all the time in the world together to pass inside information.

And if you have any doubt that they were really close, remember the testimony; it was five minutes on the witness stand from Special Agent Youn.  When the F.B.I. went to arrest the defendant where was he?  Where was he staying?  He was sleeping in Nikas' apartment.  You couldn't script it any better if it was a movie.  They were going to arrest him for insider trading with Nikas, and he is at Nikas' apartment.  You see the closeness of the relationship between these two that formed the backbone of their sharing inside information.

What else do you know about their relationship?  Nikas was constantly trading.  Giatrakos, the cousin -- Panayotis Giatrakos, Nikas' cousin -- testified last week.  Nikas was constantly following the market.  If he was free, he was on the screen.  And he -- that means Nikas -- and the defendant talked about stock market activity frequently.  The defendant knew that Nikas was a trader, and you have seen evidence that the two of them talked about stocks.

Here an e-mail from April 2013 where Nikas is sending

the defendant a news article about a corporate acquisition, joking around "You're bidding again."  You saw text messages from 2017 the defendant texted Nikas, he reaches out to Nikas, "Tell me please that you still have stock in Lauder because I have seen where it is."  Nikas writes, "I do.  I gave them and then bought them again."

Ladies and gentlemen, the defendant knew about Nikas' stock positions.  He sent him this text because he knew that Nikas was already invested in Lauder, Este Lauder.  These guys aren't passing acquaintances, these guys aren't pen pals living across the country.  They are best friends and they talk about stock trading.

But that's not all.  They also talked about insider trading.  You learned that in 2013 Nikas traded in the stock called AmerisourceBergen, and it was based on inside information.  Demane talked about that.  Jan Jindra, the trading records guy, put up some charts showing you that Nikas put in money to AmerisourceBergen right before the stock spiked.  And then there was a public announcement that caused the stock to spike.  Out of the blue the defendant sends this e-mail chain to Nikas.

Look at the bottom.  The defendant just forwards that corporate announcement to Nikas about a deal -- if you look at the bottom -- between Wallgreens, AmerisourceBergen and some company named Alliance Boots.  Why did he do that?  Because the

defendant is so interested in a company named Alliance Boots? He didn't even write anything in the e-mail, he just sends the news on to Nikas.

Ladies and gentlemen, if the defendant didn't already know that Nikas was invested in AmerisourceBergen, that bottom e-mail would look very different. Hey, George, I know you follow news about Alliance Boots really closely, thought you might be interested in this announcement.

No, this is the announcement that made the stock pop. This is the announcement to let Nikas make all that money. The defendant forwards it right along.

And look at Nikas' response. "Yup" as in just like I told you. Who does that? If Nikas hadn't shared with the defendant that he had been trading in AmerisourceBergen, this top e-mail too, would have looked different. Thanks Telemaque, that's interesting, it just so happens that I own a bunch of AmerisourceBergen stock and I just profited by a lot of money. He doesn't write that. These guys are celebrating.

Now, why is this important? This is March 2013. This is before October, the first of those three insider trading events, the first time when the defendant passes actionable information that you've seen, actionable information that Nikas makes millions on. They're not just guys who are acquaintances. They're not even just guys who talk about stocks and stock trading. They are guys who know each other's

K1D7LAV3                    Summation - Mr. Cooper

stock positions, who know what the market is doing.

You have seen that their relationship though extends even beyond that.  You've seen evidence that their finances were intertwined.  What do I mean?  Well, we had some testimony on it this morning, so it's probably pretty fresh in your mind -- I will move somewhat quickly through this part -- but you saw that in March 2015 Nikas and his wife Miranda Patera invest $500,000 in Mediterra.  And you saw that that wasn't just Miranda Patera's investment.  This was some testimony from Ms. Stathi this morning.  We're going to get the exhibit number for you in a moment.  But Ms. Stathi said this was just Miranda Patera's investment, it was just her money.  But you also saw during trial an e-mail from Nikas where he talked about he and his wife being invested in Mediterra together.  This was a family investment; this was Nikas money.

And there was more.  Just for good measure the next year Nikas loans $200,000 to the defendant.  And loans is in quotes here, ladies and gentlemen, because of that e-mail that you saw about a half an hour ago.

Now, Ms. Stathi may not have recalled the back story.  And that's fine.  She was clearly doing her best on the stand to remember these events.  She said the company Mediterra wasn't having liquidity issues, this was just a normal course loan, an arms-length loan.  But the e-mail shows you it was anything but.

Here is that e-mail.  They're talking about the loan, and the defendant about Nikas writes, "He trusts us but needs to have a document in place in case his bank asks where the money is going."

These guys aren't even interested in doing a real contract together.  This is just to paper over the record in case the bank comes around asking, hey, why did you send $200,000 to a snack bar business in Switzerland.  That's why they did the loan agreement.

And you know that the defendant needed that money. "We're extremely tight at the moment with liquidity.  We have some very important invoices to pay."

He couldn't pay the bills.  He didn't have time to put a document together.  So, who did Nikas turn to? -- I'm sorry. Who did the defendant turn to to get that money?  George Nikas.

Now, the defense case this morning I gather suggested that Mediterra was a real business.  Sure, it was.  That's not a contested issue here, ladies and gentlemen.  The fact that it was a real business tells you nothing about whether this investment and this loan were benefits to the defendant.  You know he needed the money, and you know where he turned to to get that money that he so desperately needed:  Nikas and Nikas' family.

In light of all that you learned and all that you know about the relationship, is it any surprise that the defendant

K1D7LAV3                    Summation - Mr. Cooper

would share secret corporate information with Nikas?  It was wrong, it was a crime, but it's certainly not a surprise.

And when you consider this close personal relationship between the two of them, and ask yourself why the defendant and his father did this, why the defendant and his father shared secret corporate information with George Nikas, you see all the different kinds of personal benefits that they got.

Ladies and gentlemen, personal benefit here can be as simple as giving confidential corporate information to a friend so they can trade on it.  It's as easy as that.  And you have seen that in spades here.  You've seen that close personal relationship.  I'm not going to go through all the e-mails.  We read a bunch of them in our case.  You saw the stipulation where they talked about that very close meaningful personal relationship.  You know that the defendant gave this information to Nikas because Nikas was his friend and because instead of reaching into his pocket and giving his best friend cash he gave him something just as good, information that Nikas could use to make millions.

And while we're on this, by the way, ladies and gentlemen, you know about the defendant's father too.  We're going to come back to that in a minute -- or perhaps we will talk about it right now.  You know that as part of doing this the defendant's father got a personal benefit.

Remember, Harvey Berger told you that 2011, 2012, the

K1D7LAV3                        Summation - Mr. Cooper

defendant's father, Athanase Lavidas, was having a serious

financial crunch.  He had fancy apartments, Dr. Berger

testified, around the world, but he didn't have the money to

keep the lifestyle going.  He seemed desperate.

(Continued on next page)

MR. COOPER:  And what happened?  Nikas was paying Telemaque Lavidas and his father.  You see the motive.  They needed money.

But also consider this.  The defendant's father wanted to help out his son.  You saw that whenever he was able, that Sorel Trust investment we talked about this morning, the other financing, whenever he was able, he was putting money into his son's business.  But he was cash crunched.  He didn't have a lot of cash in his pocket at this time that he could give to his son, so he gave the next best thing -- secret corporate information that a savvy stock trader like Nikas could use to make unless of dollars.  He did it to benefit others without having to reach into his own pocket.

You see the personal benefit that the defendant and his father received.  What other personal benefit did the defendant himself get?  All this assistance to Mediterra from Nikas.  The $500,000 investment, the $200,000 loan.  You saw even that Nikas put the defendant's snack bars, gave out samples with delivery orders at Nikas' restaurants:  "Nothing to do with us, just helping out a friend."

That's the relationship they had.  That's the benefit the defendant got.

Now, you see here that there was plenty of personal benefit.  So I want to step bank here again for a moment.  What does this all mean?  What does this close personal relationship

K1ddlav4                    Summation - Mr. Cooper

mean in your consideration of the evidence?

Look at the closeness.  Look at the relationship. Look at the things that the defendant and Nikas talked about. Friendship, money, business help -- all of the above.

You know who didn't have that kind of relationship with George Nikas?  Darina Windsor.  The defendant and Nikas were thick as -- this is another reason you know why the defendant is the one who tipped all of that inside information.

Next reason.  The trading network.  What do I mean here.  I'm going to tick off a few different ways that that trading analysis that Jan Jindra showed you, why that shows that it was the defendant, and not Darina Windsor or anyone else.

First, who makes the most money on these three different insider trading events?  George Nikas.  By far he makes more than any of the other traders in this network.  It is not even close.  He profits by over $4.7 million.

By the way, look at the next column over to the left. "Total bet."  It's called a bet here, but you know there was no risk involved.  You know it was a sure thing.  But look at how much money Nikas puts down.  He puts down 40 million and he profits by almost $5 million.  Why?  it makes sense.  You do you that when you are the closest one to the source, when you have the most confidence about the reliability of that information.  Nikas had the confidence to go short in October,

K1ddlav4                         Summation - Mr. Cooper

to go -- reverse his position and go long again, and then continue going long.

Now, you saw some testimony about that.  Demane told you, you have the confidence to take a short position because the relationship Nikas had with the defendant.  We'll talk about Demane in a little bit, but he -- say what you will about him, he is a savvy stock trader.  He is not going to lay down millions of his own money unless he knows that Nikas' tip is coming from a very reliable source -- the defendant.  And he told you that.  That was the confidence.  That's what gave him that confidence.

Now, also, some of these traders traded in one of the three events.  Some of them you see traded in two of the three event.  The only one to trade all three events -- George Nikas.  Why?  Again, he was closest to the source and because the defendant was the only insider you've heard about who had the inside information about all three events.

His trading analysis tells you that that's true.  At this trial you have seen one and only one source that Nikas had.  It was the defendant.  This is yet another independent reason you can convict the defendant.

Next reason:  The testimony of Demane.  But step back for a minute, ladies and gentlemen, because we had talked about seven different independent reasons why the defendant is guilty before we even get to Demane.  You can convict the defendant

without even considering Demane's testimony.  But you also have Demane.  Demane told you about the criminal conspiracy from the inside.  He told you who the source of that inside information was.  The defendant.  And that is enough on its own to convict the defendant.

I want to say that again because this is an important point.  If you credit Demane's testimony, that on its own is enough to convict the defendant.

We could have called Demane, had a one-day trial, and rested because he told you everything you need to know about the defendant's guilt.

What did he tell you?  During the conversations with Nikas, what did Nikas say about his source?  Telemaque Lavidas and his father.  Nikas was on the phone with Telemaque Lavidas, and they were meeting quite often at their house and at the restaurant.  These guys were together all the time and Demane knew it.

What else?  The defendant was Nikas' only source, and you know that here.

"Did George Nikas ever tell you that he got information about Ariad from anyone other than the defendant and his father?

"A  No, sir.

"Q  Did you -- did Demane -- ever get information about Ariad from any other source?

"A    No, sir."

The defendant's guilty.

"Q    And was the information that you got about Ariad, was that unique in any way?

"A    Yes, it was unique, because all of Demane's other sources were investment bankers, and this one, this one was a different source."

Why?  Because it came from a member of the Board of Directors of the company, to his son, to the son's best friend, Nikas.

Ladies and gentlemen, the defendant is guilty right there.  Just three different slides, three different transcript quotes that show you the defendant is guilty.

And step back for a minute and think about why these conversations between Demane and Nikas make sense.  You saw that Demane and Nikas had a longstanding insider trading relationship.  Demane fed a lot of tips to Nikas over time.  He told you that.  And Nikas made a lot of money.  Why in the world would Nikas lie about his sources to Demane and risk that cash cow?  Why would he lie and make up a story to Demane, risk Demane losing a lot of money?  He wouldn't do that.  He wouldn't do that because he also relied on Demane to give him tips.  These guys had a relationship of mutual trust.  They trusted each other and they passed tips bank and forth.

Also, think about this.  Demane and the defendant had

each other's contact numbers, telephone numbers, in their phones. You remember they exchanged phone numbers at that restaurant, at Lavo, when they met each other back in 2011.

You also saw that the two of them texted. Demane and the defendant texted. You also saw an email exchange. They had each other's email address, as you see here.

Would Nikas really falsely claim that the defendant was a source when, if things went south, Demane could so easily check to confirm? Of course not. Of course not, ladies and gentlemen.

But you don't even have to just take Demane's word for it, because you've also seen at this trial that Demane is corroborated. What he told you is backed up by other documents, other evidence, that he has never even seen, some of which he has and some of which he hasn't, but it all shows that Demane is corroborated.

What do I mean by that? First, Lavo. He recalled first meeting the defendant in a restaurant called Lavo, and he remembered that Nikas organized that meal. OK? What are the documents that you've seen at this trial? Nikas' credit card records showing that he paid for dinner. It was a group of eight or ten people. They got a lot of food. They got drinks. It was a big group. This is what they did, but this corroborates Demane.

Also the text messages. You remember, Demane texted

the defendant and said, Hi, Telemaque we met at Lavo with Georgios Nikas.  He's corroborated.

What's another example?  Demane recalled that in that winter 2013 time period -- remember, this was after -- at first everybody bet the stock was going to go down and make a lot of money, and then they started betting the other way, the stock was going to go up.  Demane told you that he got those tips from Nikas.  And he remembered that when he learned about that, what he called the long tip, that the stock was going to go up in the winter of 2013, Demane remembered being in Asia on Holiday -- Singapore, Thailand, Vietnam.  Well, look at Demane's passport.  He is in Singapore December 2013.

Corroboration again for what he told you.

What is another example.  This is from Demane's testimony.  He tipped a guy named Yomi Rodrig with the inside information he had.  He knew that Yomi Rodrig, going into October 2013, had a big long position.  He was betting -- he was invested thinking stock was going to go up.  Demane got secret inside information from Nikas, who got it from the defendant.

What does Demane do?  He calls his friend and says it's not a good time to be long, it is a good time to be short.  Meaning sell your stock so you don't lose your shirt.  And Demane actually saw Yomi Rodrig, he told you, logon to a computer and go from investing long to investing short.

Totally changing in his position, totally changing his investment.

Now, what do the trading records show you? Look at Yomi Rodrig. There is a huge green bar going into that early October 2013 time period. Yomi Rodrig thinks the stock is going to go way up. And what does he do? He sells -- the scale of this thing is huge, but he sells 200,000 shares of Ariad on one day. Like that.

This is corroboration for what Demane told you about Yomi Rodrig. These details, ladies and gentlemen, these corroboration details, these are the very hallmarks of truth. These show you that Demane was testifying as he recalled and he is testifying as to what happened.

And that, that is a big problem for the defense lawyers, because, as I said, Demane's testimony is devastating. We talked about all sorts of other reasons you can convict the defendant, by on this one also, you credit Demane, he's guilty. End of day. End of story.

So what do the defense lawyers do? They suggested in opening statement -- this is what Mr. Streeter said -- that you can't believe what Demane told you. They claimed he's making up the fact that he had this conversation with George Nikas. Why? Well, as we talked about, I don't know why he would make this up. But they introduced a stipulation earlier today, if you recall, that sort of came in passing. Mr. Streeter read it

from the podium.  And while Demane told you on the stand that he recalled having that conversation with Nikas about the defendant being the source, the first conversation, he recalled having that a few days after that Lavo dinner, at an earlier meeting with the government, he recalled that meeting happening the same night as Lavo.

Seriously, ladies and gentlemen?  This is the reason they say that Demane is lying?  Because one conversation, at one point he remembered it happening on one day and at another point it happening a couple of days later?  This is the reason they say he's lying?  You know that is absurd.  You know that from your own lives.

Memory doesn't work that way.  You don't have a calendar in your mind.  Think about an important event in your own lives.  Think about going to a wedding.  Right?  If you go to a wedding and the groom falls into the cake at the wedding, you are going to remember that forever.  You are going to tell that story forever.  But if you don't remember the color of the floral arrangements or what song the band played when the bride came out, does that mean that the groom didn't go facedown in the cake?  Of course not.  You know how memory works.  That argument is absurd.

Let me say a couple of other reasons why you can believe Demane.  First, think about his incentives there on the stand.  You heard it from him.  What happens if he lies?  His

cooperation agreement gets torn up, but he can't get his guilty plea back.  You heard that he is facing 750 years in jail if he lies or loses his agreement.  The only way he keeps that agreement is if he tells the truth.

And you also heard that the outcome of this trial matters not at all for whether he gets that cooperation agreement.  In short, Demane has nothing to gain and everything to lose by lying on that stand.  Why in the world would he lie?  That's reason enough.

Think about his incentives.  And when you consider whether it makes sense for him to have lied on the stand, or if he made up this whole story, think about this.  Was it a situation where he came into the courtroom, took that witness stand and said, I didn't do it, it was that guy?  No.  he didn't do that.  He pled guilty.  He accepted responsibility. He confessed to insider trading, and he told you what happened.

Also think about this.  If Demane were prepared to lie on that witness stand, wouldn't he say, instead of reporting Nikas talked about the defendant being the source, why wouldn't Demane just say at Lavo I talked directly to the defendant, who told me his dad was a board member, and the defendant directly gave me hot tips?  That would certainly be a much better lie. If his whole goal was to come in here and make up a story to implicate the defendant, he would have said that.  He would have lied in that way.  But he didn't.  Because he told you

what he remembered.  He told you what happened.

Did Demane commit serious crimes?  You bet.  He'll get sentenced for those crimes, as he told you.  The question for you is whether you can credit his testimony.  And for all the reasons we've just discussed, you know that you can.  So you can convict the defendant based just on Demane's testimony.

There you have it.  Eight different reasons, eight different ways you know it was the defendant who committed this crime, that it was the defendant who was Nikas' inside man.  You can convict the defendant on any of these eight, but you have all eight.

So in the face of this crushing evidence, of all these different reasons, what does the defense says?  Again, I will remind you yet again, they don't have a burden.  But what do they say in the face of all of this evidence.  I am going to say a few words about their main arguments.  But I first want to remind you to rely on the evidence.  And you know why.  Because Mr. Streeter made you promises in his opening statement, and he just didn't deliver.  Again, they don't have a burden.  But when you evaluate their arguments, consider whether they delivered on their promises.

Let me read to you something that Mr. Streeter promised you in his opening statement.  Transcript page 31.  "With respect to Ariad Securities, we are going to bring evidence before you that Demane and Nikas had other better

sources of inside information about Ariad."

Really?

"They had other sources," he said, "and we're going to bring that evidence before you, and it's not just one person, it's multiple people who provided inside information about Ariad into this massive network."

That was the promise that he made.  Multiple people? Some international network of tipsters about Ariad?  Have you heard anything about that?  No.

It's a promise that they did not keep.

Now, I'm going to talk Darina Windsor in a moment in more detail, but when it comes to Ariad, they show you nothing, nothing at all to back up that promise.  All the evidence that you have seen at this trial points to one tipper for Ariad, and that's the defendant.

Be careful with these defense arguments.  They made promises they didn't back up.

So let's talk about that main defense, because they opened on it in their opening statement, they read from a bunch of documents about it this morning and last week.  It's this "Darina did it defense."  We're going to talk in more detail.

But let me just say up front, this is a ridiculous argument.  You have seen zero evidence that Darina Windsor had the inside information in those three occasions that are at issue in this case.  You have seen zero evidence that Darina

Windsor even knew George Nikas or even knew any of these traders.  You have seen zero evidence that Darina Windsor passed Ariad inside information to anyone.

This, ladies and gentlemen, this is their Darina defense.  It is ridiculous.  It does nothing to explain all those calls, all that trading, those timelines that you saw from those three trading events.  It does nothing to explain why in October 2013, Nikas goes from being very long to very short.  It does nothing to address the facts in this case.  It's a complete smoke-and-mirrors effort by the defense.

Here's the evidence, ladies and gentlemen.  Demane said -- I think this is what they say that will support this argument.  But Demane said on the stand he believed that the guy -- one of the guys he was getting information from, a guy named John Dodelande, he believed at some point that Dodelande had a source, etc.  He didn't know it.  No names.  Didn't confirm.  Just had that belief.

And then the defense showed you some emails and a stipulation suggesting that a woman named Darina Windsor happened to work at Centerview Partners in London, an investment bank, and that she got some emails mentioning Ariad, amongst a number of other companies, in time periods irrelevant to this case -- 2012, early 2013.  They've shown you no connection between Windsor and Nikas -- no meetings, no phone calls, no evidence they even knew each other.

K1ddlav4                    Summation - Mr. Cooper

When you evaluate this argument, this defense, look very carefully at the dates, and ask whether there is any connection for all three of the insider trading events between Windsor on the one hand and Nikas on the other hand.  There is nothing.

Ladies and gentlemen, either side can call witnesses. The defense didn't bring witnesses before you to make that connection because it's false.

MR. SUSSMAN:  Objection.

THE COURT:  Overruled.

MR. COOPER:  Let me say that one more time.  They didn't bring witnesses before you to make that connection because it's false.

Now, aside from the complete lack of evidence, what are the other problems with this "Darina did it" defense?

First and most powerfully, let's take October 2013. It is a critical time in this case.  We're not going to go back to the timeline, but you remember the call, and Nikas goes from very long to very short.  By now you probably have that timeline committed to memory.

But where is Darina in October 2013?  Where is Darina Windsor?  She's nowhere.  If it were really the case that she were the source, remember she is the investment banker, and you learned investment bankers advise companies on takeovers.  You also learned that when there is a takeover, a company's stock

K1ddlav4                      Summation – Mr. Cooper

price goes up.

So if this is a Darina tip, if this is a Darina Windsor tip, everyone should be betting the stock is going to go up.  But what happens in October 2013?  The opposite.  They all put money down knowing the stock is going to go down.  Why?  Because there is no evidence that Darina Windsor was the tipper.  It was false.

Also keep this in mind.  That inside information about the FDA, all those issues with the drug Iclusig in 2013, Darina Windsor wasn't even involved in that.  Centerview Partners wasn't involved in that.  Harvey Berger told you:  "Did Ariad provide information to Centerview Partners about those issues with the medicine Iclusig in 2013?"

Answer:  "No, sir."

He didn't say, no, sir, except there was a woman named Darina Windsor who we gave some information about the FDA to.  No.  He said, "No, sir."  And they've shown you nothing, nothing at all, to suggest that Darina Windsor even knew this information or that Centerview Partners had it.

Now, I encourage you to listen very carefully to the defense summation, particularly when it comes to this October 2013 time period when everyone goes short, when all those traders place multi-million-dollar bets that the stock is going to go down.  Ask yourself if there is any evidence to support this "Darina did it" defense in October 2013.  You are

going to find the answer to that question is there is zero evidence to support that.

Now, let's talk about 2015 for a moment.  The defense has suggested that in 2015 Darina Windsor was the source of Nikas' inside information that Ariad got a takeover offer.  Remember, he brought a batch over to offer, some were 2015.  This is also ridiculous.  I am just going to give you a few reasons.

First, what are they relying on?  Well, there was a stipulation that they offered this morning that talked about a forensic analysis firm, and it talked about the spreadsheets and the documents.  But what does the spreadsheet -- I'm sorry.  What does the stipulation say?  It talks about a forensic firm that went into the computer systems of Centerview Partners and went into the laptop of Darina Windsor.  And if you can make sense of it, it says:  "The forensic firm compiled lists of over 70,000 artifacts from the Windsor laptop.  Each artifact in the lists refers to a file, folder, document, or data."

Artifacts, ladies and gentlemen?  This isn't an archeology dig.  It is a court of law, and they have not brought you any evidence.

What else did the stipulation say about Darina Windsor?  It says that those artifacts show you that she attempted to access documents.  And I'm quoting here.  This is paragraph 4:  "from those lists, from the work that the

forensic firm did, it is not possible to determine whether Windsor was able to successfully access those documents."

Not possible, maybe she accessed. It's based on artifacts. This is the thin read on which they stand for 2015.

In the documents themselves, they showed you this morning a series of PowerPoint presentations that they read from -- some were from July 2015, and they pointed you towards the fact that it looked like Baxalta was considering making an acquisition offer for Ariad. And there were some of these artifacts that showed that Darina Windsor may have attempted to access those documents.

But what does that really mean? You know, also based on the stipulation, that those files were accessed or attempted to access business Darina Windsor in 2015. You also know that Centerview Partners and their forensic firm went in to get those files in 2019, four years later, and couldn't tell whether it was the same file that was put before you by the defense as the one that Darina Windsor attempted to access back in 2015.

Ladies and gentlemen, this is about as unreliable as it gets, and this -- this -- is what they expect you to buy about Darina Windsor. Keep all those different hoops in mind. As you listen to Mr. Sussman's closing about this 2015 period, keep all of those different hoops in mind that you have to jump through just to get to the point where maybe Darina Windsor

K1ddlav4                        Summation - Mr. Cooper

attempted to access information about Ariad, setting aside the fact that there is no evidence -- zero evidence -- that she ever talked to anybody about Ariad, or that she even knows George Nikas or any of these other guys.  Zero evidence put before you.

Let's just look at the numbers in this 2015 time period, because the numbers also show you that this Darina defense falls totally flat in July 2015.  What do I mean by that?

Now, you saw that Nikas buys about $480,000 worth of Ariad stock on July 28, 2015.  This is one day after Darina Windsor may have attempted to access an artifact for a document that may have appeared like the one that they showed you on the stand.  OK, Nikas buys approximately $480,000.  Then what happens?  July 31st, he buys $3.5 million.  I'm not going to back to the slide, but this was the time period, July 31st, when the defendant talks to his father.  Within 15 minutes, the defendant calls Nikas, and then within 15 minutes Nikas starts buying $3.5 million worth of stock.  Where do you think he got the information for that trade from, ladies and gentlemen?

Even if you entertain for one moment this flight of fancy about Darina Windsor -- and you have to assume that the information magically found its way to George Nikas, even though they have shown you no connection -- even if you assume that for just one moment, look at what happens on July 31st.

The defendant gets the tip.  The defendant calls Nikas.  Nikas buys three-and-a-half million dollars worth of stock.  He didn't make that huge bet based on someone he never met from London.  He made that bet because he had just gotten off the phone with his best friend, his inside man.

So when you step back on this Darina defense, I want you to think about what they're asking you to believe.  They're asking you to believe that the information -- let's just take the FDA information -- starts at Ariad Pharmaceuticals there in Cambridge, Massachusetts.  We all know that.  They ask you to assume that the information goes from Ariad Pharmaceuticals all the way to Centerview Partners in London, even though, as you remember, Harvey Berger told you Centerview didn't have that information.  So that link is broken.

What else did they need you to believe?  That Darina Windsor accessed that information, even though Centerview never had it.  Another link is broken.

And where does it go from there?  There have been a lot of names in this testimony.  The defense has shown you no one that Darina Windsor passed this information to.  But you heard that one of Marc Demane's sources was a guy name John Dodelande.  So I don't know, maybe the information went to him on Ariad.  But you've seen zero -- zero -- evidence of that.

Did that information go to Marc Demane?  Demane told you he got information about Ariad from one and only one

person.  It was Nikas.  He didn't get Ariad information from John Dodelande.  So that doesn't work.

Again, did it go from Demane to Nikas?  The same thing.  Demane only got -- Demane only got information on Ariad from Nikas.  He never gave Nikas any Ariad information.  So that link doesn't work.

The defense expects you to believe that this inside information about the FDA and Ariad Pharmaceuticals travels through multiple companies and multiple people all around the world based on no evidence.  This is the "Darina defense."

Ladies and gentlemen, you don't have to have a Ph.D. in economics.  You don't have to be a finance expert or a corporate governance expert to know the truth.  You've all known the truth since you were children.  The closer you get to the truth, the simpler things become, the clearer things become.  The farther away from the truth, the more muddled and messy things become.  This is the Darina defense.

What else have you seen at this trial?  You know that this is confusing, doesn't make any sense, because there is nothing to back it up.  What have you seen evidence of?  Did the information travel around the world and back again?  Or did it go from the defendant on Fifth Avenue and 67th Street all the way three blocks west to his best friend, George Nikas, on Broadway?

When you think about the Darina defense, imagine this.

K1ddlav4                        Summation - Mr. Cooper

Imagine that Kevin and Bill take a math test, a pop-quiz math test in high school. They cheat. They are sitting next to each other. They're best friends. They've cheated before and they cheat on this test. They get all the same answers and they get A's. Everyone else fails the test.

The principal hauls Bill into his office. Confronts him. Bill, you were cheating. I know that Kevin was the source.

Where do you think he got the information from? His buddy, who was sitting next to him, who he had cheated before with? Or some exchange student he never met from London?

Ladies and gentlemen, the answer is obvious. All of the evidence, and your common sense, tells you that this Darina defense falls apart. It is an insult to your intelligence and your common sense. Don't fall for it.

Now, I want to just talk about a couple of concepts before I sit down in just a few moments.

First, did the defendant engage in a scheme to defraud Ariad? Did he defraud the company? Of course he did. He stole Ariad's secret corporate information. You know Ariad had all those policies, insider trading, couldn't share the information. The defendant and his father stole that information for their own purposes. They embezzled that information. And if you find that he did this on any of those three incidents, he engaged in a scheme to defraud Ariad.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

Plain and simple.  I went through eight different ways you know that's the truth.

The defendant, as you know, is also charged with wire fraud charges.  So let's talk about wires for just a quick moment.

How do you know there are interstate and international wires in this case?  This one is also easy.  Online brokerage accounts, you heard testimony about that.  That's how these guys traded, wires zipping around the world, computer systems to make these trades.  There were phone calls, including phone calls where the defendant called his dad when his dad was in Greece.  You saw that in the evidence.

What else do you have?  Wire transfers.  Nikas and his wife wired half a million bucks, and then Nikas wired another 200,000 bucks to Mediterra during the course of this scheme.  All of these are wires.  No real question about this.

I also want to say a few words about something called venue.  A fancy way of saying what happened right here in the Southern District of New York, which includes Manhattan.  Ariad shares trade on NASDAQ.  You learned that NASDAQ is here in Manhattan.  You saw plenty of evidence that the defendant tipped Nikas right here in Manhattan.  You saw plenty of evidence that Nikas traded while right here in Manhattan.  So plenty of illegal conduct happened in Manhattan.

All right.  I'm going to sit down in just one moment,

but I want to leave you with one -- one final thought.  You've heard a lot of names, a lot of dates, a lot of places, and concepts like "net position" and "long" and "short" at this trial.  But at the end of the day, this is a simple case. Despite the defense lawyers' efforts to make this complicated and about all sorts of other things, this is a simple case. The defendant's father had secret corporate information.  The defendant used that information to tip his best friend George Nikas so Nikas could make a killing in the stock market.  That is cheating.

And no one, no matter their connections inside a company -- it doesn't matter if your father is a wealthy businessman on the board of directors, it doesn't matter if the guy you're tipping is your best friend -- it is cheating, plain and simple, and nobody is above the law.

The defendant did it again and again and again. October 2013, winter 2013, summer 2015.  He was brazen.  He knew the rules.  He just thought the rules didn't apply to him.

Hold him accountable, ladies and gentlemen.  No one is above the law.

Thank you.

THE COURT:  So, ladies and gentlemen, we're going to take our luncheon recess now, and we'll resume at 2 o'clock.

Thank you.  Don't discuss the case.

(Continued on next page)

K1ddlav4

(Jury not present)

THE COURT:  So, counsel, anything we need to discuss?

MR. COOPER:  Not from the government, your Honor.

MR. SUSSMAN:  No, your Honor.

MR. STREETER:  Your Honor, just one question.  There was that one sentence that I wanted deleted from the charge regarding Title 18 securities fraud about -- essentially my argument was that theft is not fraud.  That became especially important with Mr. Cooper's argument.

THE COURT:  I think you are referring to page 14, and the sentence that was -- I am going to read it as it was and as it has been revised:  "It includes embezzling or converting for one's own use property belonging to another."  It now reads: "It includes fraudulently embezzling or fraudulently converting for one's own use property belonging to another."

Thank you, counsel.

MR. STREETER:  I still have my objection, your Honor. Thank you.

THE COURT:  Well, actually, I think it responded to your objection, but I appreciate that you still have an objection.

MR. STREETER:  I don't think that the word "fraud" has been adequately defined in these instruction, your Honor.  That is my objection.

THE COURT:  Thank you, Mr. Streeter.

K1ddlav4

Have a nice lunch.

THE CLERK:  All rise.

(Luncheon recess)

                              AFTERNOON SESSION

                                  2:00 p.m.

          (Jury not present)

          THE COURT:  Counsel, I forgot to ask for your comments

on the verdict form that was distributed to counsel as well.

It's marked as a court exhibit.

          DEPUTY COURT CLERK:  Court Exhibit 4.

          THE COURT:  Any objections?

          MR. SUSSMAN:  No, your Honor.

          MR. TRACER:  No, your Honor.

          THE COURT:  Thanks.  Bring in the jury.

          (Continued on next page)

K1D7LAV5                    Summation - Mr. Sussman

(Jury present)

THE COURT:  Counsel.

MR. SUSSMAN:  Thank you, your Honor.

We're here today because the government made a series of assumptions and they arrested Telemaque Lavidas before checking the facts.  The case presented by the government to you here today and throughout the course of last week does the exact same thing.  It presents you, the jury, with a series of assumptions, and at every turn -- at every turn -- the government has either ignored, messed up or concealed the facts and the evidence underlying those assumptions.

Now, there is an old saying we're all familiar with that when you assume, you make an ass out of you and me. Sadly, in this case the government's assumption made a defendant out of Telemaque Lavidas.  What is even more serious is the government's assumption in this case could make Telemaque Lavidas a convicted felon and deny him his liberty.

Now, it's too late --

MR. COOPER:  Objection.

THE COURT:  Sustained.  The jury shall disregard that comment of counsel.

MR. SUSSMAN:  It's too late to fix the assumptions that led to Telemaque's arrest, but fortunately it's not too late to prevent a much more devastating result here.  And your job, ladies and gentlemen, is to make the government back up

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

their assumptions with evidence -- evidence that leads you --

each of you -- with no reasonable doubt that their assumptions,

their charges, their allegations, are actually correct.

          Telemaque Lavidas, as the judge has told you, is

innocent as he sits here before you.

          THE COURT:  Excuse me, counsel.  I will charge as to

the law.  Of course, I have told the jury that the defendant is

presumed innocent and protected by a presumption of innocence.

          MR. SUSSMAN:  And that won't change until each and

every one of you find that the government has proved its case

beyond a reasonable doubt.  It's not about emotions, or hunches

or assumptions.  It's about evidence.  And if you have any

legitimate doubts about the government's case, Telemaque

Lavidas should remain an innocent man.

          OK.  I'm going to tell you up front --

          THE COURT:  So, ladies and gentlemen, again, counsel,

I'm going to instruct the jury as to the law.

          MR. SUSSMAN:  I'm sorry, I wasn't attempting to.

          THE COURT:  So, I will give you instructions as to

what a reasonable doubt is.  Thank you.

          MR. SUSSMAN:  So, ladies and gentlemen, what I'm going

to talk to you about today here may take some time.  I will be

frank with you it may take a couple hours even.  The fact of

the matter is that it takes a little longer when you're not

making assumptions.  It takes a little longer when you don't

make up imaginary calls, where you don't make up imaginary maps

where people go on magic carpets three minutes across

Manhattan.  It takes a little longer when you actually look,

you look at the trades in this case.

So, I will bear in mind what defense counsel said to

you and I will try not to insult you or your common sense, but

I want to be clear about one thing:  There is a big difference

between common sense and imagination.  And what the government

is doing is they are asking you to substitute imagination for

common sense.

Common sense means look at the evidence, use your

everyday experience to tell you what the evidence means.  It

doesn't mean you sit there and you speculate and say, well, of

course if they were talking about this, they must have been

talking about that.

Let's start.  I'm going to start really where

Mr. Streeter left off, which is the wrong -- your Honor, I am

concerned that one of the jurors is having an issue with her

monitor.

JUROR:  I am not having an issue with my monitor.  I

can't see the larger monitor.

MR. SUSSMAN:  May I move this a little bit?

THE COURT:  Certainly.

MR. SUSSMAN:  And, ladies and gentlemen, just so we're

clear, can everyone see?  If there is anyone who can't see,

could you just raise your hand.

THE COURT:  Counsel, what is on the larger monitor will be on the smaller one too.

MR. SUSSMAN:  That's what I was going to say, everything you see on the larger monitor will be on the smaller monitor.  And I will have a little clicker here, and you should see the dot on your monitor too, so everyone should be seeing the same thing.  And again, as her Honor told you before, if there is a problem, just raise your hand and we will make sure it's fixed.

So, let's start where Mr. Streeter left off, that the wrong man is on trial here.  OK?  Telemaque -- and these are the fundamental principles -- he is not one of Nikas' many sources of confidential information.  The government failed to show you a single word from a single document or an e-mail or a text message suggesting that he did anything improper, gave confidential information to anyone.  The government has not shown you any connection between Nikas' trading and Telemaque.  And the final thing, Demane lied to you on the stand.

And let me be clear -- and I will get to it in a few minutes -- but there is a stipulation between the parties that what he said on the stand was completely inconsistent with what he told the government.

MR. COOPER:  Objection.

THE COURT:  Overruled.  The jury's recollection on the

evidence will control.

MR. SUSSMAN:  And to be clear, ladies and gentlemen, every one of the slides that you're going to see is going to have quotes and going to have transcript cites and exhibits on them.  So I don't expect you to take my word or assume that anything I'm saying is true.  Everything that I say you are going to see in black and white with either a document that's in evidence, a transcript that's in evidence or a phone record that's in evidence.

Let's go.  Let's talk about the electronic evidence first.  Those are all the cell phones, the computers, the e-mail and all that kind of stuff, the WhatsApp.

First, you heard a stipulation that when the government arrested Mr. Lavidas they seized a black iPhone, a dark gray iPhone, USB drive, silver iPad, Apple laptop, not a particularly unusual thing for a married person with a child.

The next thinking you're going to see is the government also obtained additional electronic devices from George Nikas' apartment.  What is important about that?  Why am I even telling you this?  I'm telling you this because we're not in a situation where there was nothing to look at, so of course there is no electronic evidence.  That's not what we're dealing with here today.

In addition, what you saw in a stipulation is that the government got e-mails from Mr. Lavidas, they got e-mails in

May of 2017.  So, long before Mr. Lavidas was arrested, you heard over two years before he was arrested, the government obtained his e-mails.

Then on October 23, 2015, in January of 2017, the government also obtained George Nikas' e-mails, again long before Mr. Lavidas was arrested in this case the government was collecting evidence.

They also collected evidence from Mr. Debih: Computers, iPhones, electronic devices.  Incidentally, Mr. Streeter, you will recall, questioned Mr. Debih about, well, don't you remember on December 29 -- in December 2019, mid-December 2019, you signed a consent to search and it was more than ten items?  What was Mr. Debih's answer?  I don't know; I don't remember.

Keep this in mind, and we will come back to it.  But this is a man who got up on the witness stand, swore to tell the truth, and told you that he distinctly remembers a conversation that occurred nine years ago at a nightclub while he was out partying, but when he is in jail and going over to meet and signing documents for the government to consent to searches of his device, I don't remember, I don't remember, I don't remember.

Again, the point for what we're talking about here is the government had an enormous trove of evidence that they collected, and you heard about it in this case.  So, what does

that evidence show you?  Well, there are no e-mails, there is no text, there is no WhatsApp messages -- all of which you've seen -- showing Telemaque receiving any secret Ariad information.  There are no e-mails showing Telemaque providing any secret information.  There is not a single confidential document that the government has shown you that in Telemaque's e-mail that he either sent or received from any company anywhere.

The government has not shown you any messages that were coded where they've said, oh, well two bananas means trade twice.  No secret e-mail accounts, right?  We all know in our common experience that people do things on a different e-mail account.  No, not here.  No evidence that Telemaque had a secret cell e-mail account, no evidence that the government presented.  We heard about from Mr. Demane about all his different bank accounts and this place and that place; no evidence about secret bank accounts.

What is more important is even when you get to Mr. Demane and Mr. Debih's e-mail and text messages?  What do you see?  First, let's talk about Mr. Debih's e-mail messages for a moment.  Here is what the government's evidence have been.  They showed you that Telemaque had Mr. Debih's contact information on his phone, that Mr. Debih reached out to him by text message, asked him for his e-mail address so that he could send him some information.  Telemaque gave him his e-mail

address.  Mr. Debih wrote him.  Telemaque didn't respond. Mr. Debih asked again can you give me information.  And finally Telemaque says, you know, it's not going to work timing wise. And that's it.  Not a reference by Mr. Nikas to my source at Ariad.  Nothing.  Same thing with Mr. Nikas' e-mails, which we will talk about in a few minutes.

And let me back up to one other thing for a second. You see this?  That's a photo of Mr. Debih.  It looks like a decent photo of Mr. Debih, doesn't it?  I want you to think for a second as to why that photo is up there and why the government showed you the photo they showed you of Mr. Lavidas.

MR. COOPER:  Objection.

THE COURT:  Sustained.

MR. SUSSMAN:  Mr. Lavidas is sitting here every day in a suit and tie.

MR. COOPER:  Objection.

MR. SUSSMAN:  He is in a suit and tie.

THE COURT:  OK.  So, counsel, move on to your next point.  Thank you very much.

MR. SUSSMAN:  So, what does the government's evidence really show?  Wedding invitations, movies, trips, jokes, letters of recommendation for Nikas' daughter, discussions of legitimate business ventures, discussions of news about pharmacy.

The government pointed you to an e-mail where Mr.

K1D7LAV5                         Summation - Mr. Sussman

Lavidas forwards in March of 2013 a newspaper story about Wallgreens being acquired by Alliance Boots.  Again, these are guys -- as you know, Mr. Lavidas is in the pharmaceutical industry.  Sends him a news article in March of 2013, long before the government claims anything illegal is going on, and what does the government tell you?  What do they want you to assume from sending a news article?  They want you to assume -- with zero, zero evidence -- they want you to assume from that sending of a news article that Telemaque Lavidas knew that Nikas was involved in a huge insider trading scheme, that Nikas had disclosed to Telemaque Lavidas that he had gotten inside information on this deal and made a ton of money, and that he knew that back in March of 2013.  That's what they want you to believe from a simple forwarded e-mail.  Again, it's one thing to use your common sense.  It's another thing to use your imagination.  And the government wants you to use your imagination.

And then we get to the kicker on this.  The government read you a stipulation about how Mr. Nikas and Mr. Lavidas were close, they were good friends, and they shared information about business and their personal lives and about their romantic relations -- intimate details about their romantic relationships.  And what he then said almost made me fall out of my chair.  He then said, so, really, where is the line?  What's going to stop them from talking about doing something

illegal?  It's the same thing, if you're willing to talk about these things with your friends, of course you would be willing to engage in a felony with them.

Again I'm going to draw on your common sense and not your imagination.  We all in our everyday lives have a lot of friends that we share wedding invitations, movies, jokes, trips, letters of recommendation, we talk about our businesses, and there are plenty of relationships that we are in where we actually talk about intimate details of our personal relationships.  OK?  But there is a huge difference between that and saying let's talk about committing a huge felony together.  I don't know what friends Mr. Cooper has, but I don't have friends like that.

OK.  Again, the government wants you to believe from this evidence -- all of which you will have and you can look at.  It's innocent evidence.  They want you to reach the assumption that Mr. Lavidas is engaged in criminal conduct because he is associated with Mr. Nikas who is engaged in criminal conduct.  We call that guilt by association ordinarily, and generally as a matter of legal principle in everyday life in this country guilt by association is not how we work.

MR. COOPER:  Objection.

THE COURT:  So, counsel, I will instruct the jury as to the law.

MR. SUSSMAN:  I did not mean to attempt to instruct them on the law, your Honor.

So, let's talk about the phone records.  OK?  Here is what the government just told you.  There are calls, there are tips, there are trades, call, tip, trade, call, tip, trade.  OK?  And what they want you to assume is there is call, and they will show you a phone record where there is call.  They want you to assume -- imagine that there is a tip -- and then they're going to tell you there is a trade without really telling you anything more about it.  Right?  Because that's basically what their argument was.

So, first, as we all know, despite an active imagination, there is no evidence of what is being said on any of these phone calls.  Not a single phone call do we know what is being said.  The government said to you, well, what do you think is being said?  And I don't know, ladies and gentlemen, but you're sitting here.  He is telling you what do you think is being said on a call that took place seven years ago?  How would you know?  How would anyone know?  OK, no evidence on who is on the other end of certain calls.

Again, we talked about this with Agent Vu where she doesn't even know who is on the other end, particularly of a landline call.  And you heard evidence about the landline.  There is not even evidence of when particular conversations occurred in some instances.  Again, the government wants you to

assume what is on these calls.

Let's be clear about something -- and this is in evidence -- when we say that Telemaque and his dad were close, we're not kidding.  OK?  Every single one of these little triangles represents a call or a text message between Telemaque and his father.  They talked all the time.  What does the government want you to assume?  The government wants you to assume on the dates and times that they give you, they want you to assume that they are talking about secret inside information about Ariad.

Can the government tell you what they're talking about in any of these other phone calls?  Interestingly, no.  But the ones where they say it's on the right date, they seem to know magically what's there.

So, I want to talk about something else for just a second.  OK, stop.  When I started saying I want to talk to you about something else for a second, that was five seconds.  OK?  I will keep talking.  We will try it again.  I have a little stop watch in front of me.  So I'm saying, hello, how are you, are you doing OK.  That's five seconds.  Why am I telling you about five seconds, you say?  Well, because this call right here -- this five second call between Telemaque Lavidas and Nikas, George Nikas -- that's the call, that's the magic call now.  It was, you recall -- earlier it was the 7th of October, but then when they found out that it was a landline, and the

agent didn't even know if Dr. Lavidas was in the United States at that point in time --

MR. COOPER:  Objection.

THE COURT:  Sustained.  Counsel, confine yourself to the record.

MR. SUSSMAN:  That was in the record.

THE COURT:  Thank you.  Next point.

MR. SUSSMAN:  I will put that up later.  But here for this call the government wants you to assume -- again they told you Mr. Nikas is putting down millions and millions of dollars on this; he is making a multi-million dollar bet.  What they're going to tell you is in the space of this call that Mr. Lavidas explained to Mr. Nikas that there is some significant problems going on with the FDA and it looks like -- with the clinical trials of Iclusig -- it looks like they may have to pull it off the market.  We don't know for sure, but that's a real strong possibility.  Again, this is, what, six days before it's publicly announced.

You heard Mr. Berger's testimony about what was going on on October 3.  What Mr. Berger told you -- and I will put this up too -- what Mr. Berger told you is they just found out on October 3 what the issues were and that they were having an executive session to discuss what was going on.

But according to the government, Telemaque Lavidas learns this at 12:03 p.m. from his dad -- probably before the

executive team had even met.  By the way, the government introduced no evidence about the timing of when the executive team met at all.  They want you to assume that then after that 12:03, rather than call George Nikas, immediately Telemaque hung out for a while, maybe walked around the park -- we will never know -- and then at 12:54 made a five second call where he transmitted this information.

Now, the reality is what Dr. Berger said to you is he started informing the board, but he didn't tell you when he informed the board.  He didn't know exactly when he informed the board until it was October 7, when the board had their meeting.  And we'll get to that in a second.

So, again, those are the phone charts.  The phone charts that the government wants you to rely on are those phone charts that were verified by Agent Vu that contain duplications and errors that the government can't explain.  The government wants you to make assumptions that are inconsistent with the evidence -- and I am going to go through those in some detail -- and what you're going to see is the calls don't match the government's assumptions.  The calls don't match the government's assumptions on the trading either.

OK.  We talked about this a little bit.  Anyone can use a landline.  I think we all agree on this.  And at this point in time the reality is they can't prove anything other than a call was made by Telemaque to someone in the apartment,

and it could have been parents, sisters, household employees. We don't know.  And keep in mind, again this call is only 18 seconds too.

So, what did Special Agent Vu tell you?  Well, I asked her about the call, and she said -- I asked her, do you know who is on the other end of that call?  I said, you don't know. She said yes, she didn't know.

Then I asked her -- and this is in the record -- I asked her, in fact, agent, you don't even know if Dr. Lavidas was in the United States of America on 10/7/2013, do you?

Her answer:  I do not know the circumstances.

Again, this was the call that up until two or three days ago they were saying was the call that this secret information was passed on --

MR. COOPER:  Objection.

THE COURT:  Sustained.  Counsel, just refer to the record of the trial, if you would.

MR. SUSSMAN:  That's what I'm trying to do, your Honor.

THE COURT:  Good.  Good.  Thank you.

MR. SUSSMAN:  So we talked about the landline stip. We don't need to go into that.

Then the government got up -- Mr. Cooper got up in his closing argument, and he told you based on cell site maps and the testimony of Mr. Donaldson, he told you exactly where Mr.

Lavidas was, that he was waiting outside Nikas' apartment, and then he gave you some imagined phone conversations and the like. I mean we were listening to the same witness, Mr. Donaldson, right?

Back up a second. Well, we will get to Mr. Donaldson in a second, because I think what you will recall from Mr. Donaldson's testimony -- and we will deal with this in great detail -- is, you know, Mr. Donaldson basically said I can tell you he is kind of in this area or kind of in that area, but I can't tell you where he is, not unless I had GPS.

This is important because we're going to talk about witnesses, and the most important thing about these witnesses is not a single one of them saw Telemaque do anything remotely close to tipping confidential information using a burner phone, doing anything suspicious.

So, what the government instead did to make up for that fact is they said they gave their witnesses a set of assumptions that they wanted their witnesses to make.

And, incidentally, you will recall from the testimony, almost none of their witnesses had any involvement whatsoever in this case. In fact, if you look at the testimony, most of their witnesses didn't get involved or do any analysis in this case until after, until after Telemaque Lavidas was arrested. So, it's not like the cell site information, where Mr. Cooper can tell you he is precisely there or he is precisely here.

It's not like they had that when they went in and arrested Mr. Lavidas, they had that analysis.

MR. COOPER:  Objection.

THE COURT:  So, ladies and gentlemen, you actually have no evidence whatsoever at this trial of what evidence the government had done before the arrest.  You have no evidence of the kind that counsel is talking about as to what the nature of their investigation is or was.  Your concern here is not with what kind of investigation the government did or didn't do. Your concern is with the evidence.

I told you before the burden of proof at this trial is on the government.  It has to present evidence in this trial, in this courtroom, that convinces you of guilt beyond a reasonable doubt.  If it has provided that evidence at this trial, I am sure you will follow your duty as I will instruct you as to the law.  If it has failed in this trial to provide you with that evidence, then I'm sure again you will follow your duty as I will instruct you as to the law.

Counsel, could you confine your remarks to the evidence in the trial.

MR. SUSSMAN:  I am trying to, your Honor.

THE COURT:  Good.

MR. SUSSMAN:  The witnesses did in fact testify, several of them -- and I am providing transcript cites for the jurors -- the witnesses did testify about when they became

involved in this case.

THE COURT:  Yes, that was --

MR. SUSSMAN:  And that's what I'm referring to, your Honor.

THE COURT:  OK.  Just there was an ambiguity there that you were making a different point.

MR. SUSSMAN:  I'm sorry.  To be clear, ladies and gentlemen, I'm not suggesting what the government knew or did not know.  I am talking specifically about the government's witnesses.  I am talking specifically about what those witnesses told you about when they began their analysis.

There is no evidence before you as to whether the government did any analysis or lack of analysis before the investigation, and I am not commenting on that one way or the other.

MR. COOPER:  Objection.

THE COURT:  OK.  So, excuse me, ladies and gentlemen.  Would you just pardon us one minute.  I will see counsel here at the side bar.

(At the side bar)

THE COURT:  So, Mr. Sussman, it's not my practice to interrupt summations.  I don't like to do it.

MR. SUSSMAN:  OK.

THE COURT:  You are an experienced lawyer.

MR. SUSSMAN:  Yes, your Honor.

THE COURT:  You know the rules of the road.  You have already violated them over and over again.  You have tried to give the jury improper instructions as to the legal standards.  That was in the beginning of your jury charge.

Now, I know you care passionately about your client.  I am glad you do.  You can create I'm sure a very strong summation without drawing objections.  I'd like you to do that now.

MR. SUSSMAN:  I will, your Honor.

THE COURT:  Thank you.

(In open court)

MR. SUSSMAN:  Thank you, your Honor.  May I continue?

THE COURT:  Yes, please.

MR. SUSSMAN:  So the government directed its witnesses to make assumptions.  You heard from Dr. Jindra, who seems like a very smart guy and ultimately was turned into the equivalent of a human calculator, because he was directed to look at specific individuals, he was directed to attribute trading records in the way the government told him to.  He was directed to calculate profits as directed by the government, and he was initially directed to look at four trading windows.

MR. COOPER:  Objection.

THE COURT:  The jury's recollection will control.

MR. SUSSMAN:  OK.  First thing:

The government is actually where you got all of your

assumptions, correct?

Exactly.

When the government initially asked you to do your analysis, they asked you to look at four announcements, correct?

I believe so, yes.

And you found four announcements for the government, correct?

I was looking for four announcements.  I found four, yes.

And they asked you initially to look at four windows of trading for Mr. Nikas and other individuals, correct?

Yes.

So, to be clear, see what I said down here, initially look at four trading windows?  That's exactly what the evidence was.

Now, the government witness Dr. Jindra, only testified about three trading windows, and he only testified about three announcement dates reflected in the indictment.  The defense witness, Dr. Juneja, had to explain why.  What she told you -- and we'll get to the quotes -- is that the July 1st announcement date was from the indictment and it was wrong. The trading window reflected instead --

MR. COOPER:  Objection.

THE COURT:  Jury, your recollection of the evidence

will control.

MR. SUSSMAN:  The trading --

THE COURT:  This is argument.

MR. SUSSMAN:  The trading window reflected inside trading by Nikas on Onyx.

OK.  Let's see what she actually said:

Let me ask it more broadly.  Why is it you looked at Mr. Nikas' trading around an announcement date of July 1st?

ANSWER:  In the indictment, there was a description that had to do with alleged insider trading that focused on an announcement which said it was on or about July 1st, and that indicated that it was an announcement having to do with Ariad.  And with the acceptance of the European Commission, it's saying that these drugs, Inclusig, could be marketed.  When we looked at all the publicly available information

-- which of course Dr. Jindra was not permitted do --

-- we noticed that the announcement actually came out on July 2nd.  And so then we were interested in why the government was alleging an increase in the stock price.  And indeed there was an increase in Ariad's stock price on July 1st.  So we wanted to see what that could be coming from.  And we noticed, in reading analyst reports, news reports, and so forth, that there was this news story having to do with Onyx being an acquisition target.

And in fact -- and I asked her.  I don't believe she

got into the exact detail of why that raised the Ariad stock

price, so I'm not going to talk about it.  But what she did say

is actually the Ariad announcement was July 2.  And what

happened when that fourth announcement -- the one that Dr.

Jindra did not testify about but was asked to look at from the

indictment -- that announcement Ariad stock actually went down.

Oops.

Here is what she was referring to -- and you will have

a copy of this back with you.  On paragraph 16 of the

indictment:  On or about July 1, 2013, Ariad announced that it

received authorization from the European Commission to market

Iclusig.  Ariad's share price increased by approximately 12

percent after the announcement.

Well, gosh, that's wrong twice.  The announcement

wasn't on July 1, 2013, and the share price didn't increase.

So that trading window that they were hoping that they could

find inside information about?  Oops.

What else was Dr. Jindra required to assume?  What

wrong assumptions was he given?  Well, he was told Demane's

August 2015 trading was not illegal.

MR. COOPER:  Objection.

MR. SUSSMAN:  I will put it up on the board in one

minute, your Honor.  And he was also told to assume that the

Baxalta deal was announced at 3:03 p.m.  Conveniently 3:03 p.m.

is after Demane bought and sold Ariad CFDs on that day.

So, here is what exactly the government had Dr. Jindra assume:  Trading by Mr. Demane on 8/28/2015 in CFDs is assumed not to be trading around an announcement.  In other words, he did not trade before and then after an announcement.

I asked him:  Who asked you to make that assumption?

You did.

I'm sorry, it wasn't me, it was actually Mr. Tracer, so I apologize.

And he said:  I did.  When Mr. Tracer asked him -- or you did.  Mr. Tracer asked him.  I'm confused.  Is everyone else clear?  OK.

So to be clear -- and you can take out the word "illegal".  Forget about "illegal".  Let's just say trading around the announcement there.  Demane is required to assume this.  So, what did Dr. Juneja have to come in and do?  She had to come in and explain to you that's actually wrong, the Baxalta deal was announced at 12:21 p.m., Demane did trade around that announcement.

You recall this is the actual news story from Bloomberg -- it's in here somewhere.  It will be on the evidence, you will see.  But this is actually a Bloomberg News story, and that's important, as I will get to.  But you will see that that news story came out at 12:21 p.m.  Why is that important?  Well, because details actually matter here.  What did Demane do?  He bought CFDs at 7.07.  Bloomberg publishes an

article the 12:21, and he sells at $9.70, and makes a tidy I can't remember, around $800,000 profit, somewhere around there, but you will remember it better than I will.

Now, am I making this up? Could it just be a coincidence that Mr. Demane was smart enough to buy all these CFDs in the morning and sell them all in the afternoon? Maybe he just changed his mind. Not so much. Because what Mr. Demane explained to you is this is actually how he would do insider trading. OK? So when he talks about did you ever work with journalists as part of your inside information work --

Yeah, they were useful to bring up information.

Why would you --

Because they would move the stock price up.

So just so we're a hundred percent clear, he buys these CFDs, so he could buy a lot more, as Dr. Juneja told you, he can buy a lot more of the CFDs with little money down, buys a ton of them, and then calls a source at a newspaper -- Bloomberg in this case -- which you will recall and I will show you testimony was one of the newspapers he had sources in -- he would get them to run a story saying I have this legitimate information. The newspaper would run a story, the stock price would go up and, boom, he makes a tidy 5, $800,000, pocket change. Right? For a guy who made $70 million trading it is pocket change. So, that's what he would do.

Why would he do it that way? Because, you know what,

the Baxalta deal ultimately did fall apart, and this is a way for him to guarantee that he can actually make money off of this inside information.  Because, you know, he could take the risk, buy the stock on the inside information and then hope that the deal goes through and then he makes more money maybe, but it's a safer bet to just have the newspaper put it out, have the share price go up and, boom, you've done insider trading.  So, I don't know whether it's illegal or not, but that's what happened.

Now, the defense witnesses I think you'll agree were very different; they were not asked to make assumptions.  Dr. Juneja determined on her own when the Ariad became public.  She did the research.  That's how she found the mistake in the indictment.  She did the research as to when individuals traded around announcement dates.  That's how she figured out what Demane was doing.  She actually did a pretty good job figuring out how they did that.  And you know why?  Because she is independent.  You heard from her she gets hired by the government, by prosecutors, by defense attorneys.  She is good.

Now, let's talk about another kind of witness, an immunized witness.  I want to explain the distinction between an immunized witness and a cooperating witness.  As Mr. Giatrakos told you, he has no cooperation deal, so it doesn't -- unlike Mr. Demane, who told you --

MR. COOPER:  Objection to the graphic.

THE COURT:  Overruled.

MR. SUSSMAN:  Unlike Mr. Demane --

THE COURT:  So just because, ladies and gentlemen, it's in a graphic before you, it's argument by counsel.  Your recollection of the evidence here, your understanding of the record controls.

MR. SUSSMAN:  May I continue, your Honor?  Thank you.

So he doesn't have a cooperation deal, and this will become more clear when we talk about Mr. Demane in terms of a difference.

But basically the deal is -- what he told you is, look, the deal is this:  I will testify, and nothing I say can be used against me as long as I testify truthfully.  So, he's got no skin in the game at all.  As long as he testifies truthfully, he doesn't have to go to the government to ask for them to write a letter to the judge or anything else; he just has to testify truthfully.

So, what did he tell you?  He never got a burner phone for Telemaque.  He never saw Telemaque do anything suspicious. He saw Telemaque using his own telephone, the same number that he had seen -- or that he knows Telemaque had since 2012.  You will recall this testimony:

Did Nikas ever ask you to purchase one of these burner phones for Mr. Lavidas?

No.

Did you ever give him personally a prepaid cell phone?

No.

Did you ever see him on any occasions when you saw him on one of these cell phones?

No.

In fact, you have seen Mr. Lavidas on a cell phone and the cell phone you saw him on was not one of those phones.

Now, we get to Mr. Demane, and we will start talking a little bit more about a cooperation deal.  I think we're all in agreement that Mr. Demane is facing up to 750 years in prison.  And the more people he -- and this is what he said, and we will show you this.  He said the more people he cooperates against, the better his deal.

QUESTION:  You understand that the more people you cooperate against, the shorter your potential sentence, correct?

Yes.

OK.  That's the difference between an immunized witness and a witness that is looking for a cooperation deal and looking for the prosecutors to write them a 5K letter to the judge.

What else did he tell you?  He said in his own indictment, his 38 count indictment, Ariad is not even mentioned.  There are 20 different companies mentioned that he is involved with insider trading.  Ariad isn't even mentioned

in his indictment.  He told you he pled guilty to probably less than three or four months ago -- I don't recall off the top of my head.

Now, this is the other interesting part, to say the least, of his testimony.  He told you he agreed, just recently signed the papers, to forfeits 49 million to the United States government.  Yes, sir.  But then he told you that he made $70 million from insider trading.

So we're clear here, if anyone tells you crime doesn't pay, they are wrong.  Crime pays even when you're caught.  This guy is making a 30 percent return on his criminal conduct, and he is hoping he doesn't even have to go to jail for that long. That's the deal.  That's the deal that they worked out with him, $21 million he is walking away from as illegal proceeds. That's their witness.  That's the only guy in this whole case that says Telemaque's name, and he didn't even do anything, and we will get to that.

OK.  I told you a little bit about this; I am not going to belabor it.  But the bottom line is these prosecutors are the one who make the decision as to whether Mr. Demane did a good job of cooperating.  It's their decision as to whether to write the letter.  It will ultimately be a judge's decision as to what his sentence will be.

Now, we talked about there was discussion -- there was discussion by the government about how, well, there is not even

any connection between Nikas and Darina Windsor and all those things. Well, that's simply not true. In fact I think they said there is zero evidence Windsor knew the Nikas traders.

OK. Well, here is what Mr. Demane told us. OK? All of this here, those are citations to every single thing that is up on this screen. OK? And generally -- generally -- I don't -- what happens is -- and Mr. Demane explained this to you -- generally one of these sources -- OK, sometimes it was his friends. Sometimes it was a broker. Sometimes it was a trader. Sometimes it was the Goldman Sachs banker. Sometimes it was some other investment bankers. We heard these two guy's names that I can't even really pronounce. And they gave information. OK? And, you know, they gave rumors and tips and other information.

Then he also said that there was a guy named John Dodelande. Right? John Dodelande was the middleman that Nikas had set up to kind of protect himself from being connected to the inside information. What he told you is John Dodelande was getting information from two investment bankers, one who worked at Centerview, one who worked at Moelis. How did he know that? Well, you heard and you will see he actually got documents showing with Centerview on them.

So when the government says there is zero evidence that Windsor had a connection to those traders, that's just simply not true. And we know that Mr. Demane would then pass

the information on to Mr. Nikas, there would be a back-and-forth with Mr. Rodrig and Mr. Malnik -- remember, they were the ones who talked to him about rumors about Ariad -- and then there would also be money that went to Mr. Feingold. You remember Mr. Feingold most famously because Mr. Jindra, one of the assumptions he made was that all of the trading came from Dov Malnik, and in fact it was not Dov Malnik, it was Dov Malnik and Mr. Feingold.

And then you will hear -- I think you heard that Mr. Demane shared an Argo hedge fund. He said he shared it with Mr. Nikas.

So, what Mr. Streeter told you, that Mr. Nikas had other better sources of information, i.e., people who worked inside investment banks that were doing deals, what Mr. Streeter told you was a hundred percent true.

And let me say one other thing. The government said to you, and I quote, "Either side can call witnesses. The defense didn't bring witnesses before you to make that connection."

Well, the government didn't bring those witnesses before you either to deny that connection, the connection that their own cooperating witness made. And you better believe that if the government thought that testimony would have been helpful, the government could have brought it to you.

So, when I think of Mr. Demane, I think of, as we talk

about it, this deceit.  He was practiced in the art of deception, if I can quote The Rolling Stones.  OK?

Mr. Demane, how did he pay his sources?  He paid them in cash, in wire transfers, in fake art receipts, and then in accounts in the name of corporations, OK, and then in the case of the Centerview source and the Moelis source he was careful to pay Mr. Dodelande in cash so that he could never be traced back -- his payments for the inside information from Centerview could never be traced back to him.

Now, let me point you to another piece of Demane's testimony that's actually really interesting, and I think it's important for you to think about it and maybe talk about it.  I can't tell you what to talk about.

But he talked about George Nikas trading for him.  OK? In this particular case he talked about a company Breakwater, and he said he had George Nikas do it.  When we asked him why -- or when the government -- I don't remember who did -- asked him why to have George Nikas trade for you, what he said was it means that we decided to share the profit or loss. Nikas was buying for me in his position in stocks, and depending on the result, we would get profit.

Well, why did you decide to have George Nikas do that?

Because I was stealing information from my girlfriend at the time.  If you are too close to the source you are at risk to be caught by authorities.

OK.  Why is this interesting, Mr. Sussman, is what you're saying?  It's interesting because of the assumptions.  So, let's just back up for a second.  Who is closest to the source of Ariad inside information?  Mr. Lavidas, who e-mails and talks with him every day?  Or is it Darina Windsor?

Actually Mr. Nikas, you know, is kind of close to the source.  So, the question for you is -- and I think I didn't say that as clearly as I should -- the question for you is this:  The trades that are attributed to Mr. Nikas in this case, Mr. Nikas' trading, the question is the fact that he traded does not mean the information came from him.  That's what Demane told you.

(Continued on next page)

MR. SUSSMAN:  (Continuing) The government wants you to assume that every time Mr. Nikas traded, it was based on -- it was a trade for himself based on either information he got from Demane or his own information.  But what Mr. Demane told you is it is actually not that simple.  In many cases, Mr. Demane might be getting the information and might be having Mr. Nikas trade on it so as to conceal the source.

OK.  The important stuff that Mr. Demane told you, I'm not going to run through all of this, but the bottom line is he never saw Telemaque do a single thing.  He met him in February 2011.  He never discussed insider trading.  He never got insider trading information directly from him.  He never spoke with him about insider trading.  He never met Dr. Lavidas.  He never even saw a document suggesting, unlike in this case the Centerview documents, he never even saw a document suggesting that Mr. Lavidas' father had given inside information to another person.

OK.  Now, this is another point I wanted to make clear, which is once that -- by 2013, OK, by 2013, Mr. Nikas was communicating on phones -- phone applications and burners. OK.  That's what Mr. Demane told you because Mr. Nikas had an SEC issue in 2013.  So Mr. Nikas was being super, super careful and he was using burner phones.  And I think you know where I'm going with this.

But if Mr. Nikas is being so careful with Mr. Demane

K1ddlav6                    Summation - Mr. Sussman

and everyone else in his network, how is it that the government has these huge phone charts of all of the calls between Mr. Nikas and Telemaque Lavidas in which they tell you they know they're talking about inside information?  It doesn't match with the evidence.

How would they pay for the burner phones?  In cash. How would the subscriber names be done?  Totally anonymous.

And then we talk about -- the government talks about corroboration.  And how do you know?  Because what Mr. Demane says is corroborated.

Well, not exactly right.  First of all, let's talk about this story he tells about what Mr. Rodrig told you that I told him about his position in Ariad.  And you'll have to bear with me a little bit.  This will take just a few minutes to go through but it is important.  OK.

What Demane says is Rodrig was telling him information about Ariad, so he was getting information about Ariad from Mr. Rodrig.  So another source of information, whether you -- he referred to it as rumors.  I don't know what that means in Mr. Demane's language, and I don't mean that in a French English.  I mean it in a how he refers to an insider.

And then he said -- what he also tells you is he was telling me basically the same thing that Dov Malnik told me a few days before, that Ariad is a takeover candidate.  So we've got, to be clear, Mr. Demane telling you not just is he getting

information from, you know, from Mr. Nikas, who he says gets it from Telemaque.  He tells you he gets information about Ariad from two other guys.  OK?

Now, let's keep following it.  Now, let's talk about -- we talked a little bit about Mr. Demane's memory.  But here is what he told you.  OK?  When the government asked him, OK, where did you get information about Ariad from?  Did you ask Mr. Nikas?  No.  Why didn't you ask him?  Well, I assumed.  We get to that again.  I knew where he was getting information from.  So Mr. Demane assumed that's where Nikas was getting it from.

And he said I knew it because I knew from the beginning.  OK.

But in order to believe -- I think the government said, well, I mean, why would -- Mr. Nikas wouldn't lie to Mr. Demane.  Again, not true.  Here's what the evidence was. He did lie to Demane.  What he said -- this is, if you recall, toward the end, as Ariad -- this is now in 2017, right at the beginning of 2017.  Ariad was taken over by Takeda, a Japanese pharmaceutical company.  OK?  And as we'll show you and we talked about earlier, Mr. Nikas made a ton of money as a result of that takeover.  And to be clear, Mr. Lavidas was long off the board.

But Mr. Demane says, he said, I was really frustrated because we didn't do that last trade on the takeover deal.  He

K1ddlav6                        Summation - Mr. Sussman

didn't -- in other words, Nikas didn't share inside information with him about the takeover deal.  We could have made a big profit out of it.

Why were you frustrated at that point?  Because I knew George Nikas had the source -- which according to Demane was Telemaque's father, who of course by the time of this Takeda deal was long since off the board.  I knew George Nikas had the source and I asked him what happened and why we didn't get a tip to buy the stock again.

What did Mr. Nikas say?  Did Mr. Nikas say, oh, well, sorry, my source left the board a year and a half ago or a year ago?  No.  He said Mr. Nikas told him that he was frustrated, too, about the situation that his source didn't get any information about the takeover bid.

So you can take it either way.  You can either say Mr. Nikas was being completely up front with him and Mr. Nikas did have another source within Ariad and he was frustrated that other source, other than Dr. Lavidas, didn't give him the information.  Or you can just take it, which it probably is, that he is just lying to Mr. Nikas about it.

So, again, with the payments, these were assumptions. He just told -- all Demane tells you is I told him he was taking care of them.  He doesn't say that -- he never says Nikas told me he was paying Telemaque in cash, or Nikas told me he was paying him through investments in Mediterra, or anything

K1ddlav6                        Summation - Mr. Sussman

like that.  And Mr. Demane assumed that because that's how Mr. Demane operated.

OK.  Go back to John Dodelande.  This is just the transcript that proves what I told you before, which is that two of the sources were an investment banker at Centerview and at Moelis.  OK?  Quickly turned off his phone to avoid tracking.  And you all remember what Mr. Donaldson said about that, which is actually you can't track someone if they take the battery out of their phone.  Which Telemaque had known about that, right?

Now, how does Mr. Demane say he remembers getting inside information about Ariad in the October 2013 period?

I shorted the company, the stock of the company.

Again, which company?

Ariad Pharmaceuticals.

Do you remember whether you took a big position or a small position?

A big -- I think I took a -- not very big position, but I took a fair position, yeah, much larger than if it was a rumor, for example.

And so we're clear, short?

You mean selling stock, right?

Yes.

Had you ever taken a short position before?

No.

So, right, he is telling you I distinctly remember getting inside information from Ariad because I shorted the stock.

Oops.

Does this chart -- Dr. Jindra.

Does this chart show Marc Demane shorting Ariad shares?

It does not show him having a short position.

And did the government provide you with any trading records between 10/3 and 10/9 or 10/10 of 2013 indicating that Marc Demane shorted Ariad stock?

No.

So, again, the thing that he remembers so distinctly about this inside information, he didn't short.

And how about Mr. Rodrig?  Remember, we talked about Mr. Rodrig and how Demane remembered going over -- standing over Rodrig's shoulder while Rodrig took the position.  What did you observe with respect to Rodrig?  Well, he had a large long position entering the window, and he partially exited the long position but maintained the long position throughout.  So Rodrig didn't short either.  What Demane told you he remembered so clearly in terms of both of them shorting didn't happen.

This is -- did Mr. Rodrig:  After starting myself, this is shorting the stock -- I'm going to skip over this a little bit.  I think we've kind of talked about this.  But the

K1ddlav6                        Summation - Mr. Sussman

reality is Rodrig never shorted the stock either, and that's clear from Jindra's charts, too.

OK.  Now, the government wants you to assume that, as of today, or as of what they just said, they want you to assume that the board -- I'm sorry, I misspoke.  The board call did happen at 12 noon on October 7th.  I go to my next slide.  And the announcement happened on October 9th.  And this is why I should have spent more time on the slide.

But basically what it says is a couple of days after he started shorting the stock -- let me back up.  Sorry about that, ladies and gentlemen.  I got ahead of myself.

OK.  Let's take our time and walk through this for a second.

When was the next time you spoke to Mr. Rodrig about Ariad?

A couple of days after, or maybe a week, ten days after starting myself.

And when he says starting myself, starting to short.

And Dov and Tomer Feingold shorting the stock, knowing that we had to short the stock because bad news was coming on the company.

OK.  What time did you say to Mr. Rodrig?

He asked if I was in Geneva.  I told him we'd meet for coffee.

OK.  What happened at the meeting?

I asked him if he  was still long, and I told him it wasn't a good decision and he should -- I advised him to close his position.  I explained to him I had a very good source, and it was not the time to be long on the stock, it was the time to be short.  So we had a quick coffee.  We went back to his office, and he started changing the position.  Instead of being long, being short.  He closed off his position.  He sold the stock.  He sold more stock to be short.

Did you actually see him do that?

Yes, I did.

Let's go to one of Mr. Demane's other lies.  He was asked about whether three weeks before he had expressed a desire for the government to help him with his wife -- get his wife and children to the United States, he said, yes, I did. And he then -- he was asked, Well, did you tell them if you didn't get that help, you were going to consider stopping cooperating?

No, I didn't tell them.

You told them that you were going to think of other options if you didn't get their assistance, isn't that correct?

No, sir.

Well, you saw, and heard in the stipulation that was read, just a few weeks before that's exactly what he told the government.

So what he told you there was false.

And to be clear, he either lied on the witness stand or he lied to the government, one or the other.  And you can take your pick but, either way, he lied.

Then we had this discussion he recalled so vividly from nine years ago at Lavo and where he said -- we asked him: You recall having a conversation with Mr. Nikas and Mr. Lavidas about Ariad Pharmaceuticals that occurred at Lavo, correct?

No, sir.

It occurred after the dinner that you had at Lavo, correct?

No.  It took a couple of days after.

After as in later that night or after as in several days later?

Several days later.  A couple of weeks -- week.

Well, what did he tell the FBI on Halloween?  He told them that Nikas told him he was calling Telemaque Lavidas and Telemaque's father to get information about Ariad, and this was at some point in the evening after dinner, at which he met Telemaque Lavidas.  Why would you want to lie about something like that and not say that it was at the Lavo nightclub? Because the government has all this great corroboration on Mr. Nikas' American Express they told you about.

Well, you're going to actually have the bills from this Lavo birthday party, and you're going to see why he didn't want to tell you this really, really important conversation

from nine years ago that he remembers like it was yesterday, even though he can't remember what happened yesterday.

Well, it looks like our friends here started drinking at 2:50 in the afternoon on February 26th. We got eight glasses of Prosecco. We got some Moet, Amstels and Jack Daniels. Then we start getting a little later, some Grey Goose, Captain Morgans. Ah, but once we hit midnight, that when we go down to the club.

And when you're in a club and you're Mr. Demane, what do you do? It's bottle service. So we got two bottles of Goose. I assume that's vodka but you will use your everyday experience. A bottle of Don silver. I think that's Tequila but I don't know. Moet. Then -- that is at 12. But two hours later, apparently they need more. So they get more. Two bottles of Goose this time. A bottle of Patron. I know that that's tequila. Then some Red Bull to keep everyone up and then chardonnay. And they end -- well, we don't know when they end, right? We just know the last order is placed at 1:52 a.m.

So let's be clear. This night that happened nine years ago, where Mr. Demane tells you I remember distinctly hearing that Mr. Lavidas was the source -- Mr. Lavidas and his father was the source, this night he remembers so clearly. He had been drinking for a long, long -- at least 12 hours. How about that? Give or take. So that's why he wanted to lie about the Lavo conversation and wanted to move it out a couple

of days or a couple of weeks, because it was probably that long until he sobered up from that evening.

OK.  Now, what am I showing you here?  One of the things that Mr. Cooper told you was that he said, well, how is it -- is the defendant the unluckiest man in the world?  All three times the defendant had access to critical pieces of information -- or his father, I'm sorry, had access to critical pieces of information and in each time he insider traded. Well, of course, they picked the three times that matched up to all their assumptions.  So if you set up the game that way, fine, it's going to work out.

Incidentally, don't forget about the fourth time they set it up and it didn't quite work out.

MR. COOPER:  Objection.

THE COURT:  Sustained.

MR. SUSSMAN:  But, according to Mr. Demane, right, Mr. Nikas told him I've got a source on the board at Ariad. He's the father of my friend, and he and the friend are providing me inside information.  And that's in February of 2011.

So what am I showing you here?  What I'm showing you here is Ariad's stock between 2011 and 2013.  Why am I stopping at 2013?  I'm stopping in 2013 because 2013 is the first time Mr. Nikas ever buys Ariad stock.

So what's going on?  What am I showing you in terms of

K1ddlav6                    Summation - Mr. Sussman

these price jumps?  What I'm showing you here -- and you'll have the documents, they're 8-K documents -- is these are announcements by the company and how those announcements affect the price.  OK?  So a-dollar-79.  So if you in fact had a source that you were getting inside information from, if Mr. Nikas had that source, why isn't he trading here?  If Mr. Nikas had that source that he told Mr. Demane he had in 2011 and the stock goes up 4.6 percent, why isn't he trading there?  No.  It is fair to say, well, it is kind of chump change, those are small amounts.

The big FDA announcement, OK, the price goes down 20 percent, which, incidentally, is larger than some of the increase or changes in price of the government's -- of two of the three government announcements that they want you to look at.  The price goes down, and the FDA comes out with a box warning.  You know how the FDA process works.  Dr. Berger told you.  And there is -- I think you can use your common sense and infer that the process in January of 2012 probably wasn't that much different than it was in October of 2013.

How does that work?  The company gets in discussions with the FDA.  The company has a meeting of their executive team to talk about what is the big thing, and then the company schedules either an actual meeting or a conference call with the board members.  And the board members find out -- in the case of October, they find out two days before the

announcement.  In this case, we don't know when they found out but I think it is reasonable to infer that they found out certainly before the box warning was announced.

So Mr. Nikas apparently has this great source and he doesn't trade.  What does that tell you?  It tells you he lied to Demane.  He didn't have a source.  It means when he had this conversation, to the extent Demane -- even if that conversation even happened, Mr. Nikas lied about it.  He puffed.

why would he lie?  That's a question the government asked.  Easy.  Because he's getting really good inside information from Mr. Demane.  He's literally getting information from investment bankers who are working on huge deals.  And he's got to be able to come back with something to offer.  So that's why he lies.  That's exactly why he lies.

Let's do a quick comparison.  And the reason I'm doing this is because I think Mr. Demane gave you a very nice description of what an insider trader looks like -- what a smart insider trader looks like.  And, incidentally, I mean, you've heard about Telemaque in this case.  You heard he went to Columbia.  The government put in his bio.  This is one smart guy, comes from one smart family.  He is not an idiot.

So what do the smart insider traders do?  Well, first, they trade stock for a living.  Not Telemaque.  As Mr. Streeter told you at the beginning, you weren't going to hear, and he didn't do, a single piece of evidence about him ever, ever

K1ddlav6                        Summation - Mr. Sussman

trading stock on the stock market.  That wasn't his thing.  He was interested in pharmaceutical companies and the business, but he was not, like Mr. Nikas or Mr. Demane, constantly on his computer and making trades.

OK.  Two-way exchange of information.  The government doesn't say that Telemaque ever got information from Nikas.  All they say is -- and we'll get to this -- that he got some legitimate investments in a company that Pepsi-Cola, the Pepsi Company, wanted to invest in that they say that there is something illegitimate about Mr. Nikas' wife investing.

Incidentally, the fact that it's Mr. Nikas' wife doesn't -- is there -- can Mr. Nikas' wife not make an independent investment decision?  Do her investment decisions have to be dictated by her husband?  The stock is in her name.

And what does the government tell you?  What do they want you to infer?  They want you to infer that Mr. Nikas is using her as a front.  You heard from Ms. -- excuse me, you heard, excuse me, from counsel at Mediterra that, you know, Mr. Nikas' wife is a significant person in her own right, and she made an investment in a company of $500,000, a company that Pepsi-Cola wanted to invest $20 million in.

OK.  Only used burner phones.  We talked about phones.

Now, what does Demane tell you?  He erased Telemaque's phone number from his phone.  So how do we know that Demane's phone number was even in Telemaque's phone?  Because Telemaque

K1ddlav6                        Summation - Mr. Sussman

doesn't erase contacts from his phone.  In fact, you'll hear Mr. Nikas' contact was in his phone, all of the contacts were in his phone.  Nothing was erased.  Because he had no reason to erase Marc Demane's phone number.  OK?

Demand received payments through a fiduciary company. Telemaque received legitimate investments where he was publicly the founder and CEO.  So, again, to the extent that George Nikas was trying to hide this investment, he did a pretty poor job.

He created paper trails.  Again, we talked about all of the payments to Mediterra.  You are going to see these documents.  These are legal documents.  They are drafted by a Swiss lawyer, by a lawyer who was trained in Britain at Kings College Law School.  I mean, these are real lawyers.  These are not crooks or fly-by-night people.  These are legitimate investments.

We talked about the taking the battery out of the cell phone.  Of course the irony of Mr. Donaldson's testimony, for whatever value it had in terms of telling you where Telemaque was at any given time, what does it tell you?  It tells you Telemaque wasn't concerned about being followed, that to the extent he was actually going over to George Nikas' apartment, which they have no idea where he was going, but to the extent he was doing that, he didn't care.  He had nothing to hide.

Then cash.  Did you hear anything about cash being

seized in this case from Mr. Lavidas?  Anything?  Anything about large amounts of cash or artwork or anything else?  The government's only answer to these -- and they said it in this -- I wrote it down -- they said, well, Telemaque is just brazen.  He's more brazen than Mr. Nikas and Mr. Demane.

You draw your own conclusion on that, ladies and gentlemen.

Let's talk about the transactions.

I warned you -- I'll move along quicker but I warned you it is going to take a little time.

OK.  Here's the allegation.  By June 2013, executive members of the board, including the director, became aware of an agency of the European Commission was going to approve the marketing of Iclusig.

OK.  So here's what you heard from Dr. Berger.  The European Commission approving Iclusig was not at all a secret.  The company executives were clear that they anticipated getting the approval on July 1st.  All the analysts knew about the date of the approval.  It was only the government who believed it was secret.  Because nobody looked at the analyst reports, as you heard from Dr. Jindra.

OK.  I'm going to walk through this.  You'll have these all back there, but it basically tells you -- and you will recall this, the discussion, the debate -- I guess it is kind of an esoteric debate, depending upon the year, as to when

the exact midpoint of the year is, whether it was July 1st or not on that particular year, if it is a leap year or what have you.

Anyway, what you heard, that Harvey Berger was telling everyone who wanted to listen that by July 1st they were expecting.  OK?  We talked about the fact that everyone knew.  So what did the stock do?  Did the stock take a big jump because of this secret information?  No.  Everyone knew.

OK.  Now we get back to the call/tip/trade, call/tip/trade, the phone records.  OK.  Let's actually look at the phone records and let's look at the trades.  Dr. Jindra explained to you that the blue dots represent going long for purchases of the stock.  The red dots represent going short on the stock, and on the Y axis is the actual amount of exposure.

So where are the calls here?  OK.  Nikas buys –– makes his first buy of Ariad stock, 14,000 shares, the first time he ever buys Ariad stock.  Where is the phone call?  Oh, the phone call doesn't come until, what is that, right before July 1st at –– on June 30th at 6:42.  He makes another small buy.  Ariad announces.  Then he shorts.

So what do the phone calls tell you there?  Zip.  They tell you zip.

55 hours after Nikas trades, nine-and-a-half hours after the announcement –– big deal –– there was a phone call.

Let's talk about Darina Windsor.  OK?  Ms. Windsor,

who the government would like you to believe we're just making up out of whole cloth to confuse you or send you on a wild goose chase.  Ms. Windsor began accessing secret information about Ariad in the spring of 2013.  Humph.  Kind of close to when Mr. Nikas starts buying his stock.

What was Windsor doing?  She was evaluating acquisition targets for AstraZeneca.  Why is that important?  Well, if you guys have learned anything over the course of this trial, you've learned that when someone -- when a company is a target of an acquisition, nine out of ten times -- and don't quote me on that number -- the stock price goes up.

OK.  So what was Windsor doing?  Did she just innocently happen to access documents about Ariad?  Nope.  She was forwarding those from her Gmail account to the other source of Mr. Demane at Moelis, who you heard passed the information on to Dodelande, who passed it on, and I'm not talking about this precise information, to be clear.

MR. COOPER:  Objection.

THE COURT:  Overruled.

MR. SUSSMAN:  OK.  I'm not going to make you go through all these documents, but they are basically the same thing.  They are essentially she's taking a work email.  She's forwarding it to herself because she doesn't want to forward it directly to Benjamin Taylor so that there is a path on that.  So she forwards it to her Gmail, and then she forwards it on.

OK.  AstraZeneca oncology profile.  Right here you see "Private and Confidential."  Well, what's in those?  Well, they are focusing on -- focus should be on comparison principally for Ariad and Onyx.  Discussion materials, consideration for acquiring Arnold.

Arnold is Ariad.  We talked about that.

Private Arnold internal evaluation, valuation.  We talked about this.  And I don't want to ruin it for you, but at the end of this, when I finish with this Centerview thing, what you are going to hear is this actually leads to the actual letter that comes out from about Amgen acquiring Onyx that gets leaked to Demane that eventually he and Nikas both make insider trading purchases on.  So it is not as if this is some random event.

OK.  What do we know from the jumplist you saw earlier today?  We know that 6/13 -- so, again, Nikas starts buying on 6/28, June 28.  So five days before he starts buying, she is looking at jumplist reports and in terms of documents that reference Ariad.  OK?  And the stipulation said the only jump reports we're showing you were jump reports that referenced Ariad, where she is looking at Ariad, documents concerning Ariad.  What does she forward on from all of her searching?  She forwards on that offer letter to Dr. Coles from Amgen about acquiring the company.  OK?

Back up for one second.

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

K1ddlav6                       Summation - Mr. Sussman

So what's going on here?  To be clear, she knows Ariad is a possible acquisition target.  She knows Onyx is a possible acquisition target, Ariad and Onyx.  What does Mr. Nikas do?  What does Mr. Demane -- what does Mr. Nikas do, not Mr. Demane?  Mr. Nikas buys Ariad and Onyx.  You want to talk about coincidences?  How about that for a coincidence?

Let's go to transaction number two.

The government wants you to assume that Telemaque passed secret Ariad inside information about this FDA suspension on October 9th.  This is the allegation in the indictment.

Now, the government wrongly assumes that Telemaque received the secret Ariad information from his father in a call on October 7, 2013 at 12:03 p.m.

This is Dr. Berger talking about the fact that the board was having a conference call to discuss this FDA issue at noon on October 7th.

Here's the email about the board conference call where they are actually going to discuss the details on October 7th. OK.  That's scheduling the conference call.

Now, first off, the call on the 7th, there is no evidence that the 12:03 call on the 7th was between Telemaque and his father.  That is the one that came into the apartment. There is no evidence, as we talked about, that Telemaque's father was even in the United States, much less at the

apartment in New York when that call was made.

Here we go.  That's the call again.  This call is 18 seconds.

Landline -- I'm not going to tell you the stip again.

OK.  So we're going to look at Mr. Nikas' trading in a little bit in detail, and we're going to match it up with the phone calls.

So Mr. Nikas actually starts selling on October 4, 2013, three days before the board has its call.  He begins shorting Ariad hours before the board call.  The board call is at 12 noon.  And he begins shorting Ariad before the 12:54 -- so, in other words, there is a 12:07 -- 12:03 call, I think it is.  We will get to it and talk about it.

But here's what happens.  In this, the details matter here.  OK?  October 7th, 9 a.m., Nikas takes a small short -- a small long, which is this blue dot, and an 85,000 short position.  OK?  I don't know why this is here.  Well, we can remember from Mr. Donaldson that it wasn't very precise.

OK.  That's where I wanted to get to.

OK.  So he takes the short position.  Where are the phone calls?  The phone calls all occur -- and these are phone calls to Mr. Nikas, OK, because we know Telemaque talked to his dad all the time, and the only other call with his dad is that landline call.  So these are just the calls with Mr. Nikas. There are one, two, three, four calls that day.  Every single

one of those calls is almost four hours after Mr. Nikas starts -- I mean, this is a big, big -- it is actually a little dot, but it is a big position.  OK?  This is a big position. He is going really short here.  But he's going -- the call doesn't take place between Mr. Nikas and Mr. Lavidas, that the government wants to suggest or imply passed on the inside information, it's four hours after the trade.

The next set of calls, OK.  This is after the board meeting.  So the next set of calls, which are on October 8th. Again, Mr. Nikas at this point in time has even doubled down on his short position.  The call that is between Telemaque and Mr. Nikas doesn't take place until five hours after the trades.

And what does the government's indictment say?  On or about October 8, 2013, while in Manhattan, Lavidas spoke by telephone with Nikas regarding material non-public information relating to Ariad.

OK.  Let's go back.  The government says that this call -- this is not me, this is their indictment -- says that this call right here --

MR. COOPER:  Objection.

THE COURT:  Sustained.

MR. SUSSMAN:  This call right here, which this is a weekend, by the way, this call takes place after Mr. Nikas -- the call that the government says was passing material nonpublic information --

MR. COOPER:  Objection.

THE COURT:  Sustained.

Just argue from the evidence, counsel.

MR. SUSSMAN:  Yes, your Honor.

These calls all take place long after -- five hours after Nikas finishes trading.  These calls in no way, shape or form, long after the market is closed, these calls in no way, shape or form -- and it is before a weekend -- have anything to do with insider trading.

Let's talk about transaction three.

You know, incidentally, I do want to back up because I forgot something.

What the government had told you -- well, we don't have this, actually.  Forget it.

What the government told you in their closing statement was, or their summation, was that what does Nikas -- this is when they were arguing that the October 3rd, the five-second call, was when Dr. Lavidas passed on the material non-public information to Telemaque.  There they told you, what does Nikas do the very next day, October 4th?  He starts selling.  He starts selling his stock and he starts investing money that's going to pay off.  He starts laying down millions of dollars, betting the stock is going to go the other way.

OK.  Let's -- let me tell you what the actual evidence that you will have back there shows you.  What the actual

evidence -- and you'll be able -- you will have a stock chart that will show you -- it is in evidence -- that will show you the change in Mr. Nikas' position.  What you're going to see is -- what happens is he starts out with the 14,000 shares that he bought back in June 28th, all of which he holds on to.  Then what he does, when the government says he starts selling stock and going crazy, he sells 5,000 of those 14,000 shares.  OK? He doesn't start selling like crazy.

Incidentally, what does he do after that?  And this is in the chart.  So, back here, he sells 5,000 shares of his 14. Right here, what he does is he actually buys back 2,000 shares. To be clear, he buys -- this is a blue dot.  He buys back 2,000 of the shares he had previously sold.

So when the government tells you something like he starts selling and doing all this stuff and doesn't show you the actual data and wants you to make assumptions, look at the evidence, because the evidence does not support what they're saying.  The reality is this:  Mr. Nikas does not start taking a significant short position until this date on October 7th, which is, again, well before any phone calls come in to him.

Transaction three.

OK.  In transaction three the question is -- the secret information here is that the directors became aware that Ariad was discussing the resumption of marketing and distribution by about November of 2013.  The government's

evidence is flawed.  Again, Ariad's negotiations with the FDA were not a secret.  This wasn't secret information at all.

We have the analyst reports.  Harvey Berger, once again, regarding the label change, we have a sense based on our ongoing discussions with the Agency that it will be sooner rather than later.  We can't commit on the FDA's behalf to a particular timeline, but I guess that would be how I would guide and certainly our impression of the moment.

Again, Mr. Berger or Mr. Clackson --

THE COURT:  Counsel, when you are reading, it is very hard for the reporter to capture every word if you read really quickly.

MR. SUSSMAN:  I apologize, your Honor.

THE COURT:  Thank you.

MR. SUSSMAN:  And I apologize to my court reporter here.  I will slow it down.

I won't read this to you because that will take too long.  What I want to tell you is Ariad was transparent about what was going on.  They were transparent with the investing public that what they were doing was negotiating with the FDA. OK.

And what did the analysts view from that?  They thought that Iclusig market reentry is highly likely.  Do you remember Dr. Berger telling you it almost never happens that once a drug is taken off the market you are able get it back on

the market.  It's impossible.  It was a feat of incredible work by Ariad, and no one could ever have guessed that.  Well, these analysts guessed it, and they guessed it December 9th, so like eleven days before it happened.

And to be clear, Mr. Nikas and his friends were not the only people who anticipated this information.  Why did we put this into evidence?  Look at what's going on in the market.  OK.  There is all the public information out there.  They are negotiating with the FDA.  Iclusig is going to get back on the market.

What does every stockholder -- and you heard this a hundred times, you know, the fact that the price is going up means more people want to buy the stock.  OK.  It goes up 7 percent here, 15 percent here, 11 percent here, 11 percent on the day that it is announced.  So, I mean, the change between the 19th and the 20th is the same.

So, I mean, you know, these guys who were trading, Nikas and the like who were trading on Ariad stock at that point in time, I mean, it doesn't seem like they know anything more than what everyone else who is trading in the stock, including all the analysts and everyone else, knows.  I mean, this is not secret information.

Now, not -- in terms of the actual date of the announcement, what does Dr. Berger tell you?  He tells you they only knew the day before that it was December 20th.  So they

only knew about this announcement that the FDA was going to agree to do this on December the 19th.  OK.

Now let's look at the trading.  I want to skip this.

Whoops.

When does Nikas start going long?  Way back here.  Way back here.  And this, where he is going long and going short, I think Dr. Juneja explained that sort of hedging.  Then he is going long, and here he starts going long again here.  OK. He's buying -- he's not buying, right, knowing the announcement.  And the reason I had that other chart up here is this.  And this is why we put this in.

Remember, there was testimony about Mr. Nikas getting inside information about the fact that Amgen was going to acquire Onyx, and then it was announced that the deal was off. What does Mr. Nikas -- how does his trading pattern look when he has inside information?

Here's how it looks.  He starts buying and he goes crazy buying after the announcement.  Because he doesn't know what is going to happen after that, after the inside information, he dumps it all.  In this particular case, you know, he basically sells all but a very small portion.

Now, look at the time period that the government was talking about in terms of Mr. Nikas' Ariad exposure.  They haven't told you -- talked to you at all about what was going on between 2013 and 2014.  Why?  Because Mr. Nikas isn't --

he's just owning Ariad stock.  He has got a significant position.  At some point he goes almost up to 700,000 shares, and he's holding his Ariad stock.  He doesn't sell his Ariad stock until sometime in May of 2014.  Again, there is no allegation that he sold that based on inside information.

This guy is just investing in Ariad stock.  No one -- no one is saying he didn't get inside information at various times.  But he also actually believes in this company; at least that's what you can infer from the way he's trading here.

Oh, and incidentally, the reason why there are no phone calls on this chart like there are on the other charts, and the reason -- is because there are no phone calls.  Do you see the legend here?  It says, Phone contact between Telemaque and Athanase Lavidas.  If you remember, when there were Nikas calls in there, it is in orange.  There is no orange on this chart.  Why?  Because during this entire period, trading period, that the government alleges insider trading was going on -- this is the second page, by the way -- there are no calls.

Call/tip/trade.  Call/tip/trade.  But why is there no call/tip/trade when they say there is insider trading?  Oh, that must be the time when the cell site data tells you he's somewhere in midtown Manhattan meeting Mr. Nikas, who we don't know whether he's in the United States -- where he is in the United States.  Right?  Remember, we don't know, when we talked

to Mr. Donaldson about whether they were tracking Mr. Nikas' cell phone to see where he was, he told you he had no idea.  He could be anywhere in the United States for all he knows.  The only information we have on Mr. Nikas is when he arrived at JFK and when he left JFK to leave the country.

So then let's go to number four.

The government -- and your Honor, just so you know and so the jury knows, I don't have that much more left.  So if people can hold on for a little bit longer, I'll be done.

Transaction four.  This is the Baxalta.

Now, the government assumes, once again, that Telemaque Lavidas passed inside information about the Baxalta offer.  Again, what they're saying is members of the board became aware of the Baxalta and that Telemaque got that information from his father.

But here's the thing.  What the evidence showed you is the board didn't learn of Baxalta's offer until July 30, 2015.  Here's the email where Dr. Berger says we got a nonbinding offer from a major pharmaceutical company.  He doesn't even identify Baxalta at this point in time.

Now, the government tells you Mr. Nikas didn't start his trading until the 30th, and you remember they showed you a chart of Mr. Jindra.  And you may recall, I had some very specific questions for Mr. Jindra about his chart.  And what I talked to him about was the fact that his chart actually,

because it just looked at the end -- it netted out end-of-day positions, it wasn't -- it wasn't able to actually get the detail of how someone was trading during the day.  And that's why we had Dr. Juneja testify about this.

So what does she say about Mr. Nikas' trading on July 28th?  So in the morning he had been increasing his exposure in terms of doing the equivalent of shorting and making a short investment in Ariad.  So typically someone who does that would be betting or hoping the price -- I'm reading too fast again.  The price would go down.  As of 11:53, though, he changes the direction of his investment and then he starts reducing his exposure.  So, in other words, he is reversing the direction of his investment and taking it more towards the positive.

And that's this chart.  Because the details matter.  This chart you would never see in the assumptions that Mr. Jindra was told to make, because Mr. Jindra would just net this out and it would be sort of a negative short position that you would see.  Now, that's -- it's not inaccurate, but it really -- it's again requiring -- it's asking you -- it's letting you make a assumption that's not truly accurate -- that's not truly what happens.

Because what happens is at 11:53, Mr. Nikas, for whatever reason -- and I'll tell you why in a minute -- makes a significant decision that, uh-oh, I'm going to change -- I've

got to get out of this short position because I'm worried that something really good is going to happen at Ariad.

So, call/tip/trade, right? Call/tip/trade. OK. When does Mr. Nikas start buying? He dramatically changed his position before any calls with Telemaque Lavidas. He's changing his position and he's going long right in there before the phone call. And we'll talk about this Bloomberg thing later.

Now, the government says it's farfetched and crazy that Nikas and Demane learned about the Baxalta acquisition from Darina. They want you to say, well, he must have learned about it from Telemaque's dad. But, again, remember, Mr. Nikas starts changing his position before the Ariad board even learns about the Baxalta offer. How could you possibly know about the Baxalta offer -- how could Mr. Nikas possibly know about the offer before Ariad knows about the offer?

Oh, another coincidence.

Darina Windsor accesses data 23 times. The government says and the stipulation says they can't tell whether she was successful in accessing the data, and so the government wants you to infer, well, you know, we don't know she actually got the data. Now I will ask you to use your common sense. Do you think she's trying 23 times over the course of, you know, a month and a half or -- and this is three months or two months, almost, do you think she's doing that 23 times just to get

locked out of the system and she's not getting it?  Come on.

And what is she trying to access?  Baxalta.  She's trying to access information about Baxalta's acquisition of Ariad, Project Miles.

Background information.  And let me just be clear, 7/27/15, she's got one, two, three, four, five, six attempts -- seven, eight.  She's getting information the day before, and seriously trying to get information the day before, Mr. Nikas makes a dramatic swing in his Ariad exposure.

And we already talked a little bit about Mr. Demane's role in that whole thing, because you'll recall Mr. Demane not only knows about the Baxalta thing, then he decides to make some extra cash or to make cash by planning a -- leaking information to the newspaper and that's his trades.

So the secret information, it could not have come from the board, because when you actually pay attention to the details of the trades and the phone calls, Mr. Nikas changed his position before the board ever found out.

Now, why?  Why would Telemaque engage in criminal conduct?  Again, in your everyday life, ladies and gentlemen, despite sharing personal details about your romantic relationships, you would not just engage in criminal conduct. People engage in criminal conduct, you know, for a reason, not for fun.

The government is suggesting -- and they suggested in

K1ddlav6                        Summation - Mr. Sussman

the questioning of Dr. Berger -- that, uh-oh, Mr. Lavidas -- Dr. Lavidas was in financial trouble.  OK.  What does the evidence really show?  The family was very wealthy.  How do you know that?  They had a beautiful home in Athens.  They had a beautiful home in Manhattan.  They had a beautiful home in Paris, France.  They have a lot of assets.  And that doesn't even include the $1.4 million in stock that Dr. Lavidas had.

And, incidentally, Harvey Berger told you -- Dr. Berger told you about the fact that if information got out about these kinds of mergers, the merges might not go through and fall apart.  If Dr. Lavidas wanted to make money, he would want this information to be kept secret as possible, because he's going to make a heck of a lot more money on his shares if that information remains secret than if he tells it and gives it out to the world.

OK.  Well, this loan, let's be clear -- and you'll have these documents -- the loan was not a strict loan, it was a line of credit.  But that's like -- it's a credit card.  OK? It is a credit card.  And in this case it is a slightly higher limit that I have on my credit card; it is a million-dollar limit.  OK?

And what does this spending show?  You all have credit cards or you know people who do.  You understand how it works, and it's a question for liquidity purposes, for cash flow.  OK. So it starts up here.  Takes a little more.  Then pays it back.

Then starts a little higher, a little higher, a little higher, a little higher, and you also heard that this was surrounding an economic crisis in Greece.  This is all the way in 2017.  So let's look where the insider trading allegedly takes place, which is right around here.  So right around here, the guy's got $400,000 of credit that he's not even using.  He's not even close to maxing out his credit.

To suggest that he engaged in insider trading, violated his duties.  You heard about the respect that Harvey Berger had for this man, who he has known for 50 years.  To suggest that this man -- did this man, who's got places around the world, did this for a couple hundred grand, or whatever -- they haven't told us an amount of money he ever got for a legitimate investor.  It's absurd.

(Continued on next page)

MR. SUSSMAN:  Now, I'm just about done.  And this I think tells it all.  OK?  Dr. Lavidas resigns from the board effective July 21, 2016.  Here is the big Takeda acquisition, the one that Mr. Nikas was lying to Demane about, saying, oh yeah, I don't know why my source didn't give me information about that, which Mr. Nikas incidentally did have a source and made $4 million.

Skip that and just go right to this.  So this big insider trading that my client and his father supposedly engaged in, OK, with all of this sophisticated international ring of insider traders, what's the net result for George Nikas of having this incredible source, this incredible access to information?  Forget about the time where he wasn't even trading in Ariad while Dr. Lavidas was on the board.  He made $5.5 million while Dr. Lavidas was on the board.  It's a lot of money, don't get my wrong.  What did he make after Dr. Lavidas left the board?  $6.7 million.

I mean, you know, the government keeps -- they use the analogy of knowing tomorrow's news today and, you know, you know the lottery number before the lottery is done.  I mean if this guy supposedly knew all the answers to the test, you'd think he could have done a heck of a lot better than how he did when he didn't know the answers to the test.

I am this close to being done.  Look, this is not a story, it's not story time, it's not imagination time, it's not

movie time.  This is real.  This is real life.  These are real people.  This is a serious decision that has enormous consequence that you are going to be making.  And that's why the government's burden is so high.  So, I want you to use your common sense, not your imagination.  I want you to go back into that jury room.  I don't want you to make assumptions.  I want you to look at the evidence.

I want you to hold the government to their burden.  I want you to make sure that they have proved to you beyond a reasonable doubt that this man engaged in criminal activity.  Because I am confident that when you evaluate -- when you put the assumptions aside and you evaluate the actual evidence, you will return the only verdict that is fair and just and holds the government to their burden of proof beyond a reasonable doubt, and that is a verdict of not guilty.  Thank you for your patience.

THE COURT:  Ladies and gentlemen, we will take our midafternoon recess.  Thank you.  Let Ms. Rojas know when you're ready to resume.

(Jury not present)

THE COURT:  So, counsel, how long do you think the rebuttal will be?

MR. TRACER:  Your Honor, it will probably be 30 to 40 minutes.

THE COURT:  Ms. Rojas will let us know when the jury

is ready to resume.

(Recess)

THE COURT:  Please be seated.  Bring in the jury.

Counsel, if you want that screen moved up, that's fine.

(Jury present)

THE COURT:  Counsel.

MR. TRACER:  Thank you.

Ladies and gentlemen, when Mr. Cooper addressed you he told you to listen carefully to what defense counsel would say about October 2013 when there was that bad news at Ariad, George Nikas' trades makes $3.5 million; the rest of his network makes over $7 million.  So Mr. Cooper asked you to listen carefully to what defense counsel's answer would be.

And you heard defense counsel, they got up here and they made a serious allegation that the wrong guy is in court. And what did they tell you?  We will show you the sources; we will tell you who really did it.  So, I hope you paid close attention to that closing and you listened carefully for who else knew in October of 2013 that there was going to be bad news, market-breaking news that would cause Ariad stock to drop 66 percent in one day.

Who had that information?  Ladies and gentlemen, you heard nothing about that.  Nothing, not a word.  You know why? Because the only person who had that information was the

defendant.  He got it from his father.  Dr. Berger told you that that was the most important thing happening at the company at the time.  He shared it with the board members, and you saw that the defendant spoke to his father, and the defendant was burning up Nikas' phone.

Now, Mr. Sussman got up -- and this is emblematic of what he did on his closing.  He showed you these little snippets, right?  Look at one call, one dot on a screen, and if it's not there -- that's not how it works.

Ladies and gentlemen, it doesn't work like that.  In this rebuttal summation, I'm not going to have a chance to address everything he told you, but I'm going to point some of those out, and I'm going to point out other arguments he made that don't make sense.

Remember, he has no burden.  The defense does not have a burden.  The government has the burden in this case.  We have to prove the defendant guilty beyond a reasonable doubt, and we have done that.  And as you saw in Mr. Cooper's summation, there are eight independent reasons you know the defendant is guilty.

So, what did Mr. Sussman do?  He put up one little slide.  He said on October 7 he compared a particular call against a particular trade and said that doesn't line up.  But of course that's not what this case is about.  That's like looking at a television and asking you to look at that pixel

really closely, it's red, so you're not actually watching the movie? No, you have to take a step back, and you have to ask yourself what is going on here. And when you look at the timeline that Mr. Cooper laid out to you, you see the news, you see when the defendant's father learned the news, you see calls. You know they spent time together. You see selling, the selling billed. This is not some exercise of putting a microscope on October 7 and saying does this call match this trade. That's smoke and mirrors, ladies and gentlemen, and you should ignore it.

Now, throughout his summation -- despite all the patchwork of arguments he had to try to explain certain things -- two facts remain, two facts that are undisputable.

Number one, the defendant's father was on the board of Ariad and had access to all the secret information at issue in this case. His dad found out about everything important at the company as it was happening from the CEO, period. That's indisputable. It did not come up on the defense summation because it's a really bad fact for the defendant.

Fact number two, his best friend trades in the stock of that company. He makes ridiculously well-timed trades and earns millions of dollars. That is not in dispute. Now Mr. Sussman said, well, did you see a stipulation they shared intimate details; we all share intimate details with our friends. Really? Really? Use your common sense, ladies and

gentlemen.  They had a close friendship; they talked about everything.  And when Mr. Nikas had millions of dollars on the line, you don't think he talked to his best friend about it?

Those two facts alone, ladies and gentlemen, are devastating.  When you add your common sense to the mix, you can stop there.

And you know how Nikas had secret information about Ariad.  It's not some patchwork of analysts, Darina, and long lists of people -- and I will respond more particularly -- but that's not how it works.  Mr. Sussman told you this is the real world, these are real people.  And, ladies and gentlemen, you know how real people work.  They talk.  And in this case you saw how close they were and how much money was on the line and what the defendant knew.  And when you put all that together, there is no reasonable doubt about this case.

So aside from those two facts, there is a lot of other detail, there is a lot of other corroboration of how you can be sure that the defendant is guilty, that he took stolen information from Ariad and used it to fund a major insider trading scheme.

Now, the defense, his argument broadly broke into four modules, and so I want to address them in sort of each one of the four.

Now, number one, his main point is that the government has the wrong person on trial.  A serious accusation.  And they

K1D7LAV7                         Rebuttal - Mr. Tracer

told you that they would bring before you all these other sources on Ariad, specifically they would bring you better sources on Ariad.  So you have to ask:  Is the defendant a better source on Ariad?  Or is the person that they've brought before you a better source on Ariad?

They admit that Nikas is an insider trader.  I don't take that to be in dispute in this case.  They called him a serial insider trader in their opening, right?  So, that's not really the question here.  The question is how the inside information gets to George Nikas.  And as Mr. Cooper told you, you know many, many ways how it gets to Mr. Nikas.  It gets to him through his best friend, the defendant, who does it again and again.

Now, let's talk about some of these other sources.  So of course the one you heard about -- remember Thursday afternoon they read you documents; this morning they read you documents -- and the person who appeared in those documents is Darina Windsor.

Now, I just want to take a moment before we talk about Darina Windsor.  So during trial they talked about Darina Windsor, and then during his summation defense kind of pivoted. Now he has this whole chart of people maybe they could be the sources.  So I wrote them down.  I don't have the slide, but I wrote them down.  I am just going to read them to you, and let's see if these people are better sources of inside

information about Ariad than the defendant.

So, first of all, let me point this out:  He had a list of sources for Demane and one source for Nikas.  Well let's go through all of them.  Let's even assume that we count what he calls Demane's sources.

So number one, friends.  I don't know who he is talking about, so we're going to ignore that one.

Brokers.  OK, what brokers did they bring you evidence about that had better sources of Ariad inside information than the defendant?

Traders.  That was the third item on his list.  What evidence have you seen of traders that had better access to Ariad inside information than the defendant?  None.

Centerview source.  So that's presumably Darina.  And we will come back to her in more detail in a minute, but as you saw in the closing, what access did Darina Windsor have to Ariad information in the time that matters in this case?

So, in October 2013, or December 2013, or July and August 2015, what access did she have?  So, first of all, in October and December she had none, zero.  And then in the summer of 2015 there is about 70,000 artifacts on this computer from which it's not possible to tell, and maybe she accessed some documents, but you can't really know because they were on a server and they are the user name.  We will come back to that.  That's Darina Windsor.

K1D7LAV7                      Rebuttal - Mr. Tracer

Next, he said Moelis source?  I don't know what evidence you heard about Moelis during this trial.  I sat through the trial as well.  You can look through the evidence and see if you can figure out how Moelis is connected.

Bryan Cohen, what connection does he have to Ariad?  Again look at the evidence.  I submit there is none.

Zeynep Zenel, you might not even remember who that is, but Mr. Demane testified that it was his girlfriend that he was able to steal information from; she worked at Goldman Sachs.  The connection between Zeynep Zenel and Ariad?  Zero.

The next one was investment bankers.  I don't know who else that's referring to, but again you can check the record and see if there is any other evidence of investment bankers who had better information than the defendant.

Then there was George Scherg.  Again, you may not remember him, he was one of Demane's sources some time ago.  No connection to Ariad.

And then their only connection as a source for George Nikas was Marc Demane.  And we will come back to Marc Demane, but Marc Demane testified here in court.  You had the chance to observe him.  He was under oath, it was serious.  And we will come back to him in a minute, but I submit that he testified credibly, and he told you that his source on Ariad was George Nikas.  There was no other source on Ariad.  So this whole list falls apart, ladies and gentlemen.

And if you want to do just a quick comparison -- and I pulled up Darina -- but you can do this for any one of the traders on the list.  Put yourself a score card, and ask is this person a better source?  Or is the defendant a better source?  So let's compare him to Darina Windsor.  Now, we don't really have a better picture based on the evidence at this trial of who she is, but let's ask the questions.

Is the person's father on the board?  Or any family member on the board?  Defendant yes.  Darina no.

Does this person call George Nikas?  Defendant yes. Darina Windsor no.

Does the person e-mail with George Nikas?  Defendant yes.  Darina Windsor no.

MR. SUSSMAN:  Objection, your Honor.  There is no evidence in this case about that.

THE COURT:  I think that's the point.  Overruled.

MR. TRACER:  Do they get money from Mr. Nikas? Defendant does.  No evidence of Darina Windsor getting it.

Do they know about the FDA issues at Ariad?  What I just talked about a moment ago.  What is happening when the stock is about to tank?  Do they know?  Defendant yes.  Darina Windsor, no.

What about do they have access to all three of the events, October, December and July?  Do they know what is happening on all three of those occasions such that they could

be George Nikas' source?  Defendant yes, Darina Windsor no.

And so let me just hang onto that last point for a minute.  Defense's claim that we have the wrong person, somebody else is the source here.  Well, ladies and gentlemen, that source -- to answer all the questions in this case -- has got to know about all three of the other events.  They can't know about one.  They can't know about two, or they don't explain all the evidence.  They have to know about all three.  The only person who does that is the defendant.

Pay attention when you consider the defense counsel's argument about his patchwork, how he is trying to weave the needle.  He has this answer here, that answer there, a little bit here, a little bit there.  Or, ladies and gentlemen, should you ask yourself what is the most simple explanation?  Is there a single answer that actually explains all of this?  Is there a single answer to who had information about the good news, the bad news and the takeover?  It's a resounding yes, and it's the defendant.

And what else have the defense lawyers tried to do, faced with all the evidence, the eight ways, the timeline, the fact that he had three things, the fact that he spent time with George Nikas, the fact that he calls George Nikas?  What have they tried to do?  I submit that they've tried to distract you.  They have tried to put up other things that are irrelevant to take your eye off the ball.

Let me just go through some of this. You saw an avalanche of e-mails about Centerview Partners and Darina. And it wasn't just Darina. Let's take a look at just one example. This was one of the e-mails they read to you either this morning or Thursday afternoon. Don't look at the defendant; look at Darina Windsor. Hennie Heiner. Kirsten Dreisbach. Rich Girling, Andy Staples, Jamie Heath. You might be wondering what any of these people have to do with this case, and that would be a good question, because they have nothing to do with this case. These people are as connected to George Nikas as Darina Windsor is.

Next, what else did they do? This case is about Ariad, it's about trading in Ariad, and the question you have to answer is how did the information about Ariad get from Ariad to George Nikas. But again defense distractions. AstraZeneca. Onyx. Amgen. Remember Seattle Genetics came up on a whole bunch of those slides the other day. Takeda Pharmaceutical. Look here, ladies and gentlemen, don't look at what matters in this case.

And what else? The time periods. Not just are they myopic in their focus on looking at specific days. They want you to look at the time periods that don't matter, that aren't at issue in this case. They showed you all kinds of announcements and press releases from 2011, 2012, the summer of 2013; all of them have nothing to do with this case. They are

irrelevant.

Mr. Sussman in his closing put up a chart -- multiple charts. One of them is Nikas' trading in 2014. One of them shows the trading at the end of 2017, all trading that is not at issue in this case, when the defendant's father is getting secret information, passing it to the defendant and the defendant is passing it to George Nikas.

And they asked you, ladies and gentlemen, well, you know, if they had this source, why weren't they insider trading more? Well, first of all, ladies and gentlemen, it's never a defense to say they could have committed more crimes if they wanted to. Right? Let's just put that to the side. Even taking that question for one second, there is a whole bunch of reasons they might have. First of all -- and defense counsel just dismissed this, but you heard in the evidence that it was true -- the defendant and his father needed money in 2013. You saw when they started drawing on that credit in 2013, when they came -- when the defendant's father came to Dr. Berger and needed money. He needed liquidity, and one way to get liquidity was to provide tips to George Nikas so that Nikas could provide payments to the defendant and his father and ultimately help out with the company -- which we will get back to later.

Also you heard from Mr. Demane that there was a reason things got started in 2013. You may remember his testimony was

that he was approached by Dov Malnik -- who is another one of these traders in his network -- who actually thought that they should be long on Ariad.  So, Demane goes to Nikas and he says we need to get to the bottom of this.  Nikas is able, like that, to turn around and get him an answer it's unfounded, it's not true.  So then they go back and they short the stock.  That is something concrete that happens that would explain why it's happening when it does.

Now, let me just show you some slides.  So, again, other examples of them trying to get you off the time period that matters?  They showed you this slide.  Now you will remember when Dr. Juneja testified, she put this up.  Literally she highlighted the time period that didn't matter, the time period that is after 2016 and that is not an issue in this case.

The real story in this case, ladies and gentlemen, starts in October 2013 when they get that bad news.  And what happened?  October 2013 is one of Nikas' biggest days of profit in the stock.  Why?  Because he has inside information.

December 20, that's another one of his biggest days.  And then again August 2015.  In fact, Dr. Juneja, their own witness, testified that those were the three most profitable days for George Nikas in the entire 2013 to 2015 time period.

So, if you look at what matters, if you look at the period at issue in this case and ask yourself what happened,

you will see that the resounding answer is that the defendant provided material nonpublic information and Nikas made a mint on that information.

So, to come back to Darina quickly.  Bottom line it's a distraction, ladies and gentlemen; it's part of an attempt to take your attention away from what matters.  The evidence in this case doesn't explain her role, it doesn't explain how she had all of Ariad's information, and it literally does not explain how that information would have gotten from her down the network to Nikas.

Ladies and gentlemen, the "Darina did it," it's an excuse.  It's one of those things you say, and you try to make it work, and at some point it just doesn't work anymore.

Now I want to talk about something else that defense counsel spent a while on, which is the phone and the trading records.

Now, defense argue that, look, the father and the son talk a lot, some of the calls are before they trade, some of them are after.  Guys, take a step back.  This is not a game of whack-a-mole where you look at a particular call and you somehow divine what was said on that particular call.  You can't do that.  It's missing the forest for the trees -- the trees for the forest.  You need to ask yourself what is going on here big picture.  Who are these people?  What is their relationship?  How frequently did they talk?  And, frankly,

when you step back and you actually look at the timelines that Mr. Cooper put in front of you, you will see that they do highlight the key moments in this case.

I'm just going to go back through them very quickly. I'm not going to put up the entire timeline. But you saw in October -- again Mr. Sussman just focused on a little piece of October 7. But if you look at what happened over the entire day you will see that there are texts with his father, there is a board meeting at noon, the defendant and Nikas call each other. That's where they're burning up each other's phones.

What's going on? The defendant is desperately trying to get that secret to his friend George Nikas, and that's the same day that Nikas shorts the stock, $2.4 million, and there is zero other explanation in the record -- in evidence in this case -- as to why he did that if he did not get secret information.

And that's $2.4 million. Ladies and gentlemen, you probably take some time to think about what you're going to do when you make major purchases. You ask yourself, is this a good way to spend a lot of money? And Nikas sure as heck asked himself whether this was a good way to spend $2.4 million. And the reason he was confident in doing that is because he had an inside source; he knew that the defendant was getting information from the board of directors.

And then you saw the cell sites, that he went to his

apartment.  Now, ladies and gentlemen, defense counsel want you to think cell site is not exactly precise, maybe it's within two blocks, maybe it's within a block and a half.  Again that's not the point.  When you are within a block or two of your best friend's house -- and make no mistake, that apartment is where Nikas lives in New York.  When his best friend is within a block or two of his house, they're hanging out together.  OK?  Nikas has millions of dollars on the line.  You weren't born yesterday; you know what they were talking about.

This timeline, ladies and gentlemen, is devastating evidence.  And they short.  The fact that they short tells you everything you need to know.  All the other information in this case comes from investment bankers.  Demane's got other sources.  There are investment bankers, and you hear about an acquisition you take a long position, you don't short.

Now, defense tried to say, well, if you look at Dr. Jindra's charts you didn't see Mr. Demane's short, you didn't see Yomi Rodrig's short.  Yet look at their charts, ladies and gentlemen.  They have huge positions and they sell those positions.  They get rid of their stock before the bad news comes out.  They are betting that the stock will go down, that's what they do.  You heard Dr. Jindra testify that all the traders traded in the same direction.

Now, the chart is net trading -- and I'm not going to go into that now -- but it shows at the end of the day they may

have bought some put options, they may have sold some stock, but all of them trade in the exact same direction.  Is that a coincidence?  Of course it's not.

And then they said, well, after October there is the December trading.  Right?  And for that one there is no calls.  But remember what else you heard about December.  You heard a stipulation that Mr. Nikas was here between December 1 and December 23.  He lives a few blocks from the defendant.  You saw cell site, they were meeting, so they don't need to call each other.

And again Mr. Sussman put up a tiny slice of December and wanted to show you, well, this particular trade comes after this particular call, you look at this particular day.  No, ladies and gentlemen, that's not what is happening.  They are best friends, and he has hot information, and his friend makes a mint.

Let's just talk quickly about the third incident, July 30, 31.  Again, defense counsel did the same thing.  He put up July 28 as if that's the be all end all, one day.  And look at this chart where you've got this down arrow and this up arrow that Dr. Juneja made.  I'm not sure we fully understand what that chart means.  But in any event, on July 28 you saw Dr. Jindra's analysis.  There is about $400,000 of trading.  OK, nikas is taking a pretty small position.  But what happens on July 30 and 31st, two days after the slide that Mr. Sussman

wanted you to myopically focus on?  Defendant's father learns about the Baxalta offer.  Next day the defendant and his father talk.  15 minutes later the defendant tries to call Nikas.

Now, make no mistake the phone records are not all perfectly clear.  Sometimes they don't say exactly how long a call is, but what they do tell you is what these people were trying to do.  They were trying to get in touch.  Why?  Because the defendant had important information, information that was worth millions of dollars.

15 minutes later the defendant buys stock.  He doesn't just buy stock.  He buys $3.5 million of stock.  He bets the house.  And you don't bet the house unless it's a sure thing.

So, that's what the evidence shows.  Ladies and gentlemen, these timelines are devastating.  This is the evidence.  You saw the phone records.  Phone contact is what evidence looks like.  And if you want to see a contrast, if you want to see what a lack of evidence looks like, imagine if you mapped Darina Windsor's calls based on the evidence in this case with George Nikas.  Ladies and gentlemen, you would get a slide that looks something like this:  Nothing.  Just like the artifacts on her computer.

MR. SUSSMAN:  Objection.

MR. TRACER:  It's all smoke and mirrors.

THE COURT:  Overruled.

MR. TRACER:  Darina is not the source; the defendant

is.

Now another point that Mr. Sussman made -- and I am just going to address this quickly because it is ridiculous -- is that the information was public; they already knew it, there were analysts who had said things like that.

Just really two points on that:  Number one, in October the stock drops 66 percent when the news comes out. Stocks don't drop 66 percent when things come out that everybody knows.  It doesn't work that way.  The information was clearly not public, and that's why the stock dropped the way it did.

Number two, if you can make seven and a half million dollars by just reading the public information, we should all quit our day jobs.  OK?  Sign me up.  That's ridiculous.  The only way you make seven and a half million dollars is when you have an illegal edge.  Seven and a half million in about six days of trading, it's not how it works.  OK?  You don't get lucky like that.

Now, I'm going to move to a third point, and this is something you've heard in defense's opening and his closing: You don't know what they said on the call.  You don't know the content of some of those text messages.

Ladies and gentlemen, that is a distraction, and it doesn't matter.  It's nonsense.  You saw they're together, and then you saw what Nikas does.  And actions speak louder than

K1D7LAV7                        Rebuttal - Mr. Tracer

words.  You know what they're talking about.  They're not getting together and talking about the weather while Nikas has $3.5 million that he could lose or gain.

And what you're left with -- if you take Mr. Sussman seriously, then apparently the only way you can convict the defendant is if there were an e-mail that said, you know, Nikas writes to tell, hey, man, I know it's illegal but I'm trading in Ariad, and your dad is on the board, and I know he is not supposed to share these things, but it would be a huge help to me if he could violate the law and do it.

Come on, it doesn't work that way, ladies and gentlemen.  That e-mail doesn't exist because it's ridiculous. It's like saying you can't convict a bank robber unless he is in the bank staring at the video camera, he's got his license up in one hand, waving his gun in the other hand.  That's not how it works.  This isn't CSI; there isn't a magic bullet.  You look at the evidence, and you ask yourself:  What happened here?  And, ladies and gentlemen, the defense has given you an alternate version of what happened here, and it doesn't make sense.

Now, the defense lawyer spent a lot of time going after Marc Demane Debih.  And let's be clear, Marc Demane Debih is not perfect.  The government did not call him as a witness because he is perfect.  He is an insider trader -- a big insider trader.  But, listen, if you want to know how

accounting works, you talk to an accountant.  If you want to know how construction works, you talk to a contractor.  If you want to know how insider trading works, you talk to an insider trader.  And when he got on that stand, at that point, ladies and gentlemen, I submit he was just telling you the obvious.  OK?  Nikas has this information from his best friend whose dad is on the board.  Demane just tells you the obvious:  That's what Nikas told me.  It makes all the sense in the world because it's true.  And that testimony, I will remind you, ladies and gentlemen, is enough by itself to convict the defendant.

Now, Mr. Sussman got up there and said, Mr. Demane, he is lying to you.  There are so many problems with that argument, ladies and gentlemen, and let me just point out a few.

First of all, look at his incentives.  He is facing 750 years in prison.  If he lies, he loses his cooperation agreement and could go to jail for a long time.  Would he lie?  Or would he be honest and try to get the benefit of his cooperation agreement?

And, also, if he was lying, wouldn't he come up with a better lie?  I mean if his goal is to sell you on a story, wouldn't he say, well, I met Telemaque at Lavo and he told me that he had hot tips.  That's not what he said.  He explained to you that Nikas told him he was getting information and

that's how it worked.

And, also, why would he blame the wrong person? If Mr. Demane is engaged in insider trading and the source is Darina Windsor, why wouldn't he say the source is Darina Windsor? Cooperating is cooperating.

Also, he also suggested, well, maybe Demane didn't lie, maybe Nikas lied. Really, Nikas lied? First of all, Nikas was getting tons of inside information from Demane. He would not lie to him and then risk a deal going south and losing a ton of money. Also, why would Nikas throw his friend under the bus like that? If it weren't true, why would Nikas make up that his best friend is giving him sources unless it was to give the truth to Marc Demane? And, keep in mind, Marc Demane had Telemaque's contact number. He could have called and asked. Do you think Nikas made that up? That would not work out well for Mr. Nikas, ladies and gentlemen, and it doesn't make sense.

So, in the face of all that, what lies do they have? Well, Mr. Demane thought it might have been later in the evening; now he thinks it's a few days later. Again, ladies and gentlemen, ask yourselves, does memory work like that? Do you have a calendar of exactly when specific conversations occurred? Or do you remember significant conversations because they're significant?

And Mr. Sussman, you know, they're drinking, they got

vodka.  Were they drunk for three years, ladies and gentlemen?  When they went back and traded in October, they knew what they were doing.  When they went back and traded in December, they knew what they were doing.  When they went back and traded in 2015, they knew what they were doing.

So, ladies and gentlemen, I submit you can rely on his testimony.

And one last thing -- you should pay attention to this -- when it's bad for Mr. Sussman, Mr. Demane is a liar, but when it helps Mr. Sussman, you know who told you this?  Mr. Demane.  That's called picking and choosing, and it's a really, really big flaw in an argument.  OK?  Let me just give you two examples.

First of all, remember all the sources I read you before, the friends and brokers and traders and Bryan Cohen and Zeynep Zenel, where did he get them from?  He says Nikas has all of these other sources.  And who told you that?  Marc Demane Debih.  I guess all of a sudden he credits Marc Demane Debih.  Also he told you in August 2015 Mr. Demane must have placed an article with a journalist.  And how do we know he places articles with journalists, ladies and gentlemen?  Because he told you he places articles with journalists.

Come on, either Mr. Demane is lying or he's not.  And for all the reasons we have talked about, I submit that he is not, ladies and gentlemen.  You saw his demeanor on the stand,

you understand his incentives, and you can make a finding that he is telling you the truth.

Defense counsel asked him some questions about his forfeiture and his $49 million.  He told you that ultimately a judge will decide his sentence.  He will be sentenced.  Now, he is hoping for leniency in connection with that sentence.  Make no mistake about it, that's what he wants.  But given his incentives in this trial, would he really lie?

Another quick point.  Defense counsel went back to this Mediterra point that they made throughout.  They put on a whole witness this morning to show you that Mediterra is a real company.  So what?  Nobody disputes that Mediterra was a real company.  You see, what is helpful to see though is how Nikas helps the defendant with Mediterra.  At the heart of this case it's about friends who help each other -- when they need money, when they need to cheat, when they're corrupt.  Telemaque helped his friend Nikas cheat in the stock market, and when he needed it, Nikas helped him back.

Remember at first Ms. Stathi didn't remember if Mediterra was having trouble.  Ladies and gentlemen, Mediterra was having serious trouble.  "We're extremely tight with liquidity."  And who helped him out?  George Nikas.  Why?  Because George Nikas was his friend.  And how do you cultivate a friendship with a serial insider trader?  You pass him inside information.

Mr. Nikas helped the defendant, he helped him with the bars, he helped him with the company, he loaned him money. That's how they worked.

You don't need to know anything about Mediterra in order to convict the defendant.  It's another side show.  What you do know is that Telemaque helped Nikas cheat and Nikas was there for Telemaque.

Now very quickly, defense counsel was showing you things in the indictment that they had Dr. Juneja look at.  I just want to remind you, ladies and gentlemen, that your goal when you deliberate is not to evaluate the indictment or do some check boxing exercise on the indictment.  Your goal is to apply the law to the facts in this case.

Has the government shown that the facts meet all of the essential elements of the crime?  Have we proven the crime beyond a reasonable doubt?  And, ladies and gentlemen, of course we have.  Mr. Sussman spent all that time on the indictment because he doesn't want to talk about the evidence. He doesn't want to talk about the full-timing.  He doesn't want to talk about the whole relationship.  It's not good for his client.  So, don't concern yourself with the indictment.

Now, all the evidence shows beyond a reasonable doubt that the defendant is guilty.  Let me make one last observation before I sit down.

If the defendant weren't guilty -- play this out for a

second.  If you buy all the defense counsel's arguments, you travel down their side shows, you look into their little dots, and you don't take account of the actual position, if all that's true, you have to notice something else:  You would be looking at the unluckiest man in the whole world, literally the most unlucky person you have ever seen in your entire life.

I am just going to give you some examples.  First, you would have to believe that his best friend is a serial insider trader but he has no idea -- no idea -- it just happens that his best friend is a serial insider trader.

Then not just that.  His best friend is dumping millions of stock into a company, and his father is on the board of directors of that company.

I'm going to stop there, because that has got to be the craziest coincidence you have ever heard of in your life.  The guy's friend is dumping millions of dollars into the company and his dad is on the board.  But if you believe their arguments, that's just a coincidence, it's another coincidence.

Then in October 2013, when his dad learns news about the company, his friend shorts the stock and makes million of dollars.  But again that's a coincidence, that's a really crazy coincidence.

But that's not all, because then in December 2013 his dad learns good news about the company, his friend buys up the stock and again makes a ton of money.  But that's all a freak

accident.  Right?  That's sort of the fourth or fifth thing along a crazy chain of unfortunate events.

Then in the summer of 2015, again, day after his dad learns about this offer from Baxalta, his best friend Nikas buys stock, makes millions of dollars.  But again it's just another unfortunate coincidence for Telemaque.

And, by the way, before all of these things happen, Nikas is on the phone and meeting with the defendant.  But again it's just right before he happens to trade; it's just another set of coincidences.  We have layered coincidence on top of coincidence.

But the bad luck streak doesn't end there, because then some years later, halfway around the world someone named Marc Demane gets arrested, decides that he wants to cooperate, and the defense counsel says he is lying, he is confused, and so who does he say is his source?  Lo and behold he blames the defendant.  A crazy coincidence that he is the person that Marc Demane decides to blame.  How unlucky, another unbelievable coincidence on top of unbelievable coincidence.

And on top of that, the authorities have tracked all that information down, they are ready to go find him and arrest him.  Where is he?  They are looking for him because he is in a conspiracy which is George Nikas, and where is he?  He is in Nikas' apartment; he is staying at his best friend's apartment.

How crazy is that story?  If he is not guilty, that is

the wildest set of coincidences you have ever heard in your life.  But of course this is not a wild set of coincidences.  There is a much simpler explanation for this; it involves one simple truth, one simple explanation for all of the evidence you've seen:  That the defendant passed inside information to Nikas and that he is guilty.

Now, because of the careful attention that you have paid over the last week, the defendant has had a fair trial, he has had his day in court; and after considering all of the evidence in this case, when you ask yourself the question:  Where did Nikas get this secret information about Ariad from?  There is only one answer:  It came from the defendant.

And you should hold the defendant accountable for his crimes.  He was the critical link in that corrupt chain.  The information would not have gotten from his dad to Nikas without him.  He decided to do it, and he thought he wouldn't get caught.  He decided to cheat, plain and simple.

When you consider the evidence, you should reach the only verdict that is consistent with all the evidence in this case.  Don't focus on a single phone call, a single trade.  Ask yourself, pattern after pattern, what happened here?  And you will see that the only answer that explains everything you've seen at this trial, is that the defendant is guilty of insider trading.  Thank you.

THE COURT:  So, ladies and gentlemen, the summations

are concluded.  Tomorrow morning starting at 9:30 I will give you the charge on the law, and then you may commence your deliberations.  Do not discuss the case.  Have a nice evening.

(Jury not present)

THE COURT:  Anything the government has to address this evening?

MR. COOPER:  No, thank you, your Honor.

THE COURT:  Defense counsel?

MR. STREETER:  Yes, just one thing, your Honor.  The government has provided us with a redacted version of the indictment that they propose to send back to the jury.

THE COURT:  Yes.

MR. STREETER:  And I just want to make clear to your Honor that we object to any redaction of the indictment.

THE COURT:  OK.  So assuming that redaction is going to be permitted, do you have any objection to a specific portion of the redaction, a dispute you can't work out?

MR. STREETER:  We object to all of it.

THE COURT:  Great.  I know, and that's fine.

MR. STREETER:  That's my answer, your Honor.

THE COURT:  OK, good.  OK, objection overruled.

I would like to see a copy of the redacted indictment though so I can at least make a more careful analysis.

MR. COOPER:  We can provide that your Honor after court today.

MR. STREETER:  Your Honor, I want you to understand when reviewing the indictment, coconspirator number two in the indictment is Darina Windsor, coconspirator number one is Benjamin tailor, coconspirator number three is John Dodelande, and coconspirator number four is Marc Demane Debih.  Those are important things for you to think about in deciding whether or not the indictment should be redacted.

The government has said that we are on some sort of fantasy about whether or not Darina Windsor is an inside source for Marc Debih and George Nikas, and yet they have alleged that she is an inside source for them.  That's why we object to the redaction of the indictment.

It is absurd for the government to say that we are on some goose chase claiming that Darina Windsor is a source, when the government has alleged it and stated in press releases.  That's why we object.

THE COURT:  OK.  Is her name in the indictment?

MR. STREETER:  It is not.  But if you ask the prosecutors, they will tell you.  They have identified them for us.  And if you read the indictment, and you know the facts, you can tell exactly who is who, and that's who they are.  And it's also in the press releases.

THE COURT:  OK.  Mr. Streeter, you can -- good.  Thank you.

So, there are seven counts here that the jury is going

K1D7LAV7

to be addressing, and then there are additional counts at the end.  Can the government describe what it has redacted?

MR. COOPER:  Yes, your Honor.  As the Court is aware, two separate schemes are alleged in the indictment.  There is the Ariad scheme that the defendant and Nikas are in, and there is what we call the corporate -- the insider trading acquisition scheme which only Nikas is named in.

We redacted a couple of sets of items.  One is all of the counts relating to the acquisitions insider trading scheme that only Nikas is involved in.  As well, there are some people and companies that are defined up front in the indictment, CC I believe 1, 2, 3, as well as a series of companies.  CC 1, 2 and 3 and all of those companies are only included in the factual allegations relating to the corporate acquisition insider trading scheme that only Nikas is charged in.

When it comes to the Ariad scheme, only CC 4 -- which is Mr. Demane -- and the company Ariad -- and I believe Director 1, who is the defendant's father.  So, we left those three in because those are the only ones that are referenced in the charges against the indictment.  Everything else in the indictment relates to that corporate acquisitions insider trading scheme.  That's all in our proposed redactions.

THE COURT:  And do you have a copy of the indictment that shows the redactions, or do I have to back into them by comparing two documents?

K1D7LAV7

MR. COOPER:  We can get your Honor fairly quickly a copy that has boxes around what we propose to redact.

THE COURT:  Fine.

MR. COOPER:  Would your Honor like us to e-mail that to chambers after we get downstairs?

THE COURT:  Yes, and of course to defense counsel.

MR. COOPER:  Of course.  Thank you, your Honor.

THE COURT:  Good.  Anything else to address tonight?

So, let's just talk about getting the exhibits ready for the jury.  We talked about this briefly last week, that the redacted indictment and the exhibits are going to the jury.  There may be some individual exhibits, I don't remember, that can't go back, but everything that can go back should.

Have counsel talked about a system for making those exhibits available to the jury?

MR. COOPER:  Yes.  Your Honor.  I believe each side has discussed preparing its own, and then we will take a look at each other's.  The government has prepared our exhibits.  After court today we will confer with the defense, and we can each take a look and confer about the accuracy.

MR. SUSSMAN:  We conferred over the weekend, your Honor, on this issue.

THE COURT:  Thank you.  Are you giving the jury an index?

MR. COOPER:  Yes.  We have an index of the government

K1D7LAV7

exhibits.  I think we will talk to defense.  We can probably include everything and give them one big index.

THE COURT:  Good.  And are these going in as hard copy, or are they going in on a clean computer?

MR. COOPER:  We have both.  We have printed copies as well as a computer that has I believe all of the government exhibits loaded on, and we can send all of that back.

MR. SUSSMAN:  All of our exhibits will be in hard copy, your Honor.  And we would certainly prefer hard copy.  I mean I know some of the trading records would be voluminous and may not make sense, but we're certainly trying to do a hard copy for everything that we can.

THE COURT:  Good.  Good.  It sounds like you've made a lot of progress.  So you will work on that tonight.  Thanks so much.

MR. COOPER:  Thank you, your Honor.

MR. SUSSMAN:  Thank you, your Honor.

THE COURT:  Oh, counsel, shall we say 9:20 just in case there is an issue with respect to the redaction that I should talk about with you?  Of course I'm going to be here, so if overnight in your conversations you think that we should meet at 9, just shoot us an e-mail, and I will be here at 9.

(Trial adjourned to January 14, 2020 at 9:20 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

AIKATERINI STATHI

Direct By Mr. Streeter . . . . . . . . . . . . 805

Cross By Mr. Cooper . . . . . . . . . . . . . 828

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1305    . . . . . . . . . . . . . . . . . . . 832

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 1056    . . . . . . . . . . . . . . . . . . . 795

 1055    . . . . . . . . . . . . . . . . . . . 795

 701, 701A, 701B, 701C, 702 . . . . . . . . . 796

 702A, 703, 703A, 566, 568  . . . . . . . . . 796

 1035, 1036, 828, 1051, 1007  . . . . . . . . 796

 1035, 1036, 1043, 1048 and 1045  . . . . . . 796

 1059    . . . . . . . . . . . . . . . . . . . 797

 767, 768 and 769 . . . . . . . . . . . . . . 800

 821    . . . . . . . . . . . . . . . . . . . . 810

 801    . . . . . . . . . . . . . . . . . . . . 814

 809    . . . . . . . . . . . . . . . . . . . . 816

 822    . . . . . . . . . . . . . . . . . . . . 820

 826    . . . . . . . . . . . . . . . . . . . . 826